**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

RACHEL ROE, *a minor, by and through her parent and next friend*, ROBERT ROE; DAVID DOE, *a minor, by and through his parent and next friend*, DANA DOE; CLAIRE COE, *a minor, by and through her parent and next friend*, CHARLES COE; and PEN AMERICAN CENTER, INC.,

                    Plaintiffs,

    v.

RUTHERFORD COUNTY BOARD OF EDUCATION; JAMES SULLIVAN, *in his official capacity as Director of Rutherford County Schools*,

                    Defendants.

Case No. 3:25-cv-00429
Judge Eli Richardson
Magistrate Judge Alistair Newbern

---

**MEMORANDUM IN SUPPORT**
**OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

For most of the 2024-2025 school year, the Rutherford County Schools ["RCS"] Board of Education has been systematically removing books it finds objectionable from RCS libraries. The book banning began informally with a handful of titles in the spring of 2024. Then, at the beginning of the 2024-2025 school year, the Board re-issued Board Policy 4.403, cementing the authority of the Board to remove books *immediately* if the content of the books, in whole or in part, met, in Board members' judgment, the partial definitions of criminally obscene material as defined in Tenn. Code Ann. §39-17-901.

Shortly after the revised policy went in place, on September 19, 2024, RCS Board members selected a handful of books to be removed due to their content. Those books, including the Pulitzer Prize winning novel *Beloved* by Toni Morrison, were permanently banned from all RCS libraries.

1

Emboldened by the success of the initial removals, Board member Frances Rosales then requested the immediate removal of 150 books from RCS libraries—without any kind of review before the books were removed. The Board then voted to permanently remove books at nearly every school board meeting from September 19, 2024 to April 9, 2025, often relying on biased "reviews" of the books instead of reading the books or following the advice of their school district's own librarians.

All told, over 140 titles, including highly praised novels like *Catch 22* by Joseph Heller, *The Kite Runner (Graphic Novel)* by Khaled Hosseini, *Looking for Alaska* by John Green, *Wicked* by Gregory McGuire, and *Ready Player One* by Ernest Cline, have been removed from RCS libraries.[1] These books were removed or restricted simply because the school board disagreed with their content, finding books that even mentioned things like sex, nudity, LGBTQ+ characters, or sexual assault to be subject to removal under the Board's Policy 4.403. The book banning is likely to continue—the Board has identified more books to review that have not yet been removed.

Individual Plaintiffs, a collection of students, seek a preliminary injunction to protect their right to receive information and ideas in their schools as guaranteed by the First Amendment of the United States Constitution. Plaintiff PEN America joins the students in seeking a preliminary injunction to protect its author members' First Amendment right to share their books without undue viewpoint-based censorship. Without a preliminary injunction, more books will be banned, and students will be unable to access the titles that have already been removed, irreparably depriving them of access to important works of literature and a full marketplace of ideas.

## Statement of Facts

### I.    Rutherford County School District, Board, and Director of Schools

---

[1] A very small number of titles (16) have been restricted to 11th and 12th grade students only with parental permission or all high school students with parental permission. See REMOVED LIBRARY MATERIALS (AS PER POLICY 4.403), https://www.rcschools.net/apps/pages/index.jsp?uREC_ID=525032&type=d&pREC_ID=2636708 (last visited April 14, 2025).

2

Rutherford County Schools is the fourth largest school district in Tennessee.[2] Compl. ¶ 10. Almost 51,000 students attend the 50 schools within the district.[3] *Id*. Over 18,000 high school students (grades 9-12) are enrolled in RCS and are affected by the book bans.[4]

The RCS school board consists of seven members. *Id*. ¶ 10. The board meets every other week; its agenda, meeting minutes, and video recordings of the meetings are available online.[5] Members of the public can attend and request to speak at the school board meetings. Dr. James Sullivan currently serves as the Director of Schools for RCS. *Id*. ¶ 11.

Pursuant to Tenn. Code Ann. §49-1-102(c), local public school systems are administered by the local board of education and a director of schools. School boards are vested with the authority to promulgate policies concerning the administration and maintenance of their school districts. *See* Tenn. Code. Ann. §49-2-203. The "Age Appropriate Materials Act," Tenn. Code. Ann. §49-6-3803, *et seq*., specifically instructs the governing body of a local education agency, such a school board, to pass policies as to how its schools will ensure their library collections contain materials that are "age appropriate." RCS's policy concerning "age appropriate" materials is Policy 4.403. Compl. ¶ 13; Ex. 1 to Compl.

## II.    Policy 4.403 and the Age Appropriate Materials Act

In 2022, the Tennessee General Assembly passed Public Chapter 744, also known as the "Age-Appropriate Materials Act of 2022." ["AAMA"] The law required that each school operated by a local education agency ["LEA"] maintain a current list of all materials in the school's library

---

[2] TENNESSEE DEP'T OF EDUC., District Finder, https://tdepublicschools.ondemand.sas.com/district/00750 (last visited April 9, 2025).
[3] *Id*.
[4] U.S. DEP'T OF EDUC., National Center for Education Statistics, Common Core of Data (CCD), "Local Education Agency (School District) Universe Survey", 2023-24 v.1a.
[5] Agendas and minutes available at
https://www.rcschools.net/apps/pages/index.jsp?uREC_ID=523332&type=d&pREC_ID=2540922. Video recordings available at https://www.youtube.com/playlist?list=PL7CB325821E536E8D.

collection and post this list on the school's website. 2022 Tennessee Laws Pub. Ch. 744. The law also instructed school boards to pass three types of policies: (1) a policy that contains a procedure for developing a school library's collection that is "age appropriate" and "suitable for, and consistent with, the educational mission of the school"; (2) a policy that contains a procedure for evaluating student/parent/school employee requests to evaluate material for age appropriateness and suitability; and (3) a policy that contains a procedure to periodically review schools' library collections for age appropriateness and suitability. *Id*. In 2024, the General Assembly amended the AAMA, injecting a mandate that certain materials must be removed. That is, any material that:

(1) In whole or in part contains nudity, or descriptions or depictions of sexual excitement, sexual conduct, excess violence, or sadomasochistic abuse, as those terms are defined in § 39–17–901, is not appropriate for the age or maturity level of a student in any of the grades kindergarten through twelve (K–12) and must not be maintained in a school's library collection; or

(2) Is patently offensive, as defined in § 39–17–901, or appeals to the prurient interest, as defined in § 39–17–901, is not appropriate for the age or maturity level of a student in any of the grades kindergarten through twelve (K–12) and must not be maintained in a school's library collection.

