RACHEL ROE, a minor, by and through her )
parent and next friend, ROBERT ROE; )
DAVID DOE, a minor, by and through his )
parent and next friend, DANA DOE; CLAIRE )
COE, a minor, by and through her parent and )
next friend, CHARLES COE; and PEN )
AMERICAN CENTER, INC., )
                                )
      Plaintiffs, )
                                )
vs. )        No. 3:25-cv-00429
                                )
RUTHERFORD COUNTY BOARD OF )        JUDGE RICHARDSON
EDUCATION; JAMES SULLIVAN, in his )        MAGISTRATE NEWBERN
official capacity as Director of Rutherford )
County Schools, )
                                )
      Defendants. )

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DE 11)

COME NOW Defendants Rutherford County Board of Education and James Sullivan, in his official capacity as Director of Rutherford County Schools (collectively, "Defendants"), by and through counsel, and in response to Plaintiffs' Motion for Preliminary Injunction (DE 11) would state as follows:

## INTRODUCTION AND FACTUAL BACKGROUND

Plaintiffs' characterization of this case as involving a "book ban"[1] makes it important at the outset for Defendants to clarify that this case **does not** involve banning books. As stated by the

---

[1] Plaintiffs allege that the books at issue were "banned" twelve (12) times throughout their Complaint. (*See generally* Complaint, DE 1).

court in *C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F.Supp.3d 906 (2022):

> The District has not banned the books at issue here, and, despite repeatedly calling this a case on book bans, Plaintiffs make no factual allegations about anyone banning any books. Nowhere do Plaintiffs allege that the District has prohibited anyone from reading, owning, possessing, or discussing any book.

*Id.* at 909. Rather, this case involves actions by a local board of education and Director of Schools taken ***pursuant to state statute*** regarding the de-circulation and/or restriction of sexually explicit books and books that are not age-appropriate from school libraries.

The Rutherford County Board of Education ("Board") is comprised of seven (7) representatives from across the County, who were democratically elected to serve the educational interests of the County. Board members are elected from various zones within the County and represent the diverse demographics and individual needs of each zone.

The Age-Appropriate Materials Act of 2022, T.C.A. § 49-6-3801, *et seq.* ("Act"), gives local school boards in Tennessee broad discretion to adopt and implement procedures to maintain a library collection that is age-appropriate for school children and suitable for, and consistent with, a school's educational mission. *See* Tenn. Op. Att'y Gen. No. 25-009 (Mar. 28, 2025) (attached as Exhibit "A"). The Act on its face applies only to school library collections and does not preclude the use of otherwise-covered materials in course curriculum. *Id.* Specifically, T.C.A. § 49-6-3803 governs school library collection review, policy adoption, evaluation, and removal. Although the Act requires local school boards to develop procedures for review of library materials, the Act explicitly provides that the procedures in the Act are not the exclusive procedures for removing materials from a school's library collection. *Id.* (citing T.C.A. § 49-6-3803(e)).

2

On July 1, 2024, T.C.A. § 49-6-3803 was amended to provide that materials which are not age-appropriate (as defined by the Act) ***must*** be removed. (*See* T.C.A. § 49-6-3803, Effective July 1, 2024). Prohibited materials under the new version of the statute include those that contain nudity or descriptions or depictions of certain sexual conduct, as those terms are defined in T.C.A. § 39-17-901. *Id.*;[2] *see also* T.C.A. § 39-17-901.[3]

Under the Act, "[i]f the local school body 'determines that material contained in the school's library collection is not appropriate for the age and maturity level of the students who may access the materials,' or is unsuitable for or inconsistent with the school's 'educational mission, . . . then the material *must* be removed' from the collection." Tenn. Op. Att'y Gen. No. 25-009 (Mar. 28, 2025) (citing T.C.A. § 49-6-3803(f)). Because the Act does not define what material is "suitable for, and consistent with, the educational mission of the school," *see, e.g., id.* and § 49-6-3803(d)(1), local school boards retain discretion to prescribe criteria for determining what material is unsuitable for, or inconsistent with, a school's educational mission and must be removed on that basis. Tenn. Op. Att'y Gen. No. 25-009 (Mar. 28, 2025) (citing T.C.A. § 49-6-3803(e) & (f)). As stated by the Tennessee Attorney General:

> Preserving local discretion in these ways makes good sense. After all, the education of the Nation's youth is primarily the responsibility of parents, teachers, and ... local school officials, in addition to state officials. And local officials have long exercised that discretion, including by excluding or removing "vulgar" books from their libraries based on the books' "educational suitability." Indeed, federal courts have recognized that such questions are a core educational policy matter for local school boards.

---

[2] "(b) For purposes of this section, a material that: (1) In whole or in part contains nudity, or descriptions or depictions of sexual excitement, sexual conduct, excess violence, or sadomasochistic abuse, as those terms are defined in § 39-17-901, is not appropriate for the age or maturity level of a student in any of the grades kindergarten through twelve (K-12) and must not be maintained in a school's library collection; **_or_** (2) Is patently offensive, as defined in § 39-17-901, or appeals to the prurient interest, as defined in § 39-17-901, is not appropriate for the age or maturity level of a student in any of the grades kindergarten through twelve (K-12) and must not be maintained in a school's library collection." T.C.A. § 49-6-3803(b) (emphasis added).

[3] While material that is deemed criminally obscene under T.C.A. § 39–17–911 concerns the definition of "harmful to minors", this is ***not*** a consideration under Tenn. Code Ann. § 39-6-3803.

*Id.* (citations and internal quotation marks omitted).

Under this authority, approximately one hundred thirty-three (133) books were removed from Rutherford County Schools libraries beginning in the Spring of 2024 – April of 2025. (Complaint, DE 1, at PageID# 6, 14).[4] Plaintiffs challenge the removal or restriction of sixty (60) of these books. (*Id.* at PageID# 17-20). By way of example, below are excerpts from some of the books whose removal from school libraries is challenged by Plaintiffs:[5]

| *What Girls Are Made Of* by Elana K. Arnold | "Seth pushed down my cutoffs and bikini bottoms and went down to the ground with them, looking up at me as he pressed his tongue to my skin. My legs were shaking, so I sat down on the edge of his bed, and my legs fell open to make room for his mouth. He licked and licked like a cat at a bowl of cream, and when the inside of me felt as wet as the outside, we tried again. This time, Seth touched my face and looked into my eyes as he fit his penis up against me, as he pushed inside." – p. 20 |
|---|---|
| | "his eyes close and his mouth twists and a vein on his forehead bulges out and he thrusts again and again hard into the center of me and I want to like it but I sort of don't, and I feel him spasm, and spasm, and he makes a sound that would be funny in different circumstances before he is still. "Fuck," he says, collapsing against me. … Soft now, his penis shrinks inside me and then slips out. When I get up to go to the bathroom, a runny path of semen, like egg whites, trails down my leg." – p. 35 |
| | "I pull him out of his underwear and he's soft in my hand. I don't look up at his face before I open my mouth and pull him into it, and I pull and I suck until he grows hard and makes sounds that mean he likes it, and I keep going and when he says, "I'm going to come," I don't pull away. The jet of him is warm and salty and tastes like thickened sweat." – p. 58 |
| | "It almost hurts, the hum, the buzz, the stroke of it, so different from the jet of warm water that pours from the showerhead, so different from the press of my own hand, so different<br>from the wet lapping of Seth's tongue. It's remembering Seth's tongue that pushes me into the first orgasm, the sweet way he'd press it just there, right where I'm holding the rubber tip of the vibrator, the anxious, ineffective, hopeful lapping of his tongue. And I squeeze my eyes shut and my hips buck up against the vibrator, and my neck gets tight and my toes are stuck in a weird curled spasm, and I can't tell and don't care which way is up and which way is down, and the music is playing and I hear the words of the song and picture myself heeled at Seth's side, a faithful pet, a happy dog, an obedient good girl who follows rules and gets rewarded. … I flick the vibrator's switch back on, I grip the black handle tightly, and I press the nose of it against the center of me. The next orgasm hits almost at once, more of a tsunami than a wave, and I'm overcome and lost in it. When the crest of it passes, I don't turn off the vibrator, I don't take it away. I shove it against me, and I squirm beneath its relentless hum. I force myself to come again…" – p. 68 |

---

[4] Plaintiffs' Complaint references "over 140 books" but the RCS website lists 133 books that were removed or restricted. *See* https://www.rcschools.net/apps/pages/index.jsp?uREC_ID=525032&type=d&pREC_ID=2636708 (last accessed May 13, 2025).

[5] *See* Affidavit of Dr. James Sullivan attached hereto as Exhibit "B" attesting that these excerpts are true and accurate.

