# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

RACHEL ROE, et al.,

                Plaintiffs,

   v.

RUTHERFORD COUNTY BOARD OF
EDUCATION; JAMES SULLIVAN,

              Defendants.

Case No. 3:25-cv-00429
Judge Eli Richardson
Magistrate Judge Alistair Newbern

## PLAINTIFFS' REPLY IN SUPPORT
## OF MOTION FOR PRELIMINARY INJUNCTION

Defendants cherry pick out-of-context passages from eleven books to stand for the idea that all 133 removed or restricted books[1] were removed for being "sexually explicit." Defs' Response (Doc. 24) at PageID 178-82. "Sexual explicitness," however, is merely a pretense and a post hoc rationalization that fails to fit the facts. Defendants did not mention these passages when removing the books. In fact, one Board member concluded after the books were already removed: "…there's no way that anyone looked at those 150 books before they were submitted to say that they were sexually explicit." Compl. ¶ 39. Another Board member stated that he did not read the books and did not want to. Compl. ¶ 28; Defs.' Answer (Doc. No. 22) ¶ 28 (admitting statements). Other Board members publicly stated that they relied on (partisan, anti-LGBTQ+) BookLooks "reviews" of the books when voting to remove them, *id*. ¶ 27, 28, 33, 38, and encouraged other Board members to rely on those reviews instead of reading the books themselves. *id.* ¶ 18.

In contrast, school library materials specialists who *did* read the books noted that many, if not most, of the removed books did not contain inappropriate sexual content and were otherwise age-appropriate, valuable educational resources. *Id*. ¶ 52 (review of removed book *Ask the*

---

[1] Defendants are correct that the number of removed or restricted books is a total of 133 (111 removed; 22 restricted; 3 retained). *See* Defs.' Response (Doc. No. 24) at PAGEID 178, fn 4.

*Passengers*: "There is no nudity, no ultimate sex acts, no sexual excitement – just kissing"; review of *The Female of the Species*: "no sexual content"; review of *Girl in Translation*: same; review of *The Testaments*: same; review of *Almost Perfect*: "there are no descriptions of sex," removal likely based on "disagreement or personal beliefs"); *see also id*. ¶ 43. Of course, these reviews were largely ignored. *Id*. ¶ 43; *compare C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.,* 619 F. Supp. 3d 906, 916 (E.D. Mo. 2022) (relying on opinions of "school librarians—whose expertise on this matter outpaces this Court's and who are accountable to the locally elected school board" in evaluating book removals).

Instead of reckoning with the record, Defendants plead salacious content in the hopes of making the Court blush and look away from the real issues presented: controlling caselaw in this Circuit establishes that students, like Individual Plaintiffs, have a First Amendment right to receive information from their school libraries; authors, as represented by Plaintiff PEN America, have a right to disseminate their ideas without viewpoint censorship; school boards violate those rights when they ban books over disagreement with their content, as Defendants did here; and, school libraries are not government speech. All preliminary injunction factors weigh heavily in Plaintiffs' favor. The Court should therefore grant a preliminary injunction.

## ARGUMENT

## I. Students Have a First Amendment Right to Receive Information under *Pico* and *Minarcini* and Are Likely to Succeed on The Merits of Their Claim

*Pico* "is the only Supreme Court decision dealing specifically with removal of books from a public school library" and "must be used as a starting point." *Case v. Unified Sch. Dist. No. 233*, 895 F. Supp. 1463, 1469 (D. Kan. 1995) (citing *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982)). The majority of justices in *Pico* agreed that removal of books from a school library implicates the First Amendment. *See Pico*, 457 U.S. at 870 (Brennan,

2

J., plurality opinion); *id.* at 879-80 (Blackmun, J., concurring) ("It does not seem radical to suggest that state action calculated to suppress novel ideas or concepts is fundamentally antithetical to…the First Amendment."); *id.* at 883-84 (White, J., concurring in the judgment) (agreeing Court should remand for factfinding regarding "the reasons underlying the school board's removal of the books"—a pointless exercise if no facts could establish a violation of the First Amendment); *id.* at 908 (Rehnquist, J., dissenting) ("cheerfully conced[ing]" that some hypotheticals posed by plurality would violate First Amendment); *cf. C.K.-W. by & through T.K.*, 619 F. Supp. 3d at 914 (recognizing *Pico* holds, even on narrowest grounds, that First Amendment "impose[s] some degree of limitations upon the discretion of the removal of books from a public-school library.").