2024 Tennessee Laws Pub. Ch. 782. The amended AAMA does not specify which, if any, procedure LEAs are to use to determine if materials meet the definitions of §39-17-901; the law also does not call for *immediate* removal of these materials—only that they be removed. This version of the AAMA went into effect on April 23, 2024.

In July 2024, the RCS Board revised Policy 4.403. Crucially, under the revised policy:

(1) "As defined in TCA §39-17-901, any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body, in whole or in part, which depicts nudity, sexual conduct, sexual excitement, excess violence, or sado-masochistic abuse, is patently offensive, or appeals to the prurient interest shall be *immediately removed from all libraries within the school district* and then reviewed for final decision by the Board."

(2) As defined in TCA §39-17-901, any book, pamphlet, magazine, printed matter, however reproduced, or sound recording, which, in whole or in part, contains nudity, sexual excitement, sexual conduct, excess violence, or sado-masochistic abuse, is patently offensive, or appeals to the prurient interest, or which contains explicit and

4

detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, excess violence, or sado-masochistic abuse, is patently offensive, or appeals to the prurient interest, shall be *immediately removed from all libraries within the school district* and then reviewed for final decision by the Board."

[Ex. 1 to Compl.] (emphasis added)(citing Tenn. Code. Ann. §39-17-901; Tenn. Code. Ann. §39-17-911). The revised policy's "immediate removal provisions" (as stated above) do not outline how materials will be determined to meet these criteria, stating only that these materials will be removed immediately and summarily from all school libraries and then "reviewed for final decision by the Board." The immediate removal provisions incorporate the following definitions from Tenn. Code. Ann. §39-17-901(Tennessee's anti-obscenity act):

- **Nudity:** The showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering or the showing of the female breast with less than a fully opaque covering of any portion below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state. §39-17-901(9);
- **Sexual Excitement**: The condition of human male or female genitals when in a state of sexual stimulation or arousal. §39-17-901(15);
- **Sexual Conduct:**
  - (A) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated. A sexual act is simulated when it depicts explicit sexual activity that gives the appearance of ultimate sexual acts, anal, oral or genital. "Ultimate sexual acts" means sexual intercourse, anal or otherwise, fellatio, cunnilingus or sodomy; or
  - (B) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals; §39-17-901(14);
- **Excess Violence**: The depiction of acts of violence in such a graphic or bloody manner as to exceed common limits of custom and candor, or in such a manner that it is apparent that the predominant appeal of the material is portrayal of violence for violence's sake. §39-17-901(4);
- **Sadomasochistic abuse:** Flagellation or torture or physical restraint by or upon a person for the purpose of sexual gratification of either person. §39-17-901(13);
- **Patently Offensive:** That which goes substantially beyond customary limits of candor in describing or representing such matters. §39-17-901(11);
- **Prurient Interest:** A shameful or morbid interest in sex. §39-17-901(12);

While the immediate removal provisions in Policy 4.403 cite in a footnote to Tenn. Code Ann. §39-17-911, Tennessee's criminal law regarding distribution of obscenity to minors, the provisions themselves only reference the adult obscenity act (§39-17-901) and do not contain the phrase

5

"harmful to minors" or any other language to suggest that these definitions are to be considered as to minors. The revised version of Policy 4.403 took effect August 8, 2024. Compl. ¶ 15.

### III. Book Banning at September 19, 2024 Board Meeting Based on BookLooks's Reviews

Shortly after the revised Policy 4.403 took effect, the Board added to its agenda a list of seven books to be considered for permanent removal.[6] Compl. ¶ 17. The books were:

- *Beloved* by Toni Morrison
- *Queen of Shadows* by Sarah J Maas
- *Tower of Dawn* by Sarah J Maas
- *Homegoing* by Yaa Gyasi
- *Skin and Bones* by Sherry Shahan
- *The Perks of Being a Wallflower* by Stephen Chbosky
- *Wicked (The Life and Times of the Wicked Witch of the West)* by Gregory Maguire

At a Board "work session" on September 17, 2024, Board member Caleb Tidwell publicly endorsed a website, Book Review Rutherford County, bookreviewrc.com, that contains "reviews" of books being considered for removal (as well as other books yet to be removed as of the filing of this Motion). Compl. ¶ 18. At the September 19, 2024 meeting, Board member Tidwell revealed that the website was created at his behest by a "a guy who was trying to help me." *Id*. Mr. Tidwell asked him to create the website because "not everybody has the ability to read all of the books. But if you see the content that's in question, then you can make a decision based on that." *Id*.