4

| | |
|---|---|
| *the sun and her flowers* by Rupi Kaur | |
| *Life Is Funny* by E.R. Frank | ""Uh huh", I go, and we're down to the carpet strip of floor with all those millions of nice books watching, and oh, Lord I am on her, she's pressing up, I'm pressing down, wet mouth and warm skin under thin girl shirt, my palm stroking, brushing everywhere, sweaty fingers edging into my pants, crawling to my hard, hard dick, holding, squeezing, pressing, feeling fingers stop and I want to cry, but she's pulling my hand at her jeans, unzip, panties, elastic, heat, slippery, sweaty finger pushing mine inside, sliding, gliding, hips moving, one finger two fingers, rocking, moaning, pulling, pushing, oh, Lord oh, Lord, beautiful Keisha wet hot pussy fucking my finger please, please, please let my dick, and then someone's at my back snatching me up…" – p. 182<br><br>"I look at her deep eyes and her big old feet, and then we're kissing, watery tongues, springy lips, tugging, pulling, and we lie down, and she peels off my shirt, and I unbutton her short, pretty mini, and soon we're all skin to skin, warm, sexy, mouth and hands brushing, stroking over tits and ass and stomach, lost, mush brain, heat, curves, sucking, rocking, slipping, swollen, wet, shiny pussy, pushing, pulsing, breathing, moaning, straining thick dick, hat smells like salt balloons, sticky, rolling over aching stiff thing, shy sly fingers, oh, Lord its tip kissing her melting slit, slide glides in, deep, swallowed, sucked, rocking, aching, bucking, pumping, fucking, oh, Lord Jesus, God, Allah, Buddha, Keisha, thank you." – p. 187-188 |
| *Red, White, and Royal Blue* by Casey McQuiston | "He kisses Henry's solar plexus, his stomach, the stretch of skin above his waistband. "I've, uh," Alex begins. 'Tve never actually done this before." "Alex," Henry says, reaching down to stroke at Alex's hair, "you don't have to, I'm--" "No, I want to," Alex says, tugging at Henry's waistband. "I just need you to tell me if it's awful.". Henry is speechless again, looking as if he can't believe his fucking luck. "Okay. Of course." Alex pictures Henry barefoot in a Kensington Palace kitchen and the little sliver of vulnerability he got to see so early on, and he thrills at Henry now, in his bed, spread out and naked and wanting. …" – p. 141<br><br>"Alex rolls his eyes. "For fuck's sake, man, you just had my dick in your mouth, you can kiss me good-night."" – p. 146<br><br>""C'mere," he says, surging up to kiss Alex, and he's putting his whole body into it now, sliding his hands down to palm at Alex's ass as he kisses him. Alex feels a sound tear itself from his throat, and he's following Henry's lead blindly now, kissing him deep into the mattress, riding a continuous wave of Henry's body. He feels Henry's thighs–those goddamn horseback-riding, polo-playing thighs–moving around him, soft, warm skin wrapping around his waist, heels pressing into his back." – p. 197<br><br>"It pushes Henry over some kind of edge, melted and overwhelmed on the lush bedclothes. Alex spends neatly an hour afterward coaxing little tremors out of him, in awe of his elaborate expressions of wonder and blissful agony, ghosting featherlight fingertips over his collarbone, his ankles, the insides of his knees, the small bones of the backs of his hands, the dip of his lower lip. He touches and touches until he brings Henry to another brink with only his fingertips, only his breath on the inside of his thighs, the promise of Alex's mouth where he'd pressed his fingers before. Henry says the same two words from the secret room at Wimbledon, this time dressed up in, ''Please, I need you to." He still can't believe Henry can talk like this, that he gets to be the only one who hears it. So he does. When they come back down, Henry practically passes out on his chest without another word, fucked-out and boneless..." – p. 220 |

| | |
|---|---|
| | "He fucks Henry slow and deep, and if it's the last time, they go down shivering and gasping and epic, all wet mouths and wet eyelashes, and Alex is a cliche on an ivory bedspread, and he hates himself but he's so in love." – p. 275 |
| *milk and honey* by Rupi Kaur | i am learning<br>how to love him<br>by loving myself<br><br>you must have known<br>you were wrong<br>when your fingers<br>were dipped inside me<br>searching for honey that<br>would not come for you<br><br>47          93 |
| *Red Hood* by Elana K. Arnold | "Do you shiver from desire? Do you shiver because it is cold? Do you shiver from anticipation, for the moment when- at last, at last- his mouth finds his way to the center of you? At last, at last, he's found his way there, a hand on each of your thighs, his head buried between them, and he's not teasing you, not now, not anymore, he's earnest in his desire to bring you desire, and yes, you think, as his tongue and lips press into you, as his fingers pull you apart, as you come undone beneath his hands, it is important to be earnest if this is what earnestness brings. Yes, the smell of him, the sight of him, the feel of him, all of it familiar, but not chis- the hot firm pressure of his tongue against your center, the insistence of his hands on your thighs, the building wonder of your pleasure rising, oh, chat is not familiar, that is new, brand-new. You gush- that is the word, the only word- you gush as the pleasure becomes too much to survive, and it bursts like a shaken-up can of soda, it tickles and it burns and it ripples from your center outward, in pulses of sensation so intense you are pinned by them, and your left hand curls into a fist and your right hand flails, hitting the damp cold glass and streaking away the steam, and your eyes open as the pleasure ebbs, and just then the clouds outside part, revealing the full white moon, unblinking, staring down at you from a black velvet sky." – p. 10-11 |
| *All Boys Aren't Blue* by George M. Johnson | "My heart immediately started to race. Nervously, I asked him what he was doing, and he said, "You." I laughed at first but then told him that I had never been the bottom. He looked at me and said, "Well, that's about to change tonight." I was extremely nervous. There is a fear, as with most things that you are doing· for the first time. But this was my ass, and I was struggling to imagine someone inside me. And he was ... large. But, I was gonna try. I had previously topped someone who clearly enjoyed it, but he had been enjoying anal sex before I ever came along. He knew what to expect. I didn't. As an avid porn watcher, the only thing I knew about anal sex previously was that it was painful, or at least played up as such on the cameras. Nervous and drunk, I listened and got on my stomach. He got on top and slowly inserted himself into me. It was the worst pain I think I had ever felt in my life. He then added more lube and tried again, which felt better but not by much. He began his stroking motion. Eventually, I felt a mix of pleasure with the pain. I can't say that I didn't enjoy it, because I did. But it was painful for sure. In those few minutes though, I can say that he was gentle. His aim wasn't to hurt me, and my aim was for him to be pleasured, too. He didn't last long inside of me, thankfully. He gave me a kiss before he pulled out. I didn't stay long, nor did I masturbate after." – p. 271-272<br><br>"As we kissed, he began unzipping my pants. It was clear to me in this moment that he wasn't new to this. He reached his hand down and pulled out my dick. He quickly went to giving me head. I just sat back and enjoyed it as I could tell he was, too. He was also definitely experienced in what he was doing, because he went to work quite confidently. He then came up and asked me if I wanted to try on him. I said sure. I began and he said, "Watch your teeth." I didn't want to let him know I was inexperienced. So, I slowed down and took my time and luckily got into a good rhythm. He didn't know I was a virgin, and I did my best to act dominant like my favorite porn star. I was an actor, and this was my movie. There was so much excitement running through my body. This |

6

| | |
|---|---|
| | was much more than losing my virginity. For once, I was consenting to the sexual satisfaction of my body. This moment also confirmed that sex could look how I wanted it to look. And that it could be passionate and kind, but most importantly, fun and satisfying. His body felt great in my mouth. I came up after a while and kissed him again. We both got up and went into his bedroom, where we got completely naked. He took off his clothes and immediately lay on his stomach. I then took off my shirt, and then my boxer briefs. I got behind him. There was moonlight coming through the shades of the dark room. Two Black boys under the glow of blue moonlight. How poetic, dare I say ironic? Now, I was scared as hell. One, because I didn't know what I was doing and clearly, he did. Two, because it was still college, and my fear of word getting out that I was inexperienced or bad in bed would have been too big of a campus rumor. Let alone that I was having sex with men and a friend of someone in my chapter. For the first few minutes, we dry humped and grinded. I was behind him, with my stomach on his back as we kissed. After a few minutes of fun and games, he got up and went to his nightstand, where he pulled out a condom and some lube. He then lay down on his stomach. I knew what I had to do even if I had never done it before. I had one point of reference, though, and that was seven-plus years of watching pornography. Although the porn was heterosexual, it was enough of a reference point for me to get the job done. I remember the condom was blue and flavored like cotton candy. I put some lube on and got him up on his knees, and I began to slide into him from behind. I tried not to force it because I imagined that it would be painful; I didn't want this moment to be painful. So I eased in, slowly, until I heard him moan. As we moved, I could tell he was excited-I was, too, but the pride in me told me not to show it. I felt like I was in control and proud of myself for getting it right on the first try-all the while still being nervous. I wanted to stay dominant in that moment. We went at it for about fifteen minutes before I started to get that feeling. Weakness in the legs, numbness in the waist. I finally came and let out a loud moan-to the point where he asked me to quiet down for the neighbors. I pulled out of him and kissed him while he masturbated. Then, he also came." – p. 266-268 |
| *Damsel* by Elana K. Arnold | "Holding them both in one of his, he managed to twist free the buttons of his trousers, and then he guided Ama's fingers to the shaft of him. A noise like a hiss escaped from Emory as he used his hand to wrap Ama's fingers around his yard. It was hot and hard, with a dew-wet drip at its tip. Emory moved Ama's hands within his grip, up and down, up and down, slowly at first and then faster, until, with a grunt and a groan and a spasm so tight that the knuckles of Ama's fingers cracked, a jet of warmth spilled out of him and trickled down Ama's hands, still encased in Emory's. A moment passed, during which the only sounds were Emory's labored gasps and the intermittent squeaking of carriage wheels. When Emory's breath had quieted, he cleared his throat and released Ama's hands, which were still wrapped around the kings yard, now softening and shrinking. Her fingers were coated with the sticky mess of him." – p. 284 |
| *One Last Stop* by Casey McQuiston | "There are hands, and mouths, and fingertips, and tongues, and a sound coming out of August somewhere between a hiss and a sigh, and there's Jane's breath hot on her skin. There are, objectively, a lot of things going on, August understands vaguely, but all she can think is want-how much, how hard, how deep she's been wanting it. Jane's been wanting it, all of it held between Jane's lips now, pressing and blooming through her, so keen that it hurts. Jane bites down, and August sucks in a breath through her teeth. The hand on August's thigh is inching up her skirt, fabric gathering at Jane's wrist. When Jane leans into August's ear. The cotton of Jane's bra is against her, the insistent heat of her body, the unbearable slide of skin against hers. "I wanna go down on you," Jane murmurs. "Is that cool?" August's eyes snap open. "Wha-what the fuck kind of question is that?" Jane's head drops back with a bark of laughter, eyes shut and lips swollen, the line of her throat obscene and gorgeous. "I need a yes or no." "Yes, okay, Jesus."" – p. 223<br><br>"When August pulls her into another kiss, she can taste herself on Jane's tongue, and that, more than anything, the fierce wave of possessiveness it pulls over her, is what has her fumbling at the fastenings of Jane's jeans." – p. 226 |
| *Tilt* by Ellen Hopkins | "He pulls me into his lap, licks down my neck, to the curve of my shirt. Take it off, he says, and as if he has hypnotized me, I do exactly as I'm told. Quickly, his hands work the hooks of my bra and before I can even think to say no, my entire upper body is bared. That's it, my pretty little girl. He moves to kiss my nipples, and though I want to say no, I can't. It feels good. Great. Amazing. Beneath my skirt, I feel him grow hard against the thin barrier of my panties. I like how that feels, too. But I'm still not ready. "Stop." His mouth is around my nipple and he mumbles, Why? All innocent. Now his lips move an inch or so higher and he starts to suck, softly at first, then harder. It is crazy good and it makes me moan but when he tries to slide down my panties I know I can't. Not yet. "I ... I have my period." It's a lie, but he can't know that, and it's better than saying I'm too young. He stiffens. Stops. Then he says, We can do something else then. He lifts me up, undoes his zipper and this is no movie when he frees his erection and shows me exactly how to use my mouth to get him off. I wish I could say I don't like it. But somehow I do." – p. 435-435 |