As for when the First Amendment is violated, the plurality held "that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 872 (quoting *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). This decision confirmed—and did not abrogate—the Sixth Circuit's earlier holding in *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 (6th Cir. 1976), which found that school board members cannot "winnow the library for books the content of which occasioned their displeasure or disapproval." *Id.* at 581.

Indeed, *Minarcini* remains controlling Circuit precedent and binds both this Court and the Sixth Circuit. *See, e.g., Gilbert v. Nat'l Emp. Benefit Companies, Inc.,* 466 F. Supp. 2d 928, 933 (N.D. Ohio 2006) ("Under *stare decisis,* a district court in this circuit is bound only by opinions of the U.S. Supreme Court and the U.S. Court of Appeals for the Sixth Circuit, while other authority is advisory."); *U.S. v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014) ("A panel of this [Sixth Circuit] court may not overturn binding precedent because a published prior panel decision

3

remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." (quotation omitted)). *Minarcini* is still routinely cited for the holding that students have a First Amendment right to receive information from their public-school libraries. *See, e.g.*, *Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585, 591 (6th Cir. 2003) (citing *Minarcini* for holding that right to receive information includes access to libraries); *Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573, 2025 WL 902041, at *4 (M.D. Fla. Feb. 28, 2025) (citing *Minarcini* for holding that students have right to receive information); *Crookshanks. v. Elizabeth Sch. Dist.*, No. 1:24-CV-03512, 2025 WL 863544, at *16 (D. Colo. Mar. 19, 2025) (similar); *Parnell v. Sch. Bd. of Lake Cnty., Fla*., 731 F. Supp. 3d 1298, 1313 (N.D. Fla. 2024) (similar). Under *Pico* and *Minarcini*, Plaintiffs are therefore likely to succeed on the merits of their claim.

## II.     Authors Have a Right to Share Ideas without Viewpoint Censorship

"Authors have a right to share their books and ideas, and this right is protected under the First Amendment." *Crookshanks*, 2025 WL 863544, at *8 (granting preliminary injunction to Author's Guild over removal of books from school library); *cf. PEN American Center, Inc. v. Escambia County School Board*, 711 F.Supp.3d 1325 (N.D. Fla. 2024) (finding authors plausibly stated First Amendment claim over removal of books from school library). "The right of freedom of speech and press has broad scope. […] This freedom embraces the right to distribute literature, and necessarily protects the right to receive it." *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943) (internal citation omitted).

A school library is, at a minimum, a non-public forum. Restrictions in this forum must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 800 (1985).

4

As argued below, Defendants excluded PEN's member authors' books over disagreement with the ideas those books contained—in short, viewpoint discrimination. *Cf. Virden v. Crawford Cnty., Arkansas*, No. 2:23-CV-2071, 2024 WL 4360495, at *4 (W.D. Ark. Sept. 30, 2024) ("The fact that viewpoint discrimination was a substantial motive for [book restrictions] has profound First Amendment implications.") (rejecting school board claims that books were restricted for "sexuality" as pretense for excluding books that had LGBTQ+ narratives). Plaintiff PEN America therefore has standing and is likely to succeed on the merits of its claim.