The Book Review Rutherford County website lists each Board member and their contact information, as well as books "under review" at RCS for the content they contain. Compl. ¶ 20. Each book "under review" links to a review of the book created by "BookLooks." *Id*. BookLooks.org is a website linked to Moms for Liberty, a well-known anti-government group that opposes LGBTQ+ and racially inclusive school curricula. *Id*. ¶ 21. The BookLooks reviews offer

---

[6] Board Meeting Work Session Agenda, September 5, 2024, https://4.files.edl.io/76d0/09/05/24/210338-7be92a6b-50e5-42b1-9dba-ad32a6b894e1.pdf.

a one sentence synopsis of the book and then lists select, out-of-context passages from certain books that contain references to, among other things, sex, body parts, or LGBTQ+ characters or concepts. *Id*. The review then assigns the book a rating from 0-5, with "5" being the most sexually explicit. This 0-5 rating system was developed by founding members of Moms for Liberty in Brevard County, Florida. *Id*. ¶ 23; Ex. 4 to Compl.

Books that contain LGBTQ+ characters or themes automatically receive higher "inappropriate" scores regardless of whether the selected passages contain depictions of sex acts. Compl. ¶ 23. That is, books that contain "explicit sexuality/gender ideology," as defined by BookLooks as "descriptive references to one's sexuality or gender identity, e.g. 'Jake thinks he's bisexual…'" or "John takes hormones to transition his body to a female," are ranked the same as works that feature drug or alcohol use or moderate violence. Id. "Profanity" also increases the book's rating. *Id*. ¶ 24. Some reviews have a profanity word count table that simply lists, without context, the numbers of times words like "piss" or "tit" appear in the book. The words "queer" and "negro" are considered by be profane, regardless of context. Id. Books containing references to sexual assault or battery are ranked a "5"—the highest level—and are labeled "aberrant content" and "adult only." *Id*. ¶ 25. Books containing "controversial racial, social or religious commentary" are also assigned higher scores but those terms are undefined. *Id*. ¶ 26.

At the September 19, 2024 Board meeting, Board member Stan Vaught moved, and Board member Butch Vaughn seconded, a motion for any book contained in high school libraries that had a rating of "3 or 4" on BookLooks.org to be contained in a section behind the library desk that would require parental approval to be checked out and any book with a rating of "5" to be removed

7

immediately and permanently.[7] Compl. ¶ 27. Though, this motion failed, it illustrates the Board's overt reliance on BookLooks. *Id*.

Instead, Board member Tidwell made a motion to vote on each book individually to determine if they contained "sexually explicit content in whole or part and to require their removal under Tennessee State law." Tidwell explained that he believed the term "sexually explicit" to be shorthand for all the phrases defined by Tenn. Code. Ann. §39-17-901. Compl. ¶ 29. He also expressed the belief that if the Board did not vote to remove these books, "you'll have a lawsuit if you *keep* the sexually explicit material,"[8] implying that maintaining the books under consideration would subject the Board to criminal liability for possessing obscene materials. After some Board members expressed confusion as to what legal standard or rule they were to use vote to remove the books, school board attorney Jeff Reed referenced the immediate removal provisions in Policy 4.403 as the correct standard by which to consider the removal of these books. Compl. ¶ 29.

Ultimately, the Board voted to remove all the books except for *Skin and Bones* by Sherry Shahan.[9] Compl. ¶ 30.

## IV. Continued Banning of "Sexually Explicit" Books

On November 12, 2024, Board Member Frances Rosales requested that RCS librarians immediately remove more than 150 books. Compl. ¶ 32. Board member Rosales stated in an interview with a local news channel that in ordering the review of 150 books in RCS libraries, she was relying on the rating system from BookLooks in identifying titles to be removed. *Id*. ¶ 33.

---

[7] Board Meeting Minutes, September 19, 2024, pg. 13-14, available at https://4.files.edl.io/9a7f/10/01/24/130158-02792999-cbf8-4b03-8968-a553c241c6b3.pdf.
[8] RCTV, *Board of Education Meeting - September 19, 2024*, YouTube (Sept. 19, 2024), https://www.youtube.com/watch?v=RMzsrDQ6Lrs&list=PL7CB325821E536E8D&index=29 at 1:26:09.
[9] Board Meeting Minutes, September 19, 2024, *supra* note 13 at pg. 13-17.

RCS librarians immediately removed the books from the libraries. Compl. ¶ 34. The effort to immediately remove hundreds of titles from school libraries was extremely time-consuming for school library staff. *Id*. As a result, some libraries had to close their circulation desks for at least a day while librarians removed books instead of checking books out for students. *Id*. Students who had checked out books needing to be removed were told to surrender their books immediately. *Id*.

On the November 14, 2024 school board meeting, the Board voted to request that RCS librarians review each of the 150 titles and to pay librarians a $1000 stipend for their efforts.[10] Compl. ¶ 35. For each subsequent board meeting, RCS library materials specialists attached their book reviews to the board meeting agenda for the Board's consideration. *Id*. ¶ 42.

Despite praising the expertise of RCS' library materials specialists, and paying tens of thousands of dollars for their reviews, the Board proceeded to largely ignore the recommendations of RCS library material specialists, repeatedly voting to remove or restrict books that specialists recommended for retention. Compl. ¶ 43. For example, RCS library materials specialists reviewed the novel *Eleanor and Park* and found that "there is no content whatsoever that falls within the definitions from 39-17-901." Compl. ¶ 52. Nonetheless, on January 9, 2025, the Board voted to remove this book under Policy 4.403's immediate removal provisions, which only allow for the removal of materials that meet the listed definitions in Tenn. Code Ann. §39-17-901. Compl. ¶¶ 15, 50, 52. Similarly, A.S. King's *Ask the Passengers* was noted by RCS library materials specialists to contain "no nudity, no ultimate sex acts, no sexual excitement—just kissing." Compl. ¶ 52. This novel is about a girl who falls in love with another girl. *Id*. It was removed by the Board under Policy 4.403 on February 6, 2025. *Id*. RCS library materials specialists noted the same thing about *Almost Perfect* by Brian Katcher (a novel about a boy falling in love with a transgender girl).