7

| | |
|---|---|
| *The Carnival at Bray* by Jessie Ann Foley | "She could feel her nipples pucker and tighten in the salted wind. He began to suck them, hard, and she grimaced, looking over his head into the water and at Bray Head, silent and ponderous in the distance. It didn't occur to her to tell him to stop. With his free hand, he yanked at the button of her jeans, pulled down the zipper, and stuffed his hand down her underpants. He found her warm opening, and twisted two fingers inside. Her breath caught sharply as the tight tissue inside of her unknit itself and gave way. Then the strangest thing happened. The pain of what he was doing to her somehow made her feel better. A memory floated before her, of Samantha Steinle, a weird, quiet girl from her Chicago neighborhood who, in seventh grade, had taken Maggie into the bathroom stall during recess, unbuttoned the cuff of her school blouse, and showed Maggie the patterns of razor marks that she'd scored herself with from wrist to elbow. "Hurting myself is the only thing that makes me feel better," Samantha had said. Now, with Paul's fingers twisting inside of her, his teeth on the thin skin of her breasts, she finally understood what Samantha had meant. He pulled his hand from between her legs and she heard the dull clinking of his belt buckle, the sharp exhale of a zipper being undone. "Put your mouth on it," he whispered into her neck, his forearm a heavy pressure on her shoulders, and she crouched on the wet ground, her naked spine facing seaward, the puddles soaking into the knees of her jeans. He put his hands on the back of her head and pushed her closer to his thighs so she was nearly choking on it, and then his whole body stiffened and he moaned in just the way she'd heard her mother and Colm moaning through the thin walls of their bedroom. To stop herself from vomiting, she spit it out on the wet ground." – p. 78-79 |

<u>**STANDARD OF REVIEW**</u>

Plaintiffs' request for preliminary injunction seeks entry of a preliminary injunction (1) requiring the Defendants to restore the sixty (60) removed and restricted books to their previous availability in school libraries; and (2) enjoining Defendants from removing and restricting books from Rutherford County Schools libraries pursuant to the immediate removal provisions of Board Policy 4.403. (Memorandum of Law, DE 12, PageID# 104).

A request for a preliminary injunction is governed by Fed. R. Civ. P. 65. *Farnsworth v. Nationstar Mortg*., LLC, 569 F. App'x 421, 427 (6th Cir. 2014). "The movant bears the burden of demonstrating its entitlement to the preliminary injunction sought, ***and its burden is a heavy one***. *Total Toxicology Labs, LLC*, 2019 WL 7046843, at *3 (E.D. Mich., Dec. 23, 2019) (emphasis added); *see also Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009). "Preliminary injunctions are extraordinary remedies which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it." *Ciavone v. McKee*, 2009 WL 2096281, at *1 (W.D. Mich. July 10, 2009) (citing *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)).

The factors for consideration by the District Court for entry of a preliminary injunction include: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Planet Aid v. City of St. Johns, MI,* 782 F.3d 318, 323 (6th Cir. 2015). District courts must "weigh the strength of the four [preliminary injunction] factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief now as opposed to at the end of the lawsuit." *D.T. v. Sumner Cty. Sch*., 942 F.3d 324, 326 (6th Cir. 2019) (citing *Friendship Materials, Inc. v. Mich. Brick, Inc*., 679 F.2d 100, 105 (6th Cir. 1982)). Similarly, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

"[G]iven that Plaintiffs here seek to enjoin the policies of a locally elected board of education, this federal Court should exercise careful attentiveness before awarding this already extraordinary remedy given that education is a core state function". *C.K.-W.*, 619 F.Supp.3d at 911 (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) ("[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.")).

## **LAW AND ARGUMENT**

I.     **Plaintiffs Are Unable To Demonstrate A Substantial Likelihood Of Success On The Merits.**

Resolution of the "substantial likelihood of success on the merits" factor frequently calls for a fact-based inquiry. *See e.g., In re Eagle-Picher Industries, Inc*., 963 F.2d 855, 859-60 (6th

Cir. 1992). Unverified allegations in a complaint have only limited weight in the context of a request for preliminary injunction. *Fox v. Faison*, 2023 WL 2763130 (M.D. Tenn. Apr. 3, 2023). "Evidence that goes beyond the unverified allegations of the pleadings . . . must be presented to support or oppose a motion for a preliminary injunction." *King v. Whitmer*, 505 F. Supp. 3d 720, 727 (E.D. Mich. 2020) (quoting *Wright & Miller*, 11A Fed. Prac. & Proc. § 2949 (3d ed.)). At this early stage in the case, no discovery has been conducted. The only information proffered in support of the preliminary injunction consists of Plaintiff's own allegations, which are not sufficient on their own to satisfy the "substantial likelihood of success on the merits" requirement.

### A. Plaintiffs Cannot Invoke A Right To Receive Information To Challenge Books Removed From School Libraries.

"Plaintiffs have a First Amendment right to read books. They don't have a First Amendment right to force a public library to provide them." *Little v. Llano Cnty.,* 2025 WL 1478599 at * 29 (5th Cir. May 23, 2025) (Ho, J., concurring).

In a very recent *en banc* opinion, the Fifth Circuit considered a virtually identical case in the context of a public library (rather than a school library). *See Little v. Llano Cnty.,* 2025 WL 1478599 (5th Cir. May 23, 2025) attached hereto as Exhibit "C". The Court considered whether plaintiffs may challenge a public library's removal of books as violating the Free Speech Clause where the materials were allegedly removed because of their treatment of racial and sexual themes and held that plaintiffs cannot invoke a right to receive information to challenge a library's removal of books and that a library's collection decisions are government speech and therefore not subject to Free Speech challenge. *See id.*[6] Specifically, the *Little* Court found that "invok[ing] the right to

---

[6] In the *en banc* opinion by seventeen (17) Fifth Circuit judges, ten (10) judges joined in the opinion that there is no First Amendment right to receive information in this context and seven (7) of these ten (10) judges further joined in the opinion that the speech at issue is government speech.

receive information to challenge the library's removal of the challenged books" would "stretch the right far beyond its roots". *Id*. at \*8. The Court further explained:

> [T]he above cases teach that people have some right to receive information from others without government interference. *See, e.g., Martin*, 319 U.S. at 143, 63 S.Ct. 862 ("[F]reedom [of speech and press] embraces the right to distribute literature and necessarily protects the right to receive it.") (citing *Lovell v. Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938)). But plaintiffs want more. They demand to receive information from the government itself.
>
> It is one thing to tell the *government* it cannot stop *you* from receiving a book. The First Amendment protects your right to do that. *See, e.g., Lamont*, 381 U.S. at 306, 85 S.Ct. 1493 (Postal Service could not regulate receipt of "communist political propaganda"). It is another thing for *you* to tell the *government* which books it must keep in the library. The First Amendment does not give you the right to demand that. *See, e.g., Pico*, 457 U.S. at 889, 102 S.Ct. 2799 (Burger, C.J., dissenting) ("[T]here is not a hint in the First Amendment, or in any holding of th[e] [Supreme] Court, of a 'right' to have the government provide continuing access to certain books.").

*Id.* at \*9.

Just as the student Plaintiffs cannot invoke the First Amendment to compel the government to provide them continuing access to certain books, Plaintiff PEN American Center, Inc. cannot compel the government to provide their books to students. *See Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 71 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 790 (2023) ("The First Amendment works as a shield to protect *private* persons from encroachments by the government on their right to speak freely, not as a sword to compel the government to speak for them.").