### III. Defendants Removed Books Because of Disagreement with Books' Content and in a Narrow, Partisan Manner

"Sexual explicitness," or pervasive vulgarity, to put it in terms closer to *Pico*, is merely a pretext for removal and cannot legitimize Defendants' actions. *See Case*, 908 F. Supp. at 875 ("The court is required to assess the 'credibility of [school officials'] justifications for their decision.'") (quoting *Pico*, 457 U.S. at 875)). First, Defendants' own statements reveal a patent dislike for the books. Compl. ¶ 28 ("I don't like them. I wouldn't read them."); id. ¶ 39 ("Look everybody wants them off the shelf…"). Second, even in the middle of the removal process, Defendants themselves questioned whether they were removing books based on a misunderstanding of sexual explicitness or were otherwise improperly removing books. Compl. ¶¶ 37, 38, 40 (Defendant Sullivan: "what may be viewed by Board members as 'patently offensive' is not 'patently offensive'…as defined in the law");(describing the removal process as a "round robin game of insanity"). Third, Board members relied on BookLooks reviews in their decisions, Compl. ¶¶ 20, 27, 28, 33—indeed, an overwhelming majority of the books were initially removed *solely* based on BookLooks reviews, Compl. ¶¶ 32, 33. These reviews are highly partisan and biased, particularly against LGBTQ+ characters or stories about sexual assault, among other themes. *Id*. ¶¶ 20-26; Pls.' Memo in Support of P.I. (Doc. 12) at PageID 97. Board members then merely gave a rubber stamp of approval on

the removals each time they met—without any indication that they read the books and without any deference to the library materials specialists' reviews. Compl. ¶ 43.

Indeed, according to the school district's own library materials specialists, many of the removed books were *not* sexually explicit—they just contained disliked content.[2] *Id.*¶ 51; Pls. Memo in Support of P.I. (Doc. 12) at Page ID 88-89. The exact disliked viewpoints are clear when one reviews the books that were removed or restricted. *See* Compl. ¶58 ("content relating to sex, sexuality, or nudity in any form"); Compl. ¶ 23, 58 (sexuality, LGBTQ+ themes, characters); Compl. ¶ 22, 26, 48, 51 (books by authors of color, particularly books that highlight racism); *see also* Pls.' Memo in Support of P.I. (Doc. 12) at PageID 97; Roe Dec. ¶ 13; Doe Dec. ¶ 12; Coe Dec. ¶ 11. Plaintiffs' right to receive information was therefore violated by Defendants, who "remove[d] books from school library shelves simply because they dislike[d] the ideas contained in those books." *Pico*, 457 U.S at 872.

## IV. Government Speech Doctrine Does Not Apply

Recently, a plurality of judges in an *en banc* panel in the Fifth Circuit embraced a local government's argument that its public library is a First-Amendment free zone and is instead an avenue of government speech. *Little v. Llano County*, No. 23-50224, 2025 WL 1478599 (5th Cir. May 23, 2025). In reaching its decision, the *Little* panel reversed the decision of a district court, *id*. at *4, reversed a panel of circuit judges, *id.* at *5, disagreed with an Eighth Circuit decision, *id* at 25 (citing *GLBT Youth v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024)), and overruled its own decades-old precedent, *id*. at *1 (overruling *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d

---

[2] Of the eleven books highlighted by Defendants, two were reviewed by library materials specialists: *All Boys Aren't Blue* and *The Carnival at the Bray*. Compl. ¶ 52, fn. 38, 39. The specialists recommended retaining *Carnival* and only recommended removing *All Boys* because it technically met the Board Policy's criteria for nudity, noting "this book holds strong literary merit, and within the realm of publications for young adults, there are very few narratives from the perspective of a young man of color." *Id.*

6

184 (5th Cir. 1995))—all of which recognized that book removals implicate the First Amendment. Even then, only seven of the seventeen judges joined in the government speech holding. *Id*. at *1. Defendants nonetheless invite the Court to hang its hat on this loose screw.[3]

Several other district courts have declined such an invitation. *See PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd*., 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) ("The Court simply fails to see how any reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves."); *Virden*, 2024 WL 4360495, at *5 (similar); *Crookshanks.,* WL 863544, at *7 (similar); *Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas*, 684 F. Supp. 3d 879, 910 (W.D. Ark. 2023) (similar). The Eighth Circuit quickly rejected the government speech defense in a recent book-banning case, reasoning the government has not historically treated libraries as government speech, the public is unlikely to perceive the government of speaking through its library, and the government does not typically assert control over libraries in crafting its message. *See GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024).