---

[10] RCTV, *Board of Education Meeting – November 19, 2024*, YouTube (Nov. 19, 2024), https://www.youtube.com/watch?v=Taflkd674no&list=PL7CB325821E536E8D&index=23.

9

*Id.* The novel did not contain any content that met the definitions of Tenn. Code Ann. §39-17-901; therefore, the RCA library materials specialist concluded, its removal would likely be due to "disagreement or personal beliefs." *Id.* Indeed, *Almost Perfect* was removed by the Board under Policy 4.403 on February 6, 2025. *Id.* ¶¶ 50, 52.

Currently, the Board has voted to remove or restrict over 140 books from RCS libraries. Compl.¶ 44. Books like *Clash of Kings* and *Games of Thrones* by George R.R. Martin; *America* by E.R. Frank; *Are You My Mother* by Alison Bechdel; *History Is All You Left Me* by Adam Silvera—for example—are still listed as "under review" on the Book Review Rutherford County website.[11] This indicates that more books will likely be removed or restricted in the immediate future. Compl. ¶ 45.

## V. Plaintiff Students Harmed by Book Bans

Plaintiffs are junior high and high school students enrolled in RCS schools who intended to read and/or check out removed or restricted titles from their school libraries before they were removed. They have been unable to do so since the school board removed them.

Plaintiff Rachel Roe is thirteen years old. *See* Ex. A, Dec. of Rachel Roe ("Roe Dec.") ¶ 2. She is an eighth grader at Central Magnet School. *Id.* Next year, she will be a freshman at the same campus. *Id.* Roe is an avid reader and competes in "Book Battle"—a reading competition at her school for which she reads up to twelve books. *Id.* ¶ 5. She goes to her school library almost every morning before classes begin. *Id.* ¶ 6. She often checks out books and discusses books with her friends at this time. *Id.* Roe is interested in reading many of the books that have been removed from her school's library. She recently saw the movie *Wicked* and now wants to read the book. *Id.* ¶ 10. She also wants to read *To All the Boys I've Loved Before* by Jenny Han. But, this book is only

---

[11] BOOK REVIEW RUTHERFORD COUNTY, https://bookreviewrc.com/under-review/ (Last accessed April 17, 2025).

available to high school students with parental permission. *Id.* ¶ 11. She would like to read *Forever…* by Judy Blume, *Ready Player One* by Ernest Cline, *Speak* by Laurie Halse Anderson, *Speak: The Graphic Novel* by Laurie Halse Anderson, and *Looking for Alaska* by John Green. *Id.* ¶ 12.

Plaintiff David Doe is seventeen years old. *See* Ex. B, Dec. of David Doe ("Doe Dec.") ¶ 2. He is a junior at Stewarts Creek High School. *Id.* He is set to graduate high school in the spring of 2026. *Id.* Next year, as a senior, he intends to take the Advanced Placement English Literature course ("AP English Lit"). *Id.* ¶ 6. Plaintiff David Doe is interested in reading many of the books that have been removed from his school's library, including books that may appear on the AP English Literature test like *Catch 22* by Joseph Heller and *Beloved* by Toni Morrison. *Id.* ¶¶ 7, 14. As a member of the Diverse Student Union (a club at his school), Doe explores the racial identities and cultural heritages of himself and other students. *Id.* ¶ 4. Because of these interests, Doe is interested in reading books by people of color like *Homegoing* by Yaa Gyasi and books by Rupi Kaur like *home body*, *milk and honey*, and *the sun and her flowers*. *Id.* ¶ 12. Doe likes character-driven novels and historical fiction. *Id.* ¶ 9. Doe is also interested in works of fiction like *Ready Player One* by Ernest Cline, *Wicked: The Life and Times of the Wicked Witch of the West* by Gregory Macguire, and *Looking for Alaska* by John Green. *Id.* ¶ 13.

Plaintiff Claire Coe is thirteen years old. *See* Ex. C, Dec. of Claire Coe ("Coe Dec.") ¶ 2. She is an eighth grader at Blackman Middle School. *Id.* She will enter Blackman High School as a freshman next school year. *Id.* Coe is an avid reader and usually has a book she is reading in her spare time. *Id.* ¶ 6. She likes fantasy and mystery novels. *Id.* Coe is interested in reading books with LGBTQ+ characters and themes like *The Perks of Being a Wallflower* by Stephen Chbosky.

*Id.* ¶ 11. She feels that it is unfair to queer youth to deny access to books with LGBTQ+ themes and characters. *Id.*

**VI.    Plaintiff PEN America's Author Members Harmed by Book Bans**

PEN America is a nonprofit membership organization dedicated to ensuring that people everywhere have the freedom to create literature, to convey information and ideas, to express their views, and to access the views, ideas, and literatures of others. PEN America's membership is made up of approximately 5,000 novelists, journalists, nonfiction writers, editors, poets, essayists, playwrights, publishers, translators, agents, other literature professionals, and readers. Compl. ¶ 7. PEN America operates Free Expression Programs that serve to defend writers and journalists and protect free expression rights in the United States and around the world. Initiatives of this program include advocacy campaigns against book bans around the country. *See* Ex. D, Dec. of Summer Lopez ("Lopez Dec.") ¶ 4.

PEN America seeks injunctive relief on behalf of its author members, 32 of whom have had a total of 53 books banned or restricted by the Rutherford County Schools Board of Education. Lopez Dec. ¶ 6.  For each PEN America author member, public school libraries are a critical means of reaching their intended audiences and obtaining the broadest possible readership. Removing and restricting access to author members' books in public school libraries therefore injures authors' right to share their books. Compl.¶ 7.