None of the Supreme Court cases cited by Plaintiffs stand for the proposition that the government is obligated to provide information to anyone. "To the contrary, those cases 'only recogniz[ed] a negative right against government interference with the exchange of information by private citizens.'" *Little*, 2025 WL 1478599, at \*7 (citing Erik Ugland, Demarcating the Right

to Gather News: A Sequential Interpretation of the First Amendment, 3 DUKE J. CONST. LAW & PUB. POL'Y 113, 140 (2008)); *see, e.g., Kleindienst v. Mandel*, 408 U.S. 753, 762-3 (1972) (Scholars had the right to "receive [the] information and ideas" of a foreign scholar they invited to the United States). While Plaintiffs attempt to use the Supreme Court's decision in *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), to argue that students have a right to force a public school to provide access to information via the school library, this is not the holding in *Pico*. As one court recently clarified, even a "majority" of *Pico*'s Justices agreed "there is no First Amendment obligation upon the State to provide continuing access to particular books". *Little*, 2025 WL 1478599, at *7 (citing *Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1045 n. 30 (5th Cir. 1982)); *see also Walls v. Sanders*, 760 F. Supp. 3d 766, n. 49 (E.D. Ark. 2024) ("although some of the justices' opinions adventurously attempted to recast the right to receive information from private speakers into a right to force a public school to provide students access to information, *see Pico*, 457 U.S. at 885-91 (Burger, J., dissenting), no opinion garnered a majority of justices.").

Plaintiffs rely on the Sixth Circuit case of *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 (6th Cir. 1976) for the proposition that "[s]chools are not obligated to provide a library, but when they do provide this benefit, it cannot be 'withdrawn by succeeding school boards whose members might desire to 'winnow' the library for books the ***content*** of which occasioned their displeasure or disapproval.'" (Motion, DE 12, at PageID# 94-5) (citing *Minarcini* 541 F.2d at 581) (emphasis added). However, *Minarcini* was decided before *Pico* and is inconsistent with the Brennan plurality opinion in *Pico*, which recognized that school officials could remove vulgar and educationally unsuitable content. *See Pico*, 457 U.S. 853, 872 (1982) (plurality opinion);[7] *id*. at

---

[7] "[W]e hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics,

879-881 (BLACKMUN, J., concurring in part and in judgment); *id*. at 918-920 (REHNQUIST, J., dissenting). The narrow principle in the *Pico* plurality is that the government may not prescribe what views are orthodox. *See id.* But, in *Minarcini,* which was decided on a thin record, the court was searching for clues as to the board's official intent and did not find it. *See Minarcini*, 541 F.2d at 582. The court presumed the view of a minority of the board to be the official view of the entire school board and it parlayed this assumption into a finding of unconstitutional content regulation. *See id.*[8] *Minarcini*'s holding addresses the regulation of content, not viewpoint discrimination. *See id.* at 577. *Pico*'s orthodoxy principle is a prohibition on viewpoint discrimination, not permissible content-based regulations. *Pico* is therefore more deferential to library collection curation than *Minarcini*.

Further, Plaintiffs' interpretation of *Minarcini* misunderstands the distinction between negative and positive rights under the First Amendment. "The fundamental distinction between negative and positive rights is essential to a proper understanding of the First Amendment." *Little*, 2025 WL 1478599, at *29 (Ho, J., concurring).[9] Plaintiffs stand for the position that persons have no First Amendment right to a library but that *removing* information from a library creates a

---

nationalism, religion, or other matters of opinion.'") (citing *West Virginia Board of Education v. Barnette*, 319 U.S., at 642, 63 S.Ct., at 1187).

[8] "In the absence of any explanation of the Board's action which is neutral in First Amendment terms, we must conclude that the School Board removed the books because it found them objectionable in content and because it felt that it had the power, unfettered by the First Amendment, to censor the school library for subject matter which the Board members found distasteful."

[9] As aptly explained by Justice Ho in the Fifth Circuit case of *Little*:

> I confess that I have trouble locating in the First Amendment a distinction between refusing to purchase certain books (which the dissent would allow) and removing them (which the dissent would condemn).
>
> Consider how we would treat the proposed distinction in other constitutional contexts. Does the Fourteenth Amendment allow a government agency to refuse to hire people based on their race—just so long as they don't fire people based on their race? Does the Free Exercise Clause permit a public park to exclude all Christians from entry—it just can't kick them out once they've been let in? Obviously not. No one would draw those distinctions.

*Little*, 2025 WL 1478599, at *29 (Ho, J., concurring).

negative right under the First Amendment. However, "[a] library just as surely denies a patron's right to 'receive information' by not purchasing a book in the first place as it does by pulling an existing book off the shelves." *Little*, 2025 WL 1478599, at *9 (citing *Little v. Llano Cnty.*, 103 F.4th 1140, 1171 (5th Cir.), *reh'g en banc granted*, *opinion vacated*, 106 F.4th 426 (5th Cir. 2024), and on *reh'g en banc*, 2025 WL 1478599 (5th Cir. May 23, 2025) (Duncan, J., dissenting)).

Plaintiffs therefore have no First Amendment right to control, or ask this Court to intervene in, a school library's content. Because Plaintiffs cannot invoke a First Amendment right to receive information to challenge a library's removal of books, Plaintiffs are therefore unlikely to succeed on the merits in this case.

### B. The School Board's Removal Of The Books Is Protected By The Government-Speech Doctrine.

Who has control over the content offered to students in public school libraries? Under Plaintiffs' view, the Courts, rather than the states and local boards of education, have the final word. However, this theory mistakes local public-school systems for promoters of private speech, instead of guardians *in loco parentis* with responsibility for using its own speech to advance state-determined educational aims.

"[E]xpressive conduct which may not be prohibited by the State as sovereign may be proscribed by the State as property owner." *Pico*, 457 U.S. at 908 (Rhenquist, C.J., dissenting) (citing *Adderley v. State of Fla.*, 385 U.S. 39, 47 (1966) (upholding state prohibition of expressive conduct on certain state property – "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.")). Under the government speech doctrine, "[a] government entity has the right to 'speak for itself.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (quoting *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000)). "When the State is the speaker, it

14

may make content-based choices." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). Government speech extends to the freedom "not to speak" and to "'speak through the removal' of speech that the government disapproves" *See Mech v. Sch. Bd. of Palm Beach Cnty., Fla.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (quoting *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1012 (9th Cir. 2000)). "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Summum*, 555 U.S. at 467. When the government speaks, it may select the views that it wants to express. *Id.* at 468 (citing *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)). If the government could not do so, "it is not easy to imagine how government could function." *Summum*, 555 U.S. at 468. "People can protest what the government says, but they cannot sue to make the government say what they want". *Little*, 2025 WL 1478599, at \*15 (citing *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 247-8 (2022) - "[W]hen the government speaks for itself, the First Amendment does not demand airtime for all views.").

In holding that the selection and removal of library books from shelves constitutes government speech, the *Little* Court noted as follows:

> Most of the books in the Llano County library were written and published by private authors and private firms. They are private speech. Yet the county librarian, along with other county officials, decides which books to buy, buys them with public funds, and manages the library collection.

*Id.* at \*15. The Court likened a public library collection to other instances where a government presents a curated collection of third-party speech. *See id.* (citing *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (a newspaper runs certain editorials but not others); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622,

636 (1994) (a cable operator broadcasts some programs but not others); *Hurley v. Irish–Amer. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 570 (1995) (a parade organizer lets in certain floats but not others; *Summum*, 555 U.S. at 464-5 (government accepts some privately donated monuments over others for display in a public park)). The Court concluded that "Supreme Court precedent teaches that someone may engage in expressive activity by curating and presenting a collection of someone else's speech . . . . Governments can speak in this way, no less than private persons." *Id*. at *17 (citations omitted); *see also Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (when the government "compil[es] the speech of third parties," that is a "communicative act"). The *Little* Court further illustrated as follows:

> Take any public museum—say, the National Portrait Gallery. The Gallery selects portraits and presents them to the public. Its message is: "These works are worth viewing." A library says the same thing through its collection: "These books are worth reading." The messages in both cases are the government's.

*Little*, 2025 WL 1478599, at *17. Indeed, "[a] library's 'goal' in choosing books is to 'provide materials that would be of the greatest direct benefit or interest to the community,' to 'collect only those materials deemed to have requisite and appropriate quality,' and to 'identif[y] suitable and worthwhile material.'" *Id.* (citing *U.S. v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 204, 208 (2003)). "[L]iterally from the moment they arose in the mid-19th century, public libraries have been shaping their collections for specific educational, civic, and moral purposes. They still do today." *Id.* at *26. This curation of third-party materials, including "editorial discretion in the selection and presentation of" third-party speech that the government presents to the public, is the very definition of government speech. *See People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 30 (D.C. Cir. 2005) (quoting *Forbes*, 523 U.S. at 674). In public libraries, "the government speaks through its selection of which books to put on the shelves and which books to

16

exclude." *Little*, 2025 WL 1478599, at *29. Countless books have been written and no school library can hold them all. School officials must therefore make a determination as to which books are most appropriate for the educational mission of the school.