It is easy to see why courts have rejected the idea that school libraries are government speech. Whether the government is speaking for itself or intends to regulate private speech is a "holistic inquiry" "driven by a case's context." *Shurtleff v. Boston*, 596 U.S. 243, 252 (2022) (finding city program that displayed flags from various organizations was not government speech). Cases where the government has been found to be speaking involve markedly different circumstances than school libraries. *See e.g*., *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (U.S., 2009) (monuments in park); *U.S. v. American Library Ass'n, Inc.*, 539 U.S. 194, 198–99 (U.S. 2003) (internet terminals in public libraries); *People for the Ethical Treatment of Animals,*

---

[3] Importantly, *Little* concerns a public library, not a school library, making it even less applicable here. As discussed in Section V(b), school libraries serve a unique pedagogical function for students that a public library does not.

*Inc. v. Gittens*, 414 F.3d 23, 30 (D.C. Cir. 2005) (temporary, themed art exhibit); *Gundy v. City of Jacksonville Fla*., 50 F.4th 60, 71 (11th Cir. 2022) (opening prayer at a legislative meeting). In contrast, school libraries in Tennessee have not historically been heavily curated or regulated by state law or local policy: Board Policy 4.403 was only passed in August 2024. Compl. ¶ 15. And few people would reasonably consider school library collections as coherent messages expressed by school boards; rather, most are familiar with the paens describing school libraries as "mighty resource[s] in the marketplace of free ideas," *Minarcini*, 541 F.2d at 583, and places "designed for freewheeling inquiry." *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting).

The Supreme Court has warned that government speech doctrine is "susceptible to dangerous misuse." *Matal v. Tam*, 582. U.S. 218, 235 (2017). "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id*. This is the exact evil the *Pico* court hypothesized: a Democratic school board could remove all Republican books, or an all-white school board could remove books advocating for racial equality—all with impunity. 457 U.S. at 871. Courts, then, "must exercise great caution before extending[] government-speech precedents." *Matal*, 582. U.S. at 235.

**V.   All Other Factors Weigh in Plaintiffs' Favor**

a.   <u>Plaintiffs are irreparably harmed.</u>

"The loss of First Amendment freedoms for even a minimal period of time is *per se* irreparable injury." *Project Vote! v. Ohio Bureau of Emp. Servs.,* 578 F. Supp. 7, 9 (S.D. Ohio 1982) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (emphasis added). For this reason, in First Amendment cases, the likelihood of success on the First Amendment claim is usually the determinative factor. *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*,

274 F.3d 377, 400 (6th Cir. 2001).

      b.   <u>Balancing of interests supports injunctive relief.</u>

Putting aside that even the temporary loss of First Amendment rights constitutes per se irreparable harm, Plaintiffs' harm cannot be alleviated by the supposed availability of the books elsewhere (Defs.' Resp. (Doc. No. 24) at PageID 205-6). *See Pratt v. Ind. Sch. Dist. No. 831, Forest Lake, Minn.,* 670 F.2d 771, 779 (8th Cir. 1982) ("[r]estraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression.") This suggestion ignores the realities of being a high school student and the important pedagogical function of school libraries—things that have not changed since 1976.