PEN's author members also report that book bans can create a chilling effect, causing some authors to avoid certain topics in an effort to escape the stigmatization and reputational harm that book bans impose. Lopez Dec. ¶ 15. Book bans can also cause financial and reputational harm to authors. Book bans often also lead to a long-term drop in sales and cancellation of school visits and other paid appearances at literary conferences and libraries on which many authors rely for a

steady income. *Id.* ¶ 16. Authors whose books are banned because they are erroneously labeled as "obscene" or "harmful to minors" are stigmatized, imposing a "Scarlet Letter" effect that makes it more likely that their books will be banned in other districts and that more titles by a given author are likely to be targeted. *Id.* ¶ 17.

Based on PEN's research, works by author members that include LGBTQ+ content are especially targeted for removal nationwide. Lopez Dec. ¶ 11. For the 2023-2024 school year, a quarter of books banned nationally by schools feature LGBTQ+ characters. *Id.* A similar pattern emerges with books that feature characters of color. *Id.* Up to thirty-six percent of books banned nationally feature characters or people of color. *Id.* The rates of banning books that feature LGBTQ+ characters and characters of color are noticeably disproportionate relative to their representation among published books. *Id.*

## Legal Standard

In evaluating motions for a preliminary injunction, courts balance four factors: (1) the likelihood of success on the merits; (2) the risk of irreparable injury absent an injunction; (3) the risk of substantial harm to others; and (4) the public interest served by an injunction. Certified *Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). No single factor is a prerequisite to the issuance of a preliminary injunction. *Neveux v. Webcraft Techs., Inc.,* 921 F. Supp. 1568, 1570-71 (E.D. Mich. 1996) (citing *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995)). However, in cases like this one that involve a potential constitutional violation, "likelihood of success on the merits will often be the determinative factor." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). Plaintiffs have satisfied all four factors, and the Court should enter a preliminary injunction.

13

<u>**Argument**</u>

**I.      Plaintiffs are Likely to Succeed on the Merits of First Amendment Claim**

A moving party must establish at least a meaningful "[p]robability of success" in order for a preliminary injunction to issue. *Garlock, Inc. v. United Seal Inc*., 404 F.2d 256, 257 (6th Cir. 1968). Plaintiff students and Plaintiff PEN America will be able to demonstrate that the Board's summary removal of above-identified books from RCS libraries violated their First Amendment rights.

**A.      <u>The Board's Removal and Restriction of Books Violates Student's Rights to Receive Information and Ideas in School Libraires.</u>**

Students have a right to receive information in school libraries and that right is violated when books are removed "simply because [board members] dislike the ideas contained in those books" or in a "political or partisan manner." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982)*.* It is "well established that the Constitution protects the right to receive information and ideas," *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (quoting *Martin v. Struthers*, 319 U.S. 141, 143 (1945), and that "this right is 'nowhere more vital' than in our schools and universities," *id.* (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Tinker v. Des Moines School Dist*., 393 U.S. at 506.

In *Pico,* a plurality of the Supreme Court held that "the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library."[12] 457 U.S. at 866. Indeed, while school boards may have broader discretion over

---

[12] Though the case resulted only in a plurality opinion, the plurality, Justices Blackmun and White in concurrence, and even Justice Rehnquist in dissent all agreed that the removal of books from a school library *can* violate the First Amendment. *See Pico*, 457 U.S. at 879-80 (Blackmun, J., concurring) ("It does not seem radical to suggest that state action calculated to suppress novel ideas or concepts is fundamentally antithetical to the values of the First Amendment."); *id.* at 883-84 (White, J., concurring in

mandated curricula, library materials are about *student* selection. Students' "selection of books from these libraries is entirely a matter of free choice; the libraries afford them an opportunity at self-education and individual enrichment that is wholly optional." *Pico*, 457 U.S. at 869.

The controlling case law in this Circuit is *Minarcini v. Strongsville City School District*, 541 F. 2d 577 (1976). That case, like here, "presented a story of heated community debate over what sort of books should be…removed from a high school library." *Id*. at 577. There, also as here, the school board ignored the recommendation of faculty and ordered the removal of *Catch 22* by Joseph Heller and *Cat's Cradle* and *God Bless You, Mr. Rosewater* by Kurt Vonnegut. *Id*. The record as to the Strongsville School Board's distaste for the books was limited: board meeting minutes detailed a report to the Board in which *God Bless You, Mr. Rosewater* was called "GARBAGE" and "completely sick." *Id*. at 581. *Cat's Cradle* and *Catch 22* were simply voted upon by the board to be removed from the classroom and library. *Id*. at 580. The Court found that the removal of these books—absent any explanation from the Board "that is neutral in First Amendment terms"—occurred because the Board "found them objectionable in content" and erroneously believed it had the power "unfettered by the First Amendment to censor the school library for subject matter which the Board members found distasteful." *Id*. at 581.

Such removal violated the student plaintiffs' First Amendment right to "receive information." *Minarcini*, 541 F.2d at 583. "A library is a storehouse of knowledge," the Court reasoned. *Id*. at 581; *see also id*. at 582 ("The library is a mighty resource in the free marketplace of ideas"). Schools are not obligated to provide a library, but when they do provide this benefit, it

---

the judgment) (agreeing that the Court should remand for further factfinding regarding "the reason or reasons underlying the school board's removal of the books"—an exercise that would be pointless if no facts could have established a violation of the First Amendment); *id*. at 908 (Rehnquist, J., dissenting) ("cheerfully conced[ing]" that some of the hypotheticals posited by the plurality would violate the First Amendment).

cannot be "withdrawn by succeeding school boards whose members might desire to 'winnow' the library for books the content of which occasioned their displeasure or disapproval." *Id*. at 581. This is because the Supreme Court has long recognized that "the liberties of religion and expression may be infringed by the denial of or placing conditions upon a benefit or privilege." *Id*. at 582 (citing *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968)).