As recognized by the Court in *Little*, "the expressive activity at issue" is not "the words of the library books themselves" but rather "choosing some books and presenting them as worthwhile literature". *Id.* at *26.[10] "It is the public library—the *government*—who conveys that message, nobody else." *Id.* (emphasis in original); *see also id.* at *25 ("[T]he public library's judgment is 100-proof government speech."). First Amendment forum principles do not "apply to a public library's exercise of judgment in selecting the material it provides to its patrons." *Am. Libr. Ass'n.*, 539 U.S. at 205 (finding that a forum analysis would be "out of place");[11] *see also Little*, 2025 WL 1478599, at *19 ("Forum analysis has no place on a library's bookshelves").

Here, Defendants are regulating private speech – they are regulating the library collections for public primary and secondary school students, which is government speech not subject to First Amendment protections. *See Little*, 2025 WL 1478599, at *21 ("Library shelves are not a community bulletin board: they are not 'places' set aside 'for public expression of particular kinds or by particular groups'"); *see also id.* at *19 ("By selecting, compiling, and presenting a collection

---

[10] The case of *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, 2025 WL 863544 (D. Colo. Mar. 19, 2025), relied on by Plaintiffs (holding that the plaintiffs were likely to succeed on claims that board removal of "sensitive" books violated First Amendment rights) flippantly dismissed the district's government speech arguments based on an incorrect characterization of the speech at issue as being the *content* of the books rather than the defendants' *selection* of the books. *Id.* at *8 ("Take, for example, a high school library that includes Hitler's manifesto *Mein Kampf*. No one would seriously argue that placing this book in a school library constitutes government speech."); *c.f. Gittens,* 414 F.3d at 28 (while "[t]hose who check out a Tolstoy or Dickens novel would not suppose that they will be reading a government message, ... the government speaks through its selection of which books to put on the shelves and which books to exclude."). *Crookshanks* and its faulty reasoning should not be considered in this case.

[11] In rejecting a First-Amendment challenge, the *American Library Association* Court upheld the "Child Internet Protection Act," which addressed "problems associated with the availability of internet pornography in public libraries." *Id.* at 198–99. The Court opined that a "library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves, any more than it collects books in order to provide a public forum for the authors of books to speak." *Id.* at 206. Rather, the resources of public libraries are to "facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *Id.* The internet is simply "a technological extension of the book stack." *Id.* at 207.

of another person's speech, the government expresses its own views. It may do so by selecting hyperlinks for a town website, or pamphlets for a park display rack, or statues for a public art display, or textbooks for a state curriculum. It may also do so by selecting books for a library's collection."). No library can hold all books published, so it only stands to reason that decisions must be made to curate the materials on the shelves. *See Am. Libr. Ass'n, Inc.*, 539 U.S. at 204 (libraries cannot give "universal coverage" of books on their shelves, so they must select only materials "that would be of the greatest direct benefit or interest to the community."). Therefore, "[t]o fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide their patrons." *Id.* The same is even more true with respect to *school* libraries.

Local school boards in Tennessee are popularly elected. T.C.A. § 49-2-201. The Tennessee General Assembly has vested local school boards with broad authority of the management and operation of public schools. *See* T.C.A. § 49-2-201, *et seq*. Among its powers, a local school board has the duty and authority to manage and control all public schools with its jurisdiction, purchase all supplies and material of every kind, and employ teachers and other personnel. T.C.A. § 49-2-203. Pursuant to the Age-Appropriate Materials Act, local school boards must review library collections to ensure that the materials are "suitable for the age and maturity levels of the students who may access the materials" and are "suitable for, and consistent with, the educational mission of the school." T.C.A. § 49-6-3803(a). The manner of review and curation outlined in the statute is "not the exclusive means to remove material from a school's library collection" and local school boards are not prohibited from "developing or implementing other policies, practices, procedures for the removal of materials from a library collection." *Id.* at 3803(g).

Thus, in selecting any of the challenged books for removal or restriction, Defendants were making statutorily required, editorial choices of what books should reside on the shelves of their

public-school libraries. Here, "[t]he government as educator does not seek to reach beyond the confines of the school." *Pico*, 457 U.S. 853 at 915. But, in managing and deploying its own property and resources within those confines, it necessarily speaks from a viewpoint of what library materials are "suitable for, and consistent with, the educational mission of the school." T.C.A. § 49-6-3803(a)*; see also Little*, 2025 WL 1478599, at *19, n. 41 ("A library selects books it thinks suitable, buys them with public funds, and presents a curated collection to the public.").

Because Defendants' curation of the libraries within Rutherford County Schools constitutes government speech, Plaintiffs are therefore unlikely to succeed on the merits of their First Amendment claims.

### C.  The School Board Has Discretion To Regulate Content In Its Libraries.

"When it acts as an educator, at least at the elementary and secondary school level, the government is engaged in inculcating social values and knowledge in relatively impressionable young people." *Pico*, 457 U.S. 853 at 909 (Rhenquist, C.J. dissenting).[12, 13] Although students in a school environment do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), the "First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,'" *Kuhlmeier*, 484 U.S. at 266 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)). First-amendment rights "must be applied in light of the special characteristics of the school environment." *Id.* (quoting *Tinker*, 393 U.S. 511).

---

[12] "Though of no precedential significance, Chief Justice Burger's dissent, which three other Justices joined in full, had more votes than any opinion affirming the judgment, including Justice Brennan's plurality opinion." *C.K.-W. by & through T.K.*, 619 F. Supp. 3d at 919.

[13] Even the dissent in *Little*, while arguing that "government officials cannot constitutionally dictate what ideas are 'inappropriate' or 'offensive' for *adult* library patrons", recognized that "a student's First Amendment interests while at school must be balanced with the school's critical inculcating function". *See Little*, 2025 WL 1478599, at *44 (HIGGINSON, J., dissenting).

Who better to decide what content is appropriate for a school library if not the democratically-elected local Board of Education? It is certainly not a private association of authors promoting the sale of their books or a group of minor students who represent only their own interests in reading selection. "Local school officials, better attuned than we to the concerns of the parents/taxpayers who employ them, must obviously be accorded wide latitude in choosing which pedagogical values to emphasize, and in choosing the means through which those values are to be promoted." *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989). "Local control is one of this nation's most deeply rooted and cherished traditions." *Id.* (citing *Milliken v. Bradley*, 418 U.S. 717, 741–42 (1974) (rejecting multidistrict de-segregation solution on evidence of segregation in single district). "The doctrine of *in loco parentis* treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 357 (6th Cir. 2023) (quoting *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 189 (2021)).

### i. The First Amendment Does Not Prevent the School Board From Removing Lewd or Inappropriate Books from the School Library.

Even if Plaintiffs did have the right to receive information from the government via a school library and even if the content in school library books was not government speech, the First Amendment does not prevent the Board from removing lewd, sexually explicit, or other age-inappropriate material from school libraries. *See New York v. Ferber*, 458 U.S. 747, 757 (1982) ("we have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights"). The United States Supreme Court has held that "[t]he First Amendment does not prevent the school officials from determining that to permit [] vulgar and lewd speech . . . would undermine the

school's basic educational mission." *Fraser*, 478 U.S. at 685-86 (recognizing "the obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children . . . from exposure to sexually explicit, indecent, or lewd speech" and that "vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education."); *see also Ginsberg*, 390 U.S. at 636 & 638 (holding that the government could regulate sexually explicit material that is obscene as to minors and stating that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults."). Further, "[n]othing in the First Amendment prevents states from taking steps to shield children from [sexual] content". *Book People, Inc. v. Wong*, 98 F.4th 657, 659 (5th Cir. 2024) (Ho, J., dissenting) (citing *Ginsberg v. New York*, 390 U.S. 629, 636 & 639 (1972) ("The well-being of its children is of course a subject within the State's constitutional power to regulate," "justify[ing] . . . limitations . . . upon the availability of sex material to minors")). In addition, "[b]ookstores and motion picture theaters . . . may be prohibited from making indecent material available to children". *FCC v. Pacifica Found.*, 438 U.S. 726, 749 (1978).

While, as Plaintiffs point out, the U.S. Supreme Court has held that "the Constitution protects the right to receive information and ideas," (Motion, DE 12 at PageID# 93, citing *Kleindienst*, 408 U.S. at 763), the Supreme Court also made clear there are limits to this right and "that the school board has the authority to remove books that are vulgar." *Fraser*, 478 U.S. at 684 (citing *Pico*, 478 U.S. at 871). Indeed, courts have held time and time again that it is not only permissible for a school district to regulate inappropriate content and speech, it is also permissible to impose sanctions when such content or speech takes place in the school setting. *Id*. at 685-686. In *Fraser*, the Court made these points unequivocally clear: the Supreme Court's "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the

speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." 478 U.S. at 684. In *Ginsberg*, the Supreme Court upheld a New York statute banning the sale of sexually oriented material to minors, even though the material in question was entitled to First Amendment protection with respect to adults. *See id.* (citing *Ginsberg*, 390 U.S. 629). Further, all of the *Pico* Justices, otherwise sharply divided, agreed that a school board has the authority to remove books that are vulgar. *Pico*, 457 U.S. 853, 871-872 (1982) (plurality opinion); *id.* at 879-881 (BLACKMUN, J., concurring in part and in judgment); *id.* at 918-920 (REHNQUIST, J., dissenting). As another court has properly observed, "the purpose of public school libraries is to advance the school curriculum – that is, to facilitate the pedagogical mission of the school, which may involve some limitation of expression." *GLBT Youth In Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 670 (8th Cir. 2024) (upholding a library provision deemed viewpoint-neutral, content-based, age-appropriate restriction on the content of public-school libraries).