Students are legally compelled to attend school, Tenn. Code. Ann. §49-6-3001, where they spend most of their waking hours. They may not have the time or economic resources to simply buy all the removed books or find them at a public library (where, under Defendants' preferred caselaw, these books could also be banned). Plaintiff Roe, who starts each weekday in her school library, needs up to twelve books just for one school-sponsored activity. Roe Dec. ¶¶ 5, 6. Plaintiff Doe must read dozens of books, if not more, to prepare for his AP English Literature course and exam. Doe Dec. ¶ 6; Compl. ¶ 52 (noting the ease of reading graphic version of *Kite Runner* would help AP English students who must read many books to prepare). The cost (in terms of both money and time) of acquiring textbooks, in addition to these other wanted or needed books, is exorbitant.

Moreover, under Tennessee State Board of Education rules, school libraries "shall serve as resources for students, teachers, and community members to strengthen student learning" and "shall adequately support the curricular priorities within the school." Tn. Bd. of Educ. R. 0520-01-02-.07.[4] Given these state-imposed requirements, it is difficult to see a school library

---

[4] Available at https://publications.tnsosfiles.com/rules/0520/0520-01/0520-01-02.20201118.pdf.

successfully adopting the policy "buy it or borrow it somewhere else," *Little*, 2025 WL 1478599 at *12, particularly for books like *Beloved*, *The Kite Runner*, *Catch-22*, *The Testaments*, and *The Last Night at the Telegraph Club* that are tied to the requirements of school curricula. Compl. ¶ 52 (library materials specialist noting *Last Night* is "heavily tied to curriculum").

Nor would the "find it somewhere else" policy further the public interest in maintaining school libraries as resources dedicated to furthering students' educational freedom. *Pico*, 457 U.S. at 868, 869 ("students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding."[…]"The school library is the principal locus of such freedom."). Per Defendants, school libraries are nothing more than spaces where students read Defendants' views on the world—not "storehouse[s] of knowledge," or "mighty resource[s] in the marketplace of free ideas." *See Minarcini*, 541 F.2d at 581, 583.

The stated public interest in protecting children from sexual content, Defs.' Resp. (Doc. No. 24) at PageID 208, is undercut by the fact that the removed or restricted books have been in circulation for years—many of them have been checked out hundreds of times—seemingly without issue. Compl. ¶52 (*Ready Player One* checked out 320 times; *Speak* 1,000 times; *Thirteen Reasons Why* 434 times). And, the removed and restricted books were recommended and/or lauded by authoritative sources. *Id*. *Speak*, for example, was nominated by Tennessee's library association and association of school libraries as the Volunteer State book of the year for young adults. *Id*. Other removed books have similarly been recognized by library associations and reputable resources such as *Kirkus Reviews*, *BookList*, and the *School Library Journal*—not to mention the many awards they have won. Compl. ¶ 52. Defendants cannot seriously suggest that organizations like the Tennessee Association of School Libraries, or their own library material specialists, aimed to expose students to "early sexualization through graphic sexual content in schools." Defs.' Resp.

10

(Doc. No. 24) at PageID 208. To be sure: school boards have a role in protecting students from "offensively lewd and indecent speech" that "undermines the school's basic educational mission," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986). But by wrongly labeling dozens of books as "sexually explicit," removing them, and then claiming that it is only their speech that matters, Defendants undermine their schools' basic educational mission—not the books.

## CONCLUSION

The Court should grant Plaintiffs' Motion for Preliminary Injunction. Books removals from public school libraries clearly implicate the First Amendment. Plaintiffs are likely to succeed on the merits of their claims. All other factors weigh in favor of Plaintiffs.

Respectfully submitted,

/s/ Kerry Knox
KERRY KNOX, BPR #23302
117 S. Academy Street
Murfreesboro, TN 37130
(615) 896-1000
(615) 896-1027 (facsimile)
kek@castelliknox.com

/s/ Stella Yarbrough_____
Stella Yarbrough, BPR # 033637
Lucas Cameron Vaughn BPR# 36284
Zee Scout BPR # 042637
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
(615) 320-7142
Syarbrough@aclu-tn.org

11

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document was sent to all counsel of record via the District Court's electronic filing system on June 13, 2025.

/s/Stella Yarbrough