The *Minacini* Court found that students' right to access books in their library was particularly strong where teachers recommended reading the books to students during course instruction. *Id.* at 582 (a school library is a "valuable adjunct to classroom discussion."). Removal of books from the library that are likely to arise in classroom instruction is "a much more serious burden upon freedom of classroom discussion" than the banning of anti-war black arm bands found unconstitutional in *Tinker v. Des Moines*. *Id*. Teachers of David Doe's AP English Literature course will also certainly recommend books, like *Catch 22, The Kite Runner (Graphic Novel),* and *Beloved*, for Doe to read before his exam next year. He will not be able to find those books in his school's library, limiting his ability to freely participate in classroom discussion.

Lastly, the *Minarcini* Court dismissed the idea that the removed books being available elsewhere minimized the unlawful burden on the students' First Amendment rights. *Id*. at 582 ("Restraint on expression may not generally be justified by the fact that there may be other times, places, or circumstances available for such expression.") (citations omitted).

Courts across the country have followed these principles (in *Pico* and *Minarcini*) in finding the removal of "objectionable" books unconstitutional. *See, e.g., Case v. Unified School Dist*. No. 233, 908 F.Supp. 864 (D. Kan. 1995) (granting injunction to restore to school library a book about a romantic relationship between teenage girls); *Sheck v. Baileyville Sch. Comm*., 530 F. Supp. 679, 693 (D. Me. 1982) (students and parents were entitled to preliminary injunction restoring *365 Days*

16

to high school library after it was removed for having objectionable language); *Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 715 (D. Mass. 1978) (enjoining removal of anthology from high school library where school committee found its theme and language offensive); *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269, 1272, 1275 (D.N.H. 1979) (enjoining removal of magazine from high school library where it contained advertisements for vibrators, contraceptives, "gay material," and a "pro-communist newspaper" but also had "obvious research value"); *cf. also Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1005 (W.D. Ark. 2003) (District violated First Amendment when it moved Harry Potter books from school library's normal shelves to special area for students who have signed permission statement from parent); *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir.1995) (questioning constitutionality of board's removal of books from school library where board members had not even read the books and ignored recommendations of review committees).

More recently, courts across the nation have reaffirmed the First Amendment's role in protecting school libraries. *See Parnell v. Sch. Bd. of Lake Cnty., Fla.,* No. 4:23-CV-414-AW-MAF, 2024 WL 2703762, at *26 (N.D. Fla. Apr. 25, 2024) (Plaintiffs stated plausible claim that removing a book about two male penguins raising a baby penguin violated First Amendment); *PEN American Center, Inc. v. Escambia County School Board*, No. 3:23-CV-10385-TKW-ZCB, 2024 WL 133213, at *2 (N.D. Fla. Jan. 12, 2024) (Plaintiffs stated plausible claim that Board's removal of books from high school library violated First Amendment); *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, No. 1:24-CV-03512-CNS-STV, 2025 WL 863544, at *15 (D. Colo. Mar. 19, 2025)(Plaintiffs likely to succeed on claims that board removal of "sensitive" books violated First Amendment rights). In *Crookshanks*, many of the same titles at issue here were likely wrongly banned, including *Beloved*, several titles by Ellen Hopkins, *The Kite Runner*, *Melissa* by Alex

17

Gino, *The Perks of Being a Wallflower*, *Nineteen Minutes*, and *Thirteen Reasons Why*. 2025 WL 863544, at *15.

Here, as in *Minarcini*, Defendants brazenly removed books due to disagreement with their content—namely, because the books contained, in any part, what they determined to be "sexually explicit" content that met the definitions of Tenn. Code Ann. §39-17-901. As forecasted by Defendant James Sullivan, though, "what may be viewed by Board members as 'patently offensive' is not 'patently offensive'…as defined in the law." Compl. ¶ 40. Indeed, RCS materials specialists repeatedly found that many removed books did not contain any material that met the statutory definitions. Compl. ¶ 52. That Board members nonetheless found the content of the books to be repulsive—and disagreed with it—is clear. Board member Vaught stated about the books, "I don't like them. I wouldn't read them." Compl. ¶ 28. Board member Tammy Sharp admitted, "Look, everybody wants them off the shelf." Compl. ¶ 39. Board member Rosales stated, "I thought we wanted to get rid of all the material." Compl. ¶ 39.

Board members also heavily relied on highly partisan BookLooks reviews in their decision-making. Compl. ¶¶ 20, 27, 28, 33; *see also* Lopez Dec. ¶ 19. The BookLooks reviews selectively emphasize any sexual content whatsoever and automatically flag content related to LGBTQ+ themes or characters or discussion about topics like race and racism. Compl. ¶ 20-26. It is no wonder, then, that a "winnowing" process that relied on these reviews consistently removed books with LGBTQ+ authors, themes, and characters and books by and about people of color. Compl. ¶ 52; *see also* Roe Dec. ¶ 13; Doe Dec. ¶ 12; Coe Dec. ¶ 11. In sum, Defendants removed books because they did not approve or agree with their content. Under *Minarcini*, this clearly violates students' First Amendment right to receive information and ideas in their school libraries.

B.  The Board's Actions Cannot Be Justified Even Under Lesser Standards of Scrutiny Relating to Student Speech

Given *Pico*'s plurality opinion, district courts outside the Sixth Circuit (where *Minarcini* is not controlling authority) have considered the censorship of school libraries under different Supreme Court precedents. Even under lesser standards of scrutiny like those in *Tinker* and *Hazelwood*, however, the Defendants' actions cannot be justified under the First Amendment.