Consistent with the cases cited above, lower courts have upheld school officials' right to remove books due to vulgarity. In *President's Council District 25 v. Community Sch. Bd.*, 457 F.2d 289 (2d Cir. 1971), *cert. denied*, 409 U.S. 998 (1972), the Second Circuit held that a school board has the authority to remove books from library shelves for many different reasons, including obscenity, and that such action does *not* infringe on the rights of teachers, librarians, or students. 457 F.2d at 293. The Court explained that "to suggest that the shelving or unshelving of books presents a constitutional issue, particularly where there is no showing of a curtailment of freedom of speech or thought, is a proposition we cannot accept." *Id.* at 293. Similarly, in *Bicknell v. Vergennes Union High School Bd. of Directors,* 638 F.2d 438, 441 (2d Cir. 1980), the Second Circuit again held that a school does not violate the First Amendment when it decides to remove

22

books from the school library solely on the basis of vulgarity and indecency of language (plurality).

Therefore, there are First Amendment limitations on the rights of the speaker in reaching an

unlimited audience where, like here, the speech is sexually explicit and the audience may include

children. *See Fraser*, 478 U.S. at 684.

> ### ii. The Challenged Books Were Removed In A Viewpoint-Neutral Manner To Eliminate Sexually Explicit And Other Age-Inappropriate Material From School Libraries.

Plaintiff argues that "[e]ven if the Court treats the library as a nonpublic forum,

Defendants' actions still violate the authors' First Amendment rights" because "the books were

removed for their content." (Memorandum of Law, DE 12 at PageID# 102).[14] However, in

nonpublic forums, content-based restrictions may be made if they are reasonable given the purpose

of the forum and viewpoint neutral. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S.

788, 806 (1985); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983)

(teacher mailboxes were nonpublic forum).

Keeping sexually explicit books out of school libraries is reasonable. *Fraser*, 478 U.S. at

684 (recognizing "limitations on the otherwise absolute interest of the speaker in reaching an

unlimited audience where the speech is sexually explicit, and the audience may include children");

*see also Kuhlmeier*, 484 U.S. at 266 ("appl[ying scrutiny] in light of the special characteristics of

the school environment"). Despite Plaintiffs' repeated assertions that these books were removed

"in a narrowly partisan or political manner, or because Defendants disagree with the ideas or views

---

[14] As stated in Section I(B), *supra*, a First Amendment forum analysis would be out of place here because the challenged conduct constitutes government speech. *Am. Libr. Ass'n,* 539 U.S. at 205; *see also Little*, 2025 WL 1478599, at \*21 ("It is one thing to say that a public library's *premises* may constitute some kind of public forum. A library might open one of its rooms to poetry readings by the public and thereby create a limited public forum. . . . It is entirely another thing, though, to extend this concept to a library's *bookshelves*. . . . [I]t makes no sense to apply forum analysis to a library's collection."). However, if the Court is inclined to apply a forum analysis to the public school library setting, it appears that Plaintiffs concede that a nonpublic forum analysis is appropriate. (Memorandum of Law, DE 12, at PageID# 102-103).

contained in those books" (Complaint, DE 1, at PageID# 33; Memorandum, DE 12, at PageID# 97), Plaintiffs have "provided only rank suspicion to try to show that the District intended to deny students access to ideas with which the District disagreed, let alone that that intent was the *decisive* factor in decision." *See C.K.-W.*, 619 F.Supp.3d at 915 (emphasis in original).

Plaintiffs have not alleged that anything in Board Policy 4.403 or other applicable law requires removing any library books because of viewpoint or that such policy "prescribe[s] what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872.[15, 16] Removing books containing descriptions of sex acts and other sexually explicit or age-inappropriate material from school libraries is not a partisan decision. And, in fact, the content in the removed books falls squarely within content deemed lewd, sexually explicit, and/or age-inappropriate in the school setting, regardless of the viewpoints expressed in such books. (*See* excerpts from challenged books, *supra*). This case is easily distinguishable from the cases cited by Plaintiffs where a few select books were removed based on an alleged disagreement with the ideas expressed therein. *See Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) cited by Plaintiffs (striking down a school library policy removing Harry Potter books from easy access by students because the books might promote disobedience and/or involved witchcraft and the occult); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 867, 871 (D. Kan. 1995) (granting injunction to restore to library shelves a lesbian romance novel containing "no vulgarity, offensive

---

[15] *Pico* feared a "[d]emocratic school board, motivated by party affiliation, order[ing] the removal of all books by or in favor of Republicans." *Id.* at 871.

[16] As stated by the Eleventh Circuit, *Pico* was "a badly fractured decision" that has "no precedential value as to the application of the First Amendment to these issues." *ACLU of Fl., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1199—1200 (11th Cir. 2009). Further, *Pico* "establishes no standard" for future courts. *Id.* ("*Pico* is a non-decision so far as precedent is concerned") (quotations omitted). The Fifth Circuit has likewise held that "*Pico*'s 'highly fractured' opinions 'ha[ve] no precedential value' as to the First Amendment". *Little*, 2025 WL 1478599, at *7, n. 14 (citations omitted). Importantly, subsequent to the Supreme Court's decision in *Pico*, the Supreme Court has recognized that the curation of library materials is a form of government speech that is not afforded First Amendment protections to the right to receive information. *Am. Libr. Ass'n, Inc.*, 539 U.S. at 204.

language, or explicit sexual content that was removed because it conflicted with "traditional family values"); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679 (D. Me. 1982) (holding unconstitutional a school's decision to completely ban students from possessing a certain nonfiction Vietnam War book on school property because it contained profanity including the "f word").[17]

Plaintiffs' Complaint – without actually alleging what "viewpoints" the School Board allegedly discriminated against (DE 1, PageID# 34) – repeatedly mentions LGBTQ+ content. (*See generally* DE 1).[18] However, Plaintiffs have presented no facts in support of their Complaint (DE 1) or their Motion (DE 11) to support their position that the Board engaged in viewpoint discrimination. The Declarations (DE 12-1 – 12-4) filed with Plaintiffs' Motion for Preliminary Injunction merely discuss the <u>content</u> of certain books but fail to indicate any <u>viewpoint</u> that has been singled out for exclusion.[19] The same is true with respect to the allegations in the Complaint

---

[17] Other cases cited by Plaintiffs are also easily distinguishable. For example, the cases of *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269 (D.N.H. 1979) and *Right To Read Def. Comm. of Chelsea v. Sch. Comm. of City of Chelsea*, 454 F. Supp. 703, 715 (D. Mass. 1978) were both decided pre-*Pico* and analyzed under the criminal obscenity standard in *Miller v. California*, 413 U.S. 15 (1973), a test that was not used in *Pico* and has not been used in these First Amendment library cases since. In addition, some of the cases cited by Plaintiffs were decided only in the motion to dismiss context, not in the preliminary injunction context – and the standard is much lower. *See Parnell v. Sch. Bd. of Lake Cnty., Fla.*, 2024 WL 2703762, at *26 (N.D. Fla. Apr. 25, 2024) (Plaintiffs stated plausible claim that removing a book about two male penguins raising a baby penguin violated First Amendment); *PEN American Center, Inc. v. Escambia County School Board*, 2024 WL 133213, at *2 (N.D. Fla. Jan. 12, 2024) (Plaintiffs stated plausible claim that Board's removal of books from high school library violated First Amendment). Regardless, these are all district court cases from other circuits with no precedential value in this circuit.

[18] Plaintiffs' Memorandum of Law describes in depth the rating system of the former website "BookLooks", including the effect of LGBTQ+ content on the ratings, but then goes on to state that the Board ***voted against*** removing books solely based on their BookLooks rating and, instead, voted "on each book individually to determine if they contained 'sexually explicit content in whole or part and to require their removal under Tennessee State law.'" (DE 12 at PageID# 85-87). The "BookLooks" numerical rating then is not evidence of the intent of the Board in their ultimate removal of these books.

[19] "The government does not 'contract the spectrum of available knowledge' … by choosing not to retain certain books on the school library shelf; it simply chooses not to be the conduit for that particular information." *Pico*, 457 U.S. at 889 (Burger, C.J., dissenting) (citing *Griswold v. Connecticut*, 381 U.S. 479, 482, (1965)). "[T]here is not a hint in the First Amendment, or in any holding of this Court, of a 'right' to have the government provide continuing access to certain books." *Id*. With that said, the Declarations submitted by the minor Plaintiffs (DE 12-1 – 12-3) discuss certain books with similar topics/ideas that they have already read, which are not challenged and may or may not be in the collections of Rutherford County Schools. For example, David Doe states, "I also love LGBTQ books and themes. I read A Little Life by Hanya Yanagihara recently and thought it was a really good book. I liked learning about the characters in it. It's important to me to have LGBTQ characters and their perspectives in a library because,

(DE 1). Even to the extent that the mere content of a book could be seen as expressing a certain "viewpoint", while not describing the content of all the challenged books, Plaintiffs' Complaint describes numerous books without mentioning *any* LGBTQ+ themes. (Complaint, DE 1, at PageID# 20-31).[20] In fact, the descriptions of these books do not reveal *any* commonality of certain "ideas" or "viewpoints" present in the removed books. Further, the excerpts cited above are illustrative of the types of sexual content present in the removed or restricted books and are clearly not limited to LGBTQ+ content. Moreover, the Rutherford County Schools website lists several books that were evaluated pursuant to the process yet still retained – three of which have major LGBTQ+ themes (*Mighty Heart of Sunny St. James* by Ashley Herring Blake, *Pumpkin* by Julie Murphy, and *A Love Story Starring my Dead Best Friend* by Emily Horner).[21] The fact that a small subset of the books that were removed as part of a large-scale library review process might have involved LGBTQ+ themes is nowhere near sufficient to show that the Board removed these challenged books "because of their distaste for the viewpoints" expressed. (Complaint, DE 1, PageID# 34).