Under *Tinker v. Des Moines*, schools may only prohibit student speech if the speech is reasonably forecasted by the school to "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." 393 U.S. at 509. The forecasted disruption must be "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id*. Even under the "substantial disruption" standard, the Board's actions are unconstitutional. The removed books, before they were removed or restricted, caused no disruption to the operation of RCS schools whatsoever. Rather, as highlighted by RCS library materials specialists, many of the removed books had been checked out by RCS students hundreds of times before they were removed. Compl. ¶ 52 (*Speak* was circulated nearly 1,000 times; *Thirteen Reasons Why* circulated 434 times; *Ready Player One* circulated 320 times). The effort to remove the books was instigated solely at the urging of Defendants, Compl. ¶¶ 14, 17, 32, not because of substantial disruptions at RCS schools.

In *Hazelwood School District v. Kuhlmeier*, the Supreme Court held that school districts are entitled to exercise broad discretion in the management of curricular affairs "so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 273 (1988); *cf PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd*., 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) ("the "common theme" in all of the potentially relevant First Amendment school-library cases "(e.g., *Pico* plurality, *Hazelwood*, nonpublic forum) is that school officials cannot remove books solely because they disagree with the views expressed in the books but that they can make content-

19

based removal decisions based on legitimate pedagogical concerns ...”). In *Hazelwood*, school officials censored student reporters’ articles in a school newspaper. *Id.* The Court held that school officials may exercise greater control over student expression which is a part of the school curriculum or otherwise part of school-sponsored speech like a newspaper or theatrical production. *Id.* at 270–72. But, *Hazelwood* held, such control of student speech must still be “reasonably related to legitimate pedagogical concerns” so as to not violate student’s First Amendment rights. *Id.* at 273.

At base, *Hazelwood* may have little application to school libraries because *Hazelwood* concerned school-sponsored student speech rather than student access to information in a library. *See, e.g., Crookshanks,* 2025 WL 863544, at *15 (questioning whether books on the library shelf constitute school-sponsored speech at issue in *Hazelwood*). Assuming *arguendo* under *Hazelwood,* school libraries may be considered as bearing the “imprimatur of the school,” 484 U.S. at 281, book removal must still be reasonably related to a legitimate pedagogical interest.

No such interest was served here. Defendants summarily removed hundreds of books from their library even when RCS’s own materials experts repeatedly asserted legitimate pedagogical reasons (e.g., the books were related to curriculum, likely to appear on the AP English Lit exam, interesting to students, or helped maintain the diversity of the library collection) to *keep* the books rather than remove them. Compl. ¶ 52. At base, the Boards’ actions were patently unreasonable. Board members’ discussion makes it clear that the books were likely not read at all by Board members before being removed. Compl. ¶ 38. One Board member even described their own process as a “round robin game of insanity.” *Id.* Certainly, a “round robin game of insanity” that resulted in the haphazard removal or restriction of hundreds of books cannot be said to be “reasonably related to a legitimate pedagogical interest.” *Hazelwood*, 484 U.S. at 273.

C. <u>Mere Sexual Content Does Not Justify the Removal of Books from a School Library or Qualify the Books as "Obscene"</u>

The Supreme Court has recognized that not all content that involves sex, sexuality and/or nudity is necessarily obscene as to minors and that minors have fulsome First Amendment rights to access content, even if the government thinks the content unsuitable for them. In *Erznoznik,* a city defended its ordinance prohibiting films with nudity to be shown at drive-in theaters as necessary to protect minors from obscenity. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975). The Court struck down this ordinance, listing examples of non-obscene nudity (a picture of a baby's bottom, the nude body of a war victim, depictions of cultures that practice nudity) and reasoning that "clearly not all nudity can be deemed obscene as to minors." *Id.* Rather, obscenity to minors must be judged by the standard in *Ginsberg v. New York*, 390 U.S. 629 (1968), which requires the consideration of the whether the work appeals to the prurient interest, is patently offensive, and whether the work, as a whole, is "without any redeeming social value for minors." *Id.* at 638.

The Supreme Court, in *Reno v. American Civil Liberties Union*, struck down portions of the Communications Decency Act on First Amendment grounds, in part because the law did not adopt the *Ginsberg* standard or otherwise allow for consideration of whether the restricted materials had serious literary, artistic, political, or scientific value. 521 U.S. 844, 865 (1997). More recently, in *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011), the Supreme Court struck down a ban on "violent" video games sold to children, reasoning that while the government certainly has an interest in protecting children, that interest does not grant "a free-floating power to restrict the ideas to which children may be exposed." *Id*. at 794. Indeed, "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that [the government] thinks unsuitable for them." *Id.* (quoting

21

*Erznoznik* 422 U.S. 205 at 213-214). Thus, books that contain references to sex, sexuality, nudity, or human body parts are not *per se* obscene as to minors, *see Ernoznik*, 422 U.S. at 213, nor should they be banned from minors without further consideration of whether the work, as a whole, contains any serious literary, artistic, political, or scientific value for minors, *see Reno*, 521 U.S. at 865; *Ginsburg*, 390 U.S. at 638.

Admittedly, school districts have greater freedom to remove books from school libraries than just those that meet the adult obscenity standard. *See Hazelwood*, 484 U.S. at 266 ("[T]he First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings ... and must be applied in light of the special characteristics of the school environment." (internal punctuation and citations omitted)); *see also Pico*, 457 U.S. at 871. However much authority schools do have, though, they do not have the authority to remove non-obscene materials merely because they find them "objectionable" or "distasteful." *Minarcini*, 541 F.2d at 583.