### D. Plaintiff PEN American Center, Inc. Lacks Standing.

Plaintiff PEN American Center, Inc. is further unlikely to succeed on the merits because it lacks standing to sue on behalf of its members. An organization may have either "organizational standing" in its own right, *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 333 (6th Cir. 2002),

---

at the end of the day, all people should have access to the books that interest them." (DE 12-2, PageID# 111). Thus, Plaintiffs' own admissions belie their allegations that they are being denied access to LGBTQ+ ideas by the actions of Defendants.

[20] *Me and Earl and the Dying Girl*; *The Haters*; *Damsel*; *Thirteen Reasons Why*; *The Testaments*; *Forever*; *Plan A*; *Yolk*; *Emergency Contact*; *The Carnival at Bray*; *Life Is Funny*; *Looking for Alaska*; *Homegoing*; *To All the Boys I've Loved Before*; *Speak*; *Catch 22*; *The Kite Runner (Graphic Novel)*; *home body*; *milk and honey*; *the sun and her flowers*; *Girl in Translation*; *Wicked: The Life and Times of the Wicked Witch of the West, by Gregory Maguire*; *Heroine*; *The Female of the Species*; *Beloved*; *Out of Darkness*; *Beautiful*; *Eleanor and Park*; *Concrete Rose*.

[21] https://www.rcschools.net/apps/pages/index.jsp?uREC_ID=525032&type=d&pREC_ID=2636708 (last accessed May 13, 2025).

or "associational standing"—meaning standing on behalf of its members—"when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.*, 528 U.S. 167, 182 (2000).

Plaintiff PEN American Center, Inc. does not appear to assert that it has organizational standing and the allegations in the Complaint do not demonstrate that the organization itself suffered a "palpable injury as a result of the defendants' actions." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 333 (6th Cir. 2002). Although Plaintiff PEN America alleges that its goal is to "protect its author members' right to share their books and viewpoints without undue government censorship and to promote the circulation of its author members' books" (Complaint, DE 1 at PageID# 2-3), an organization's "mere interest in a problem" cannot confer standing. *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (internal citation omitted). Rather, the plaintiff organization must show that its "ability to further its goals has been 'perceptively [sic] impaired' so as to constitute far more than simply a setback to the organization's abstract social interests." *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716 (6th Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Plaintiff PEN America has not done so, and has therefore failed to establish organizational standing.

Plaintiff PEN America appears to assert associational standing by alleging that "[r]emoving and restricting access to author members' books in public school libraries therefore injures authors' right to share their books" and that "[s]everal of PEN's author members have authored books that have been removed or restricted by the actions of Defendants and have standing to sue in their own right." (Complaint, DE 1, PageID# 2, 3). Because, as explained in Sections II(A) and (B), *supra*,

there exists no legally protected First Amendment right for authors to compel the government to speak for them and the speech at issue is government speech, the authors of the books have not demonstrated that they have suffered an "injury in fact" and therefore do not have standing to sue in their own right. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (to have standing, a plaintiff must show that: (1) he suffered an injury, which means "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical[;]" (2) the injury was caused by the person sued; and (3) a court can likely redress the injury). Because the author members of PEN America do not have standing to sue in their own right, Plaintiff PEN America lacks associational standing. *See Friends of the Earth, Inc.*, 528 U.S. at 181.

### E. Conclusion.

The standard for a preliminary injunction calls for a ***substantial likelihood*** of success on the merits, and, "[a]t the preliminary injunction stage, a district court does not resolve doubtful or difficult questions of law or disputed questions of fact." *PolyOne Corp. v. Kutka*, 67 F.Supp.3d 863, 869 (N.D. Ohio 2014) (citations and internal quotation marks omitted). These issues involve difficult questions of law, and Plaintiffs have not demonstrated a substantial likelihood of success in the return of the challenged books to the shelves. Plaintiffs' failure to show likelihood of success is fatal. *See Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). Therefore, this factor weighs heavily in favor of denying the preliminary injunction.

### II. Plaintiffs Are Unable To Demonstrate That They Would Suffer Irreparable Injury Without The Requested Preliminary Injunction.

Without risk of irreparable harm to Plaintiffs, there is simply no need for the Court to grant the extraordinary remedy of a preliminary injunction as opposed to granting relief at the conclusion of litigation. *See Sumner Cty. Sch.*, 942 F.3d at 326; *Ciavone*, 2009 WL 2096281, at *1.

District courts must "weigh the strength of the four [preliminary injunction] factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief now as opposed to at the end of the lawsuit." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Indeed, "[t]he purpose of a preliminary injunction is to prevent future irreparable harm". *Eads v. Tennessee*, 2019 WL 13400030, at *2 (M.D. Tenn. Mar. 19, 2019). "A showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Total Toxicology Labs, LLC v. Azar*, 2019 WL 7046843, at *3 (E.D. Michigan, Dec. 23, 2019) (quoting *Lucero v. Detroit Pub. Schs.,* 160 F.Supp.2d 767, 901 (E.D. Mich. 2001). "Without such a showing, the Court simply cannot issue a preliminary injunction." *Id.* (quoting *Lucero*, 160 F.Supp.2d at 901); *see also Sumner Cty. Schs.*, 942 F.3d at 326–27 (stating that "even the strongest showing" on the other factors cannot justify a preliminary injunction without irreparable harm). Further, "the moving party must show that irreparable harm is 'both certain and immediate, rather than speculative or theoretical.'" *Id.* at 818 (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 154 (6th Cir. 1991)); *see also Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). Instead, it must be "both certain and immediate." *Sumner Cty. Schs.*, 942 F.3d at 327.

Plaintiffs are unable to show that they will face irreparable harm absent their requested injunctive relief.[22] As an initial matter, Plaintiffs' request for immediate relief contrasts with their

---

[22] Plaintiffs' requested injunctive relief falls into two buckets: (1) requiring the Defendants to restore the removed and restricted books to their previous availability in school libraries; and (2) enjoining Defendants from removing and

delay in seeking a preliminary injunction. Plaintiffs challenge book removals dating back to the "Spring of 2024" (Complaint, DE 1, PageID# 5), and yet Plaintiffs only just filed their lawsuit requesting emergency injunctive relief to restore the books and prevent future removals. The fact that Plaintiffs waited so long to file their lawsuit weighs against a finding of irreparable and immediate harm absent the requested injunction. *See Hardaway v. Lee*, 2022 WL 3270604, at \*1 (M.D. Tenn. Aug. 10, 2022) ("Mr. Hardaway's delay in seeking temporary injunctive relief suggest that there is no immediate threat and thus no basis for a temporary restraining order"); *Allied Erecting & Dismantling Co. v. Genesis Equp. & Mfg*., 511 F. App'x 398, 404 (6th Cir. 2013) (finding that "an unreasonable delay in filing for injunctive relief" weighs "against a finding of irreparable harm"); *Sarnova HC, LLC v. Reetz*, 2021 WL 1257081, at \*3 (S.D. Ohio Apr. 5, 2021) (holding that a party's delay "severely undermines [its] request for a temporary restraining order because its lack of urgency suggests it does not need immediate injunctive relief).

### A. Plaintiffs Will Not Face Irreparable Harm Absent An Injunction Restoring The Books.

Plaintiffs are unable to demonstrate irreparable harm absent their requested injunction requiring the Defendants to restore the removed and restricted books to their previous availability in school libraries. Although the minor Plaintiffs submitted declarations describing various removed books that they would like to read (*see* Declarations, DE 12-1, 12-2, 12-3), none of said declarations actually state that the Plaintiffs cannot access those books. Although the books may not be available in school libraries, nothing is preventing the Plaintiffs from obtaining the books from other sources. Plaintiffs point to the Court's holding in *Minarcini*, 541 F.2d 577, that "[r]estraint on expression may not generally be justified by the fact that there may be other times,

---

restricting books from Rutherford County Schools libraries pursuant to the immediate removal provisions of Board Policy 4.403. (Memorandum of Law, DE 12, PageID# 104).

places, or circumstances available for such expression." (Memorandum of Law, DE 12 at PageID# 95) (citing *Minarcini* at 582). However, despite Plaintiffs' characterization of the book removals as a "book ban", they have alleged no facts that the books are "banned" in schools (*i.e.*, that students are restrained from reading the books at school or otherwise restrained from expressing the ideas contained in said books). Moreover, *Minarcini* was decided in 1976 when the removal of books from a school library might have legitimately restrained a student's access to the information therein. This is not currently an issue today. In this age of information, students have access to books, information, and ideas from numerous sources, including online resources and their smartphones, and Plaintiffs have not alleged otherwise.[23] As stated by one district court in a more recent analysis of this issue:

> [E]ven if Plaintiffs were to succeed on their claim that the District's policy or actions violate the First Amendment, their harm would not be especially great, at least compared to a prototypical First Amendment violation. The removal of the books at issue from the District's schools does not stop any student from reading or discussing the book, which surely would raise a more serious issue. *See Pico*, 457 U.S. at 921, 102 S.Ct. 2799 (O'Connor, J., dissenting) (opining that a school board "surely can decide which books to discontinue or remove from the school library so long as it does not also interfere with the right of students to read the material and to discuss it").