Books that meet only some or part of the definitions in Tenn. Code Ann. § 39-17-901 are, by definition, not criminally obscene. *See Reno*, 521 U.S. at 865 (striking down law that restricted materials that met only part of obscenity test but not all three prongs); *see also* Tenn. Code Ann. §39-17-911 (materials must meet all three-prongs of test to constitute obscenity as to minors). So, the Board cannot justify the removal of books for "obscenity" when the books, at most, only met the one or two prongs of the *Ginsburg* test contained in Policy 4.403. (Many of the books Defendants removed or restricted did not meet *any* prongs of the test according to RCS library materials specialists, Compl. ¶ 52). What is left, then, are books that merely mention sex, sexuality, nudity, or human body parts in a way that Defendants found objectionable. (By Defendants own admission: "what may be viewed by Board members as 'patently offensive' is not 'patently

22

offensive'…as defined in the law." Compl. ¶ 40.) As this is the exact evil forbidden in *Pico* and *Minarcini,* the removal of these books violated Plaintiffs' First Amendment rights. *Minarcini*, 541 F.2d at 583.

### D. The Board's Removal and Restriction of Books Violates PEN America's Author Members' First Amendment Rights

Authors' right to share their books is protected under the First Amendment. *See Martin v. City of Struthers*, Ohio, 319 U.S. 141, 143 (1943) (The First Amendment "embraces the right to distribute literature."); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 (1963) (The First Amendment "embraces the circulation of books"). The First Amendment's "bedrock principle" is that the "government may not prohibit the expression of an idea simply because society finds [the] idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Thus, in most contexts, viewpoint-based discrimination is "presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va*., 515 U.S. 819, 828-29 (1995).

Even if the Court treats the library as a nonpublic forum, Defendants' actions still violate the authors' First Amendment rights. *Cf. Crookshanks,* 2025 WL 863544, at *16 (D. Colo. Mar. 19, 2025) (authors guild plaintiff likely to succeed on First Amendment claim when books removed from school library). "To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." *Arkansas Educ. Television Comm'n*, 523 U.S. at 682, 118 S.Ct. 1633. Here, as argued above, the books were removed for their content. The purpose of a library is to be "a storehouse of knowledge," a "valuable adjunct to classroom discussion," and "a mighty resource in the free marketplace of ideas." *Minarcini*, 541 F.2d at 582-583. Wanton removal of books directly violates the purpose of a library. Thus, PEN's author members' books were

excluded based on the authors' viewpoints, which is unacceptable even in a nonpublic forum like a library because censorship directly contravenes a library's purpose.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (granting injunctive relief where First Amendment claims were likely to prevail) (quotation omitted); *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). Plaintiff students would like to access the removed or restricted books but are unable to do so in violation of their First Amendment rights, *see* Section V ("Plaintiffs are Harmed"), *supra*.

## III.    The Harm to Plaintiffs Outweighs Any Harm to Defendants

"[W]hen [a] plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.2. As the Sixth Circuit has explained, "no cognizable harm results from stopping unconstitutional conduct, so it is always in the public interest to prevent violation of a party's constitutional rights.'" *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).

On the other side of the balance, restoring books to school library shelves, where the books were already located for years prior, will cause no injury to the Defendants. If Board members prefer not to read the removed books, and if some of their constituents prefer not to read the removed books, they can simply choose not to read them. Allowing others to read those books causes them no harm. *See Sheck v. Baileyville Sch. Committee*, 530 F.Supp. 679, 684 (D. Me. 1982) (Defendants failed to show that restoring *365 Days* to the school library pending decision on merits of Plaintiffs' First Amendment claims would cause them comparable injury to Plaintiffs); *Sund v.*

*City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 551 (N.D. Tex. 2000) ("Where First Amendment rights are concerned, those seeking to restrict access to information should be forced to take affirmative steps to shield themselves from unwanted materials; the onus should not be on the general public to overcome barriers to their access to fully-protected information.").

## IV.  Injunctive Relief Serves the Public Interest[13]

The preservation of First Amendment rights is always in the public interest. *Connection Distrib., Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). All RCS high school students (around 18,000) will also benefit from having access to the removed or restricted books. Thus, this factor weighs heavily in Plaintiffs' favor.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion and enter a preliminary injunction (1) requiring the Defendants to restore the removed books (Compl. ¶ 51) to Rutherford County Schools' libraries; (2) requiring the Defendants to restore the restricted books (Compl. ¶ 51) to their previous status in Rutherford County Schools' libraries; (3) enjoining Defendants from removing and restricting books from Rutherford County Schools libraries pursuant to the immediate removal provisions of Board Policy 4.403.

---

[13] Plaintiffs' request for injunctive relief should also not be barred by the doctrine of laches. Laches requires two showings: "(1) lack of diligence by the party against whom [laches] is asserted, and (2) prejudice to the [opposing party]." *United States v. City of Loveland*, Ohio, 621 F.3d 465, 473 (6th Cir. 2010). The first element sometimes is described as a plaintiff's "unreasonable delay" in asserting their rights. *See, e.g., Brown-Graves Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000).

Plaintiffs diligently asserted their First Amendment rights. The Board banned the latest tranche of books on April 9, 2025—a mere week before Plaintiffs brought the instant cause of action. Plaintiff Doe is starting AP English Literature next year—bringing his claim any sooner would render his claim unripe. Plaintiffs Roe and Coe Two are just entering high school next year and also would not have had ripe claims if brought earlier. Defendants are not harmed by any delay.

Respectfully submitted,

/s/ Kerry Knox_____
KERRY KNOX, BPR #23302
117 S. Academy Street
Murfreesboro, TN 37130
(615) 896-1000
(615) 896-1027 (facsimile)
kek@castelliknox.com

/s/ Stella Yarbrough_____
Stella Yarbrough, BPR # 033637
Lucas Cameron Vaughn BPR# 36284
Zee Scout* BPR # 42637
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
(615) 320-7142
Syarbrough@aclu-tn.org

*Admission to the Middle District pending