> The plurality in *Pico* eschewed the idea of schools denying students "access to ideas." ***Today, though, denying students access to a particular book at a school library does not deny them access to the book or its ideas. The forty years since the Court decided Pico have allowed for easier and greater access to ideas more so than perhaps any other forty-year period since the invention of the printing press.*** If it were a violation of Plaintiffs' First Amendment rights, it would still injure them, cf. *Uzuegbunam v. Preczewski*, —— U.S. ——, 141 S. Ct. 792, 802, 209 L.Ed.2d 94 (2021) ("every violation [of a right] imports damage"), ***but the harm would be***

---

[23] By way of example of the accessibility of these materials, the Rutherford County public library system partners with Libby and hoopla to make ebooks, audiobooks, and other materials available to library card holders for free online. *See* https://rclstn.org/apps/. (Last accessed March 11, 2025).

> *slight in comparison to other violations of the First Amendment*
> *because they still have access to the ideas.*

*C.K.-W. by & through T.K.*, 619 F. Supp. 3d at 919. "[R]emoving a library book does not deny anyone the chance to read it. The book has not been "banned," as plaintiffs … breathlessly claim. People who want the book can buy it or borrow it from somewhere else." *Little*, 2025 WL 1478599, at \*12. As explained by the *Little* Court:

> [B]y removing a book, the library does not prevent anyone from "receiving" the information in it. The library does not own every copy. You could buy the book online or from a bookstore. You could borrow it from a friend. You could look for it at another library. *See Pico*, 457 U.S. at 915, 102 S.Ct. 2799 (Rehnquist, J., dissenting) ("[T]he most obvious reason that petitioners' removal of the books did not violate respondents' right to receive information is the ready availability of the books elsewhere."). The only thing disappointed patrons are kept from "receiving" is a book of their choice at taxpayer expense. That is not a right guaranteed by the First Amendment.

*Id.* at \*11.

Thus, it cannot be said that students are "restrained" from the information contained in said books by removing them from the shelves of a school library. Likewise, it cannot be said that that the author members of Plaintiff PEN American Center, Inc. are "restrained" from communicating their ideas with students. Therefore, any harm the Plaintiffs might face is slight, if at all, and certainly not irreparable.

### III. Plaintiffs Cannot Show Certain And Immediate Irreparable Harm Absent An Injunction Prohibiting Future Removal Of Books.

Preliminary injunctions "will not be issued simply to prevent the possibility of some remote future injury," as "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S.

at 22. An irreparable injury is one that is "actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

In this case, neither the minor Plaintiffs nor Plaintiff PEN American Center, Inc. are able to demonstrate that any future removal or restriction of books by Defendants will cause imminent harm. While Plaintiffs allege that "[t]here are still books on bookreviewrc.com that are listed as 'under review' but have not yet been removed" and, therefore "Defendants' book banning efforts are thus not likely to end" (Complaint, DE 15, PageID# 15), the website bookreviewrc.com is not a website maintained by Defendants[24] and there are not currently any books under review by Defendants (*See* Affidavit of Dr. James Sullivan attached as Exhibit "B"). Regardless, Plaintiffs have not alleged that any of these books on the "under review" page were even written by PEN American members or that any of the minor Plaintiffs had planned to read these books.

To the extent Defendants may remove or restrict additional books in the future, which is speculative in the first place, it is also speculative whether any such books would have been written by a PEN American member or would have been checked out by one of the minor Plaintiffs. Plaintiffs' allegations regarding past removals are illustrative of this fact. Despite "over 140 titles" having been removed or restricted (Memorandum of Law, DE 12, at PageID# 81), only fifty-three (53) of said titles were written by members of Plaintiff PEN American Center, Inc. (*id.* at PageID# 91). Similarly, out of the "over 140 titles", the minor Plaintiffs only identified fourteen (14) titles that they had planned to read or would have liked to read.[25] Thus, even if it was certain that Defendants would continue to remove books, there would only be a mere possibility of a chance

---

[24] Plaintiffs admit in their Complaint that this website is not maintained by Defendants but rather was created by a third party trying to "help" with the book review efforts. (Complaint, DE 1 at PageID# 7).
[25]*To All the Boys I've Loved Before*, *Forever*, *Speak*, and *Speak: The Graphic Novel* (*see* Roe Dec., DE 12-1); *Beloved*, *Home Body: A Collection of Poems*, *Milk and Honey*, *The Sun and Her Flowers*, *Homegoing*, and *Catch 22* (*see* Doe Dec. DE 12-2); *Wicked (The Life and Times of the Wicked Witch of the West)*; *Ready Player One*; *Looking for Alaska* (*see* Roe Dec., DE 12-1; Doe Dec. DE 12-2); *Perks of Being a Wallflower* (*see* Coe Dec., DE 12-3).

33

that any such books were written by a PEN American member or would have been checked out by one of the minor Plaintiffs. This is precisely the kind of speculative future harm that is insufficient for Plaintiffs to be entitled to the extraordinary remedy of a preliminary injunction. *See Winter*, 555 U.S. at 22; *see also E. Greyhound Lines v. Fusco*, 310 F.2d 632, 634 (6th Cir. 1962) (holding that injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time in the future").

**IV.    The Public Interest Would Not Be Served By Issuance Of A Preliminary Injunction In This Matter.**

"[T]he third and fourth factors that comprise the Court's analysis—*i.e.*, whether a [preliminary injunction] would cause substantial harm to others and whether it would serve the public interest—" merge when the Government is the opposing party." *Blount Pride, Inc. v. Desmond*, 2023 WL 5662871, at *7 (E.D. Tenn. Sept. 1, 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "Under these two factors, [the] Plaintiff[] must show that a [preliminary injunction] would not result in substantial harm to others and would serve the public interest." *Id*.

The Board, as well as the public at large, has a legitimate and compelling interest to ensure that students are not exposed to early sexualization through graphic sexual content in school libraries. *See Fraser*, 478 U.S. at 684 (citation omitted) (courts recognize a widespread "interest in protecting minors from exposure to vulgar and offensive spoken language."). In no other public arena would the arguments presented by Plaintiffs (*i.e.*, that authors have a right secured by the United States Constitution to expose minors to sexually explicit content and that minors have a right secured by the United States Constitution to receive sexually explicit content) be cognizable, and it certainly should be no different in the school library setting. Even the plurality in *Pico* acknowledged that public school districts have legitimate grounds for shielding their students from vulgar or educationally unsuitable library content. *Pico*, 457 U.S. at 871.

34

This is not a case involving a few harmless books that were removed because of certain ideas expressed therein but instead the removal of numerous books containing explicit sexual content and other age-inappropriate material ***prohibited by state statute*** from being in schools. (*See* Tenn. Code. Ann. § 49-6-3803; book excerpts, *supra*). Granting the requested injunction would cause the School Board irreparable harm by forcing it to deviate from Tennessee state law. Further, evaluating and making decisions regarding the appropriateness of educational materials is part of the daily operation of school systems and the public interest weighs against federal court intervention. *See Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems, and which do not directly and sharply implicate basic constitutional values."). As the court stated in *C.K.-W. by and through T.K.*:

> [T]he injury an injunction would inflict on the District is considerable, and the public interest favors the District in this case. At issue here is a facially neutral policy, by which the District decides whether books in its libraries should be removed, that a duly elected and publicly accountable school board enacted. As previously discussed, no one disputes that the District can remove books from its libraries for numerous reasons. And, therefore, policies providing for when and why books will be removed are necessarily allowable. The specifics of such a policy—especially where, like here, the policy is facially neutral—should not easily be second-guessed by a federal court. *Epperson v. State of Ark.*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ("Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."); *Kuhlmeier*, 484 U.S. at 273, 108 S.Ct. 562; *see also Brach v. Newsom*, 2:20-cv-06472-SVW, 2020 WL 6036764, at \*5 (C.D. Cal. Aug. 21, 2020) ("Plaintiffs' proposed constitutional right would at least unsettle 'local autonomy' in public education, which the Supreme Court has described as "'a vital national tradition.'" (quoting *Missouri v. Jenkins*, 515 U.S. 70, 99, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) (citation omitted))).

*Id.* at 919-20.

35

Balancing the relative harms of the Plaintiffs with the public interest in protecting students from graphic sexual content and ensuring that democratically-elected and accountable local school boards retain the power and discretion to accomplish the same weigh in favor denying the requested preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs have failed to meet their burden of establishing entitlement to a preliminary injunction. Defendants respectfully request that the Court deny Plaintiffs' Motion (DE 11).

**Respectfully submitted,**

**HUDSON, REED & CHRISTIANSEN, PLLC**

**By: /s/ Nick C. Christiansen**
     **JEFF REED, #15000**
     **NICK C. CHRISTIANSEN, #30103**
     **JASON N. KING, #027749**
     16 Public Square North
     P.O. Box 884
     Murfreesboro, TN 37133
     (615) 893-5522
     jreed@mborolaw.com
     nchristiansen@mborolaw.com
     jking@mborolaw.com

     *Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was sent to the following via the District Court's electronic filing system and/or U.S. Mail, postage prepaid, to:

Kerry Knox
117 S. Academy Street
Murfreesboro, TN 37130
kek@castelliknox.com

Stella Yarbrough
Lucas Cameron Vaughn
Zee Scout
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
syarbrough@aclu-tn.org

this the 30th day of May, 2025.

**/s/ Nick C. Christiansen**
**NICK C. CHRISTIANSEN**