## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| RACHEL ROE, a minor, by and through her parent and next friend, ROBERT ROE; DAVID DOE, a minor, by and through his parent and next friend, DANA DOE; CLAIRE COE, a minor, by and through her parent and next friend, CHARLES COE; and PEN AMERICAN CENTER, INC., | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 3:25-cv-00429 |
| RUTHERFORD COUNTY BOARD OF EDUCATION; JAMES SULLIVAN, in his official capacity as Director of Rutherford County Schools, | ) ) ) ) ) | JUDGE RICHARDSON MAGISTRATE NEWBERN |
| Defendants. | ) ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

COME NOW Defendants Rutherford County Board of Education and James Sullivan, in his official capacity as Director of Rutherford County Schools (collectively, "Defendants"), by and through counsel, and in support of their Motion for Judgment on the Pleadings would state as follows:

## PRELIMINARY STATEMENT

This case arises from the removal or restriction of approximately one hundred thirty-three (133) books from Rutherford County Schools libraries between the Spring of 2024 and April of

2025. (Complaint, DE 1, at PageID# 6, 14).[1,2] During this time, the Rutherford County School System reviewed the content of its library collections to remove or restrict materials with sexually explicit content that were determined to not be age-appropriate for certain grades or for school libraries.

On March 24, 2022, the Tennessee legislature adopted the Age-Appropriate Materials Act of 2022, T.C.A. § 49-6-3801, *et seq.* ("Act"), which gives local school boards in Tennessee broad discretion to adopt and implement procedures to maintain a library collection that is age-appropriate for school children and suitable for, and consistent with, a school's educational mission. T.C.A. § 49-6-3803. On July 1, 2024, T.C.A. § 49-6-3803 was amended to provide that materials which are not age-appropriate (as defined by the Act) **must** be removed. T.C.A. § 49-6-3803, Effective July 1, 2024.

Plaintiffs Rachel Roe, David Doe, and Claire Coe (minor students within Rutherford County Schools who purportedly wished to access some of the removed books from their school libraries) and PEN American Center, Inc. (a writers' organization whose members authored some of the removed books) collectively challenge the removal or restriction of sixty (60) of these books. (*Id.* at PageID# 17-20). Plaintiffs claim that "Defendants removed [the challenged books] from Rutherford County Schools' libraries in a narrowly partisan or political manner, or because

---

[1] Plaintiffs' Complaint references "over 140 books", but the RCS web page for removed library materials (cited in Plaintiffs' Complaint), lists 133 books that were removed or restricted. https://www.rcschools.net/apps/pages/index.jsp?uREC_ID=525032&type=d&pREC_ID=2636708 (last accessed May 13, 2025).

[2] Plaintiffs attempt to characterize this case as involving a "book ban" and allege that the books were "banned" twelve (12) times throughout their Complaint. (*See generally* Complaint, DE 1). However, this case **does not** involve banning books and, in fact, Plaintiffs have not alleged that the Defendants have prohibited anyone from reading, owning, possessing, or discussing any book. As stated by the court in *C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F.Supp.3d 906 (2022), "[t]he District has not banned the books at issue here, and, despite repeatedly calling this a case on book bans, Plaintiffs make no factual allegations about anyone banning any books. Nowhere do Plaintiffs allege that the District has prohibited anyone from reading, owning, possessing, or discussing any book." *Id.* at 909.

Defendants disagree with the ideas or views contained in those books." (*Id.* at PageID# 33). Plaintiffs collectively bring two (2) claims against Defendants – (1) the individual student Plaintiffs bring a 42 U.S.C. § 1983 claim under the First Amendment for allegedly infringing on their rights to receive information (Complaint, DE 1, Count 1, PageID# 32-33); and (2) Plaintiff PEN America brings a 42 U.S.C. § 1983 claim under the First Amendment for allegedly infringing on its members' rights to freedom of expression (*Id.* at Count 2, PageID# 34). Plaintiffs seek declaratory relief, injunctive relief, and an award of attorney's fees and costs. (*Id.* at PageID# 35).

Defendants respectfully assert that the decision as to what books are to be maintained in a school library is a decision within the proper purview of the school system. As noted by the Tennessee Attorney General:

> Preserving local discretion in these ways makes good sense. After all, the education of the Nation's youth is primarily the responsibility of parents, teachers, and ... local school officials, in addition to state officials. And local officials have long exercised that discretion, including by excluding or removing "vulgar" books from their libraries based on the books' "educational suitability." Indeed, federal courts have recognized that such questions are a core educational policy matter for local school boards.

Tenn. Op. Att'y Gen. No. 25-009 (Mar. 28, 2025) (citations and internal quotation marks omitted). Defendants respectfully submit that Plaintiffs' Complaint should be dismissed for failure to state a claim because Plaintiffs have no constitutional right to have certain books housed in a school library collection and cannot invoke a First Amendment right to receive information to challenge books removed from school libraries, the speech at issue is government speech for which Plaintiffs are not afforded First Amendment protections, and, alternatively, Plaintiffs have failed to state a claim for viewpoint discrimination. Further, Plaintiff PEN America's claims must be dismissed for PEN America's lack of standing.

## STANDARD OF REVIEW

The standard used on a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is the same as the one used for Rule 12(b)(6). *Grindstaff v. Green,* 133 F.3d 416, 421 (6th Cir.1998). When considering a Rule 12(b)(6) motion, the Court should "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). However, the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006). Further, a plaintiff must plead facts that make his or her right to relief more than merely speculative. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Simply pleading facts that are consistent with a liability or that permit the court to infer misconduct is insufficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## ARGUMENT

### I.  Plaintiffs Fail To State A Claim Upon Which Relief Can Be Granted.

#### a.  Plaintiffs Cannot Invoke A Right To Receive Information To Challenge Books Removed From School Libraries.

"Plaintiffs have a First Amendment right to read books. They don't have a First Amendment right to force a public library to provide them." *Little v. Llano Cnty.,* 138 F.4th 834, 868 (5th Cir. 2025) (Ho, J., concurring).

In a recent *en banc* opinion, the Fifth Circuit considered a virtually identical case in the context of a public library (rather than a school library) where the materials were allegedly removed because of their treatment of racial and sexual themes. *See Little v. Llano Cnty.,* 138 F.4th 834 (5th Cir. 2025). The Court held that plaintiffs cannot invoke a right to receive information to challenge a library's removal of books and that a library's collection decisions are government

speech and therefore not subject to Free Speech challenge. *See id.*[3] Specifically, the *Little* Court found that "invok[ing] the right to receive information to challenge the library's removal of the challenged books" would "stretch the right far beyond its roots". *Id*. at 845. The Court further explained as follows:

> [T]he above cases teach that people have some right to receive information from others without government interference. *See, e.g., Martin*, 319 U.S. at 143, 63 S.Ct. 862 ("[F]reedom [of speech and press] embraces the right to distribute literature and necessarily protects the right to receive it.") (citing *Lovell v. Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938)). But plaintiffs want more. They demand to receive information from the government itself.
>
> It is one thing to tell the *government* it cannot stop *you* from receiving a book. The First Amendment protects your right to do that. *See, e.g., Lamont*, 381 U.S. at 306, 85 S.Ct. 1493 (Postal Service could not regulate receipt of "communist political propaganda"). It is another thing for *you* to tell the *government* which books it must keep in the library. The First Amendment does not give you the right to demand that. *See, e.g., Pico*, 457 U.S. at 889, 102 S.Ct. 2799 (Burger, C.J., dissenting) ("[T]here is not a hint in the First Amendment, or in any holding of th[e] [Supreme] Court, of a 'right' to have the government provide continuing access to certain books.").

*Id.*

"The First Amendment works as a shield to protect private persons from encroachments by the government on their right to speak freely, not as a sword to compel the government to speak for them." *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 71 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 790 (2023)). Thus, just as the student Plaintiffs cannot invoke the First Amendment to compel the government to provide them continuing access to certain books, Plaintiff PEN American Center, Inc. cannot compel the government to provide PEN's books to students. *See Id.*

---

[3] In the *en banc* opinion by seventeen (17) Fifth Circuit judges, ten (10) judges joined in the opinion that there is no First Amendment right to receive information in this context and seven (7) of these ten (10) judges further joined in the opinion that the speech at issue is government speech.

None of the Supreme Court cases cited by Plaintiffs in either their Complaint (DE 1) or in their Memorandum of Law in Support of Motion for Preliminary Injunction ("Memorandum of Law") (DE 12) stand for the proposition that the government is obligated to provide information to anyone. "To the contrary, those cases 'only recogniz[ed] a negative right against government interference with the exchange of information by private citizens.'" *Little*, 138 F.4th at 843 (citing Erik Ugland, Demarcating the Right to Gather News: A Sequential Interpretation of the First Amendment, 3 DUKE J. CONST. LAW & PUB. POL'Y 113, 140 (2008)); *see, e.g., Kleindienst v. Mandel*, 408 U.S. 753, 762-3 (1972) (Scholars had the right to "receive [the] information and ideas" of a foreign scholar they invited to the United States). While Plaintiffs attempt to use the Supreme Court's decision in *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), to argue that students have a right to force a public school to provide access to information via the school library, this is not the holding in *Pico*. As one court recently clarified, even a "majority" of *Pico*'s Justices agreed "there is no First Amendment obligation upon the State to provide continuing access to particular books". *Little*, 138 F.4th at 844 (citing *Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1045 n. 30 (5th Cir. 1982)); *see also Walls v. Sanders*, 760 F. Supp. 3d 766, n. 49 (E.D. Ark. 2024) ("although some of the justices' opinions adventurously attempted to recast the right to receive information from private speakers into a right to force a public school to provide students access to information, *see Pico*, 457 U.S. at 885-91 (Burger, J., dissenting), no opinion garnered a majority of justices.").[4, 5]

---

[4] "Though of no precedential significance, Chief Justice Burger's dissent, which three other Justices joined in full, had more votes than any opinion affirming the judgment, including Justice Brennan's plurality opinion." *C.K.-W. by & through T.K.*, 619 F. Supp. 3d at 919.

[5] As stated by the Eleventh Circuit, *Pico* was "a badly fractured decision" that has "no precedential value as to the application of the First Amendment to these issues." *ACLU of Fl., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1199—1200 (11th Cir. 2009). Further, *Pico* "establishes no standard" for future courts. *Id.* ("*Pico* is a non-decision so far as precedent is concerned") (quotations omitted). The Fifth Circuit has likewise held that "*Pico*'s 'highly fractured'

Plaintiffs therefore have no First Amendment right to control, or ask this Court to intervene in, a school library's content. As the Plaintiffs have no First Amendment right to receive information to challenge a library's removal of books, Plaintiffs' Complaint fails to state a claim against Defendants upon which relief can be granted.

### b. The School Board's Removal Of The Books Is Protected By the Government-Speech Doctrine.

Who has control over the content offered to students in public school libraries? Under Plaintiffs' view, the Courts, rather than the states and local boards of education, have the final word. However, this theory mistakes local public-school systems for promoters of private speech, instead of guardians *in loco parentis* with responsibility for using its own speech to advance state-determined educational aims.

Under the government speech doctrine, "[a] government entity has the right to 'speak for itself.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (quoting *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000)). "When the State is the speaker, it may make content-based choices." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). Government speech extends to the freedom "not to speak" and to "'speak through the removal' of speech that the government disapproves" *See Mech v. Sch. Bd. of Palm Beach Cnty., Fla.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (quoting *Downs v. L.A. Unified Sch.*

---

opinions 'ha[ve] no precedential value' as to the First Amendment". *Little*, 138 F.4th at 844, n. 14 (citations omitted). As stated by the Eighth Circuit:

> Under the *Marks* rule, *Pico* lacks any holding as to the First Amendment because the narrowest grounds for the judgment was the opinion of Justice White who declined to decide any constitutional questions. *See Pico*, 457 U.S. at 883–84, 102 S.Ct. 2799 (White, J., concurring in the judgment); *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (quotation omitted)).

*Walls v. Sanders*, 2025 WL 1948450, at *4 (8th Cir. July 16, 2025).

*Dist.*, 228 F.3d 1003, 1012 (9th Cir. 2000)). "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Summum*, 555 U.S. at 467. When the government speaks, it may select the views that it wants to express. *Id*. at 468 (citing *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)). If the government could not do so, "it is not easy to imagine how government could function." *Summum*, 555 U.S. at 468. "People can protest what the government says, but they cannot sue to make the government say what they want". *Little*, 138 F.4th at 852 (citing *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 247-8 (2022) ("[W]hen the government speaks for itself, the First Amendment does not demand airtime for all views.")).

In holding that the selection and removal of library books from shelves constitutes government speech, the *Little* Court noted as follows:

> Most of the books in the Llano County library were written and published by private authors and private firms. They are private speech. Yet the county librarian, along with other county officials, decides which books to buy, buys them with public funds, and manages the library collection.

*Id*. at 852. The Court likened a public library collection to other instances where a government presents a curated collection of third-party speech. *See id.* (citing *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (a newspaper runs certain editorials but not others); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) (a cable operator broadcasts some programs but not others); *Hurley v. Irish–Amer. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 570 (1995) (a parade organizer lets in certain floats but not others); *Summum*, 555 U.S. at 464-5 (government accepts some privately donated monuments over others for display in a public park)). The Court concluded that "Supreme Court precedent teaches that someone may engage in expressive activity by curating and

presenting a collection of someone else's speech . . . . Governments can speak in this way, no less than private persons." *Little*, 138 F.4th at 854 (citations omitted); *see also Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (when the government "compil[es] the speech of third parties," that is a "communicative act"). The *Little* Court further illustrated as follows:

> Take any public museum—say, the National Portrait Gallery. The Gallery selects portraits and presents them to the public. Its message is: "These works are worth viewing." A library says the same thing through its collection: "These books are worth reading." The messages in both cases are the government's.

*Little*, 138 F.4th at 854. Indeed, "[a] library's 'goal' in choosing books is to 'provide materials that would be of the greatest direct benefit or interest to the community,' to 'collect only those materials deemed to have requisite and appropriate quality,' and to 'identif[y] suitable and worthwhile material.'" *Id.* at 853 (citing *U.S. v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 204, 208 (2003)). "[L]iterally from the moment they arose in the mid-19th century, public libraries have been shaping their collections for specific educational, civic, and moral purposes. They still do today." *Id.* at 865. This curation of third-party materials, including "editorial discretion in the selection and presentation of" third-party speech that the government presents to the public, is the very definition of government speech. *See People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 30 (D.C. Cir. 2005) (quoting *Forbes*, 523 U.S. at 674). In public libraries, "the government speaks through its selection of which books to put on the shelves and which books to exclude." *Little*, 138 F.4th at 837. Countless books have been written and no school library can hold them all. School officials must therefore make a determination as to which books are most appropriate for the educational mission of the school.

As recognized by the Court in *Little*, "the expressive activity at issue" is not "the words of the library books themselves" but rather "choosing some books and presenting them as worthwhile literature". *Id.* at 865.[6] "It is the public library—the *government*—who conveys that message, nobody else." *Id.* (emphasis in original); *see also id.* at 863 ("[T]he public library's judgment is 100-proof government speech."). First Amendment forum principles do not "apply to a public library's exercise of judgment in selecting the material it provides to its patrons." *Am. Libr. Ass'n.*, 539 U.S. at 205 (finding that a forum analysis would be "out of place");[7] *see also Little*, 138 F.4th at 859 ("Forum analysis has no place on a library's bookshelves").

In the other very recent case of *Walls v. Sanders*, 2025 WL 1948450 (8th Cir. July 16, 2025), the Eighth Circuit analyzed the First Amendment right to receive information by students in the school curriculum context. The plaintiffs in that case were two public school students who alleged an Arkansas law violates their rights under the First Amendment's Free Speech Clause by prohibiting their teachers from providing classroom materials and instruction about Critical Race Theory (CRT). *Id.* at *1. The district court concluded that the two students were entitled to a preliminary injunction based on their "right-to-receive-information" claim under the Free Speech

---

[6] The case of *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160 (D. Colo. 2025), relied on by Plaintiffs (holding that the board removal of "sensitive" books violated First Amendment rights) flippantly dismissed the district's government speech arguments based on an incorrect characterization of the speech at issue as being the *content* of the books rather than the defendants' *selection* of the books. *Id.* at 1172 ("Take, for example, a high school library that includes Hitler's manifesto *Mein Kampf*. No one would seriously argue that placing this book in a school library constitutes government speech."); *c.f. Gittens*, 414 F.3d at 28 (while "[t]hose who check out a Tolstoy or Dickens novel would not suppose that they will be reading a government message, ... the government speaks through its selection of which books to put on the shelves and which books to exclude."). *Crookshanks* and its faulty reasoning should not be considered in this case.

[7] In rejecting a First-Amendment challenge, the *American Library Association* Court upheld the "Child Internet Protection Act," which addressed "problems associated with the availability of internet pornography in public libraries." *Id.* at 198–99. The Court opined that a "library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves, any more than it collects books in order to provide a public forum for the authors of books to speak." *Id.* at 206. Rather, the resources of public libraries are to "facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *Id.* The internet is simply "a technological extension of the book stack." *Id.* at 207.

10

Clause and that the Arkansas officials did not show a legitimate pedagogical reason for withholding teaching about CRT, so the students were likely to prevail on their claim. *Id*. at *2. The defendants appealed the district court's grant of the preliminary injunction, arguing that the instruction and materials the students claim to have a right to receive constituted government speech and therefore the decision to withhold such information is not subject to the Free Speech Clause. *Id*. at *3. On appeal, the Eighth Circuit reversed the grant of the preliminary injunction, concluding that:

> [T]he Constitution does not give courts the power to block government action based on mere policy disagreements. The right to receive information cited by the students in support of the preliminary injunction does not authorize a court to require the government to retain certain materials or instruction in the curriculum of its primary and secondary public schools, even if such information was removed for political reasons. Since the speech belongs to the government, it gets to control what it says. We therefore conclude the students are unlikely to succeed on the merits of their right-to-receive claim and should not have been granted a preliminary injunction.

*Id.* at *6.

In addressing the students' "right to receive" claim, the Court cited the Fifth Circuit case of *Little* for the proposition that "[t]hough a listener's right to receive information means the government cannot stop a willing private speaker from disseminating his message, that right cannot be used to require the government to provide a message it no longer is willing to say." *Id.* at *3 (citing *Little*, 138 F. 4th at 842-47). The *Walls* Court also rejected the idea that schools could not make curricular decisions for political reasons. "The government is ultimately accountable to its citizens for its speech through elections, so the government may change the message it promotes in response to the political process." *Id.* (citing *Walker v. Tex. Div., Sons of Confederate Veterans*,

*Inc.*, 576 U.S. 200, 207 (2015); *Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217, 235 (2000)). The Court further explained:

> "[V]irtually all educational decisions necessarily involve 'political' determinations," *Pico*, 457 U.S. at 890, 102 S.Ct. 2799 (Burger, C.J., dissenting), so any time something is removed from the curriculum based on the decision of a democratically elected government entity, it could be characterized as a "partisan or political" choice.
> …
> If the removed materials were added to the curriculum for "partisan or political" reasons, future governments should surely be free to remove those materials to reflect new priorities based on voters' wishes. Nevertheless, under the students' proposed rule, the government is stuck with those materials unless it can sufficiently convince a court that it is removing them for non-ideological reasons.
> …
> Ultimately, if we followed the students' approach, a government could not successfully defend its decision to change the curriculum by arguing that it was responding to the electorate and the political process. Such an outcome runs headlong into the Supreme Court's government speech cases, which repeatedly emphasize the role of the political process and elections in regulating government speech. *E.g., Summum*, 555 U.S. at 468–69, 129 S.Ct. 1125; *Shurtleff*, 142 S. Ct. at 1589; *Southworth*, 529 U.S. at 235, 120 S.Ct. 1346. Typically, "[i]f the citizenry objects, newly elected officials later could espouse some different or contrary position." *Southworth*, 529 U.S. at 235, 120 S.Ct. 1346. Thus, we usually permit changes in government speech motivated by the political process, rather than declare them unconstitutional. It would be odd to treat government speech in schools differently since "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood Sch. Dist.*, 484 U.S. at 273, 108 S.Ct. 562.

*Walls*, 2025 WL 1948450, at *6. Although *Walls* arose in the context of public school curriculum, its reasoning applies with equal force to public school libraries. In each setting, the school is selecting content that it deems suitable for its educational mission. *See* T.C.A. § 49-6-3803(f) (providing that library materials unsuitable for or inconsistent with the school's educational mission must be removed from the collection). Such choices are government speech. Just as the

government may choose what to include or exclude from classroom instruction without violating the Free Speech Clause, it likewise retains discretion over the contents of its school libraries.

Together, *Little* and *Walls* make clear that when the government curates speech—whether in a public library or classroom curriculum—it is engaged in government speech and thus exercises broad discretion over content without triggering Free Speech Clause protections. Here, Defendants are not regulating private speech – they are regulating the library collections for public primary and secondary school students, which is government speech not subject to First Amendment protections. A public school library, like the public library in *Little* and the curriculum decisions in *Walls*, functions as a government-curated educational tool, and its collection decisions about what books to include or remove are equally protected as government speech. *See Little*, 138 F.4th at 859 ("Library shelves are not a community bulletin board: they are not 'places' set aside 'for public expression of particular kinds or by particular groups'"); *see also id*. at 856 ("By selecting, compiling, and presenting a collection of another person's speech, the government expresses its own views. It may do so by selecting hyperlinks for a town website, or pamphlets for a park display rack, or statues for a public art display, or textbooks for a state curriculum. It may also do so by selecting books for a library's collection."); *see also Walls*, 2025 WL 1948450, at *4 ("The government is ultimately accountable to its citizens for its speech through elections, so the government may change the message it promotes in response to the political process. … Students do not possess a supercharged right to receive information in public schools that alters these principles."). No library can hold all books published, so it only stands to reason that decisions must be made to curate the materials on the shelves. *See Am. Libr. Ass'n, Inc.*, 539 U.S. at 204 (libraries cannot give "universal coverage" of books on their shelves, so they must select only materials "that would be of the greatest direct benefit or interest to the community."). Therefore,

13

"[t]o fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide their patrons." *Id.* The same is even more true with respect to *school* libraries.

Plaintiffs rely on the Sixth Circuit case of *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 (6th Cir. 1976) for the proposition that "[s]chools are not obligated to provide a library, but when they do provide this benefit, it cannot be 'withdrawn by succeeding school boards whose members might desire to 'winnow' the library for books the content of which occasioned their displeasure or disapproval.'" (Memorandum of Law, DE 12, at PageID# 94-5) (citing *Minarcini* 541 F.2d at 581). However, *Minarcini*, which was decided in 1976, "predates the numerous Supreme Court decisions holding that the government is permitted to engage in viewpoint discrimination when it speaks." *Walls*, 2025 WL 1948450, at *5 (citing *Summum*, 555 U.S. at 467–68 (collecting cases establishing that the Free Speech Clause "does not regulate government speech")).

In *Walls*, the Eighth Circuit addressed its 1982 decision in the case of *Pratt v. Independent School District No. 831*, 670 F.2d 771 (8th Cir. 1982) which reached a similar conclusion to *Minarcini* and held that "'school boards do not have an absolute right to remove materials from the curriculum' if the removal 'was intended to suppress the ideas expressed' in the removed materials." *Walls*, 2025 WL 1948450, at *5 (citing *Pratt*, 670 F. 2d at 776). The *Walls* Court noted as follows:

> Since *Pratt*, the Supreme Court has instructed that a court must consider "principles applicable to government speech" when the issue involves "speech by an instructor or a professor in the academic context." *Southworth*, 529 U.S. at 235, 120 S.Ct. 1346. *See also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("When the University determines the content of the education it provides, it is the university speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the

> speaker or when it enlists private entities to convey its own message.").
>
> …
>
> *Pratt* omitted the crucial step of considering whether the speech at issue was the government's and therefore not subject to the Free Speech Clause's restrictions. Indeed, its test resembles the one applied to the government's regulation of student speech in school-sponsored settings. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). We have not reaffirmed *Pratt*'s application to a Free Speech Clause challenge since the proliferation of the government speech doctrine.

*Walls*, 2025 WL 1948450, at \*5. The *Walls* Court concluded that *Pratt* only engaged in "half of the analysis" required to address the issue, noting the "clear incompatibility of *Pratt*'s imposition of a viewpoint discrimination limitation and the Supreme Court's government speech doctrine". *Id.* Ultimately, the *Walls* Court recognized that *Pratt*'s test has been abrogated by the Supreme Court." *Id.* at \*6. *Minarcini*, which utilized a similar "viewpoint discrimination" test, is likewise incompatible with the subsequent Supreme Court precedent establishing that "[t]he Free Speech Clause . . . does not regulate government speech." *Summum*, 555 U.S. at 467–68 (citing *Johanns v. Livestock Marketing Assn.,* 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny"); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 139, n. 7 (1973) (Stewart, J., concurring) ("Government is not restrained by the First Amendment from controlling its own expression"); *Board of Regents of Univ. of Wis. System v. Southworth,* 529 U.S. 217, 229 (2000) ("A government entity has the right to "speak for itself."); *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833 (1995) ("the government . . . is entitled to say what it wishes"); *National Endowment for Arts v. Finley,* 524 U.S. 569, 598 (1998) (SCALIA, J., concurring in judgment) ("It is the very business of

government to favor and disfavor points of view").[8]  Thus, *Minarcini*'s framework cannot stand under current Supreme Court precedent.[9]

Local school boards in Tennessee are popularly elected. T.C.A. § 49-2-201. The Tennessee General Assembly has vested local school boards with broad authority of the management and operation of public schools. *See* T.C.A. § 49-2-201, *et seq*. Among its powers, a local school board has the duty and authority to manage and control all public schools with its jurisdiction, purchase all supplies and material of every kind, and employ teachers and other personnel. T.C.A. § 49-2-203. Pursuant to the Age-Appropriate Materials Act, local school boards must review library collections to ensure that the materials are "suitable for the age and maturity levels of the students who may access the materials" and are "suitable for, and consistent with, the educational mission of the school." T.C.A. § 49-6-3803(a). The manner of review and curation outlined in the statute

---

[8] As explained by Justice Scalia:

> It is the very business of government to favor and disfavor points of view on (in modern times, at least) innumerable subjects—which is the main reason we have decided to elect those who run the government, rather than save money by making their posts hereditary. And it makes not a bit of difference, insofar as either common sense or the Constitution is concerned, whether these officials further their (and, in a democracy, our) favored point of view by achieving it directly (having government-employed artists paint pictures, for example, or government-employed doctors perform abortions); or by advocating it officially (establishing an Office of Art Appreciation, for example, or an Office of Voluntary Population Control); or by giving money to others who achieve or advocate it (funding private art classes, for example, or Planned Parenthood). None of this has anything to do with abridging anyone's speech.

*National Endowment for Arts,* 524 U.S. at 598 (1998) (SCALIA, J., concurring in judgment).

[9] Further, Plaintiffs' interpretation of *Minarcini* misunderstands the distinction between negative and positive rights under the First Amendment. "The fundamental distinction between negative and positive rights is essential to a proper understanding of the First Amendment." *Little*, 138 F.4th at 867 (Ho, J., concurring).  Plaintiffs stand for the position that persons have no First Amendment right to a library but that *removing* information from a library creates a negative right under the First Amendment. However, "[a] library just as surely denies a patron's right to 'receive information' by not purchasing a book in the first place as it does by pulling an existing book off the shelves." *Little*, 138 F.4th at 845 (citing *Little v. Llano Cnty*., 103 F.4th 1140, 1171 (5th Cir.), *reh'g en banc granted*, *opinion vacated*, 106 F.4th 426 (5th Cir. 2024), and on *reh'g en banc*, 2025 WL 1478599 (5th Cir. May 23, 2025) (Duncan, J., dissenting)); *see also Walls v. Sanders*, 2025 WL 1948450, at *6 (8th Cir. July 16, 2025) ("We see no basis in the Free Speech Clause to conclude the students would have a right to prevent something from being removed from the curriculum based on ideology if they do not also have a right to require the school to add materials.").

is "not the exclusive means to remove material from a school's library collection" and local school boards are not prohibited from "developing or implementing other policies, practices, [and] procedures for the removal of materials from a library collection." *Id.* at 3803(g).

Thus, in selecting any of the challenged books for removal or restriction, Defendants were making statutorily required, editorial choices of what books should reside on the shelves of their public-school libraries. Here, "[t]he government as educator does not seek to reach beyond the confines of the school." *Pico*, 457 U.S. 853 at 915. But, in managing and deploying its own property and resources within those confines, it necessarily speaks from a viewpoint of what library materials are "suitable for, and consistent with, the educational mission of the school." T.C.A. § 49-6-3803(a)*; see also Little*, 138 F.4th at 856 n. 41 ("A library selects books it thinks suitable, buys them with public funds, and presents a curated collection to the public.").

Because Defendants' curation of the libraries within Rutherford County Schools constitutes government speech, Plaintiffs' First Amendment rights are not implicated and their Complaint fails to state a claim upon which relief can be granted.

> **c.    In The Alternative, Plaintiffs' Complaint Fails To State A Claim For Viewpoint Discrimination.**

As no constitutionally protected rights are violated by a school system exercising its government speech by deciding which books to house in a school library, a First Amendment forum analysis would be out of place. *See Am. Libr. Ass'n,* 539 U.S. at 205; *see also Little*, 138 F.4th at 859. "It is one thing to say that a public library's *premises* may constitute some kind of public forum. A library might open one of its rooms to poetry readings by the public and thereby create a limited public forum. . . . It is entirely another thing, though, to extend this concept to a library's *bookshelves*. . . . [I]t makes no sense to apply forum analysis to a library's collection."

*Little*, 138 F.4th at 859. However, assuming *arguendo* that a forum analysis was applicable to the case at hand, Plaintiffs still have not stated facts supporting a cause of action against Defendants.

"When it acts as an educator, at least at the elementary and secondary school level, the government is engaged in inculcating social values and knowledge in relatively impressionable young people." *Pico*, 457 U.S. 853 at 909 (Rhenquist, C.J. dissenting). "[T]he government has broad discretion to make content-based judgments in deciding what private speech to make available to the public", *Am. Libr. Ass'n, Inc.*, 539 U.S. at 204, and the "First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)).[10] First-amendment rights "must be applied in light of the special characteristics of the school environment." *Id.* (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969)). Under the doctrine of "*in loco parentis*" school administrators are treated as "as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 357 (6th Cir. 2023) (quoting *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 189 (2021)). Thus, school systems have a duty to protect students while in the custody of the school. "Local school officials, better attuned than we to the concerns of the parents/taxpayers who employ them, must obviously be accorded wide latitude in choosing which pedagogical values to emphasize, and in choosing the means through which those values are to be promoted." *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir.

---

[10] Even the dissent in *Little*, while arguing that "government officials cannot constitutionally dictate what ideas are 'inappropriate' or 'offensive' for *adult* library patrons", recognized that "a student's First Amendment interests while at school must be balanced with the school's critical inculcating function". *See Little*, 138 F.4th at 884-5 (HIGGINSON, J., dissenting).

1989). This necessarily involves making content-based decisions on what materials to maintain in school libraries.

The United States Supreme Court has "observed a distinction between, on the one hand, **content discrimination**, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, **viewpoint discrimination**, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995) (emphasis added). "Viewpoint discrimination" is defined as "regulating speech when the **specific motivating ideology or the opinion or perspective of the speaker** is the rationale for the restriction". *Id.* (emphasis added). By way of example, the Sixth Circuit has explained that in the school context, "a blanket ban on the use of 'odious racial epithets' by 'proponents of all views' constitutes mere content-based regulation, while a ban on the use of racial slurs by one group of speakers but not 'those speakers' opponents' constitutes viewpoint-discrimination." *Barr v. Lafon*, 538 F.3d 554, 572 (6th Cir. 2008) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992)). As explained above, a First Amendment forum analysis would be out of place in this case because the challenged conduct constitutes government speech. However, if the Court is inclined to apply a forum analysis to the public school library setting, it appears that Plaintiffs concede that a nonpublic forum analysis is appropriate. (Memorandum of Law, DE 12, at PageID# 102-103).[11] In both a nonpublic forum and a limited public forum, the government can impose reasonable restrictions based on speech content, but it cannot engage in viewpoint discrimination. *See Miller v. City of Cincinnati*, 622

---

[11] The Sixth Circuit has identified three different categories of the government-created forums for speech: (1) a public forum, "which by long tradition or government fiat has been devoted to assembly and debate" and within which "the rights of the state to limit expressive activity are sharply circumscribed"; (2) a "limited" or "designated" public forum, which is opened "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects"; and (3) a nonpublic forum, access to which may be regulated based on "subject matter and speaker identity" so long as such distinctions are reasonable and viewpoint neutral. *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001).

F.3d 524, 535–36 (6th Cir. 2010) ("government limitations on speech in both a limited public forum and a nonpublic forum receive the same level of scrutiny. In both instances, any restrictions must be 'reasonable and viewpoint neutral.'") (citations omitted).

Despite Plaintiffs' repeated assertions that these books were removed "in a narrowly partisan or political manner, or because Defendants disagree with the ideas or views contained in those books" (Complaint, DE 1, at PageID# 33; Memorandum, DE 12, at PageID# 97), Plaintiffs have "provided only rank suspicion to try to show that the District intended to deny students access to ideas with which the District disagreed, let alone that that intent was the *decisive* factor in decision." *See C.K.-W.*, 619 F.Supp.3d at 915 (emphasis in original). As stated by the C.K.-W Court:

> Even using [Justice Brennan's] most expansive view of the purported right at play, this First Amendment right to receive ideas, Plaintiffs here have a narrow path. *See Pico*, 457 U.S. at 867, 102 S.Ct. 2799 (Brennan, J.); *see also id.* at 910, 102 S.Ct. 2799 (Rehnquist, J., dissenting) (noting the plurality opinion placed "limitations" on the right it recognized demonstrating even it had "discomfort with the new doctrine [that it] fashion[ed] out of whole cloth"). The *Pico* plurality recognized local school boards have "a substantial legitimate role to play in the determination of school library content" and that districts have "significant discretion" to determine the books available in school libraries. *Id.* at 869–870, 102 S.Ct. 2799. The discretion, though, "may not be exercised in a narrowly partisan or political manner." *Id.* at 870, 102 S.Ct. 2799. The central issue, according to the plurality, was the "motivation behind" the action. *Id.* at 871, 102 S.Ct. 2799. Only if the officials "intended by their removal decision to deny [students] access to ideas with which [the officials] disagreed, and if this intent was the decisive factor in [their] decision" does the removal violate the First Amendment. *Id.* (emphasis added); *accord Pratt*, 670 F.2d at 778 (finding students "had a right to be free from official conduct that was *intended* to suppress the ideas expressed in" the materials (emphasis added)).
>
> ***This mens rea requirement necessarily means schools may remove books for numerous reasons. Indeed, if an intent to deny must be the decisive factor, schools may even remove books partly because***

> ***they intend to deny students access to ideas with which they
> disagree.*** The *Pico* plurality specifically pointed to two plainly
> proper reasons for removing books. It explained that school officials
> certainly may remove books based on the books' "educational
> suitability" or if the books are "pervasively vulgar." *Pico*, 457 U.S.
> at 871, 102 S.Ct. 2799.

*C.K.-W.*, 619 F. Supp. 3d at 915 (emphasis added).

Plaintiffs' allegations fall far short of this standard. Plaintiffs' Complaint – without actually

alleging what "viewpoints" the School Board allegedly discriminated against (DE 1, PageID# 34)

– repeatedly mentions LGBTQ+ content. (*See generally* DE 1). However, Plaintiffs have presented

no facts in support of their Complaint (DE 1) or their Motion for Preliminary Injunction (DE 11)

to support their position that the Board engaged in viewpoint discrimination. The Declarations (DE

12-1 – 12-4) filed with Plaintiffs' Motion for Preliminary Injunction merely discuss the ***content*** of

certain books but fail to indicate any ***viewpoint*** that has been singled out for exclusion.[12] The same

is true with respect to the allegations in the Complaint (DE 1). Plaintiffs' Complaint describes in

depth the rating system of the former website "BookLooks", including the effect of LGBTQ+

content on the ratings, but then goes on to state that the Board ***voted against*** removing books solely

based on their BookLooks rating. (DE 1 at PageID# 10). Plaintiffs admit in their Memorandum of

Law that the Board instead voted to "vote on each book individually to determine if they contained

'sexually explicit content in whole or part and to require their removal under Tennessee State law.'"

---

[12] "The government does not 'contract the spectrum of available knowledge' … by choosing not to retain certain books on the school library shelf; it simply chooses not to be the conduit for that particular information." *Pico*, 457 U.S. at 889 (Burger, C.J., dissenting) (citing *Griswold v. Connecticut*, 381 U.S. 479, 482, (1965)). "[T]here is not a hint in the First Amendment, or in any holding of this Court, of a 'right' to have the government provide continuing access to certain books." *Id*. With that said, the Declarations submitted by the minor Plaintiffs (DE 12-1 – 12-3) discuss certain books with similar topics/ideas that they have already read, which are not challenged and may or may not be in the collections of Rutherford County Schools. For example, David Doe states, "I also love LGBTQ books and themes. I read A Little Life by Hanya Yanagihara recently and thought it was a really good book. I liked learning about the characters in it. It's important to me to have LGBTQ characters and their perspectives in a library because, at the end of the day, all people should have access to the books that interest them." (DE 12-2, PageID# 111). Thus, Plaintiffs' own admissions belie their allegations that they are being denied access to LGBTQ+ ideas by the actions of Defendants.

(DE 12 at PageID# 87). This is by very definition a content-based restriction, which is permissible in a nonpublic forum. *See Miller*, 622 F.3d at 535–36.

Even to the extent that the mere content of a book could be seen as expressing a certain "viewpoint", while not describing the content of all the challenged books, Plaintiffs' Complaint describes numerous books without mentioning *any* LGBTQ+ themes. (Complaint, DE 1, at PageID# 20-31).[13] In fact, the descriptions of these books in Plaintiffs' Complaint do not reveal *any* commonality of certain "ideas" or "viewpoints" present in the removed books. The only commonality alleged by Plaintiffs is that "Defendants removed or restricted each and every one of these books for containing 'sexually explicit' content that met, in their judgment, the definitions of Tenn. Code Ann. §39-17-901…". (Complaint, DE 1, at PageID #32). These allegations merely suggest that Defendants imposed a ***content-based*** restriction on school library collections. Thus, this case is easily distinguishable from the library cases relied on by Plaintiffs where a few select books were removed based on an alleged disagreement with the ***ideas*** expressed therein. *See, e.g, Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) (striking down a school library policy removing Harry Potter books from easy access by students because the books might promote disobedience and/or involved witchcraft and the occult); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 867, 871 (D. Kan. 1995) (granting injunction to restore to library shelves a lesbian romance novel containing "no vulgarity, offensive language, or explicit sexual content that was removed because it conflicted with "traditional family values").

---

[13] *Me and Earl and the Dying Girl*; *The Haters*; *Damsel*; *Thirteen Reasons Why*; *The Testaments*; *Forever*; *Plan A*; *Yolk*; *Emergency Contact*; *The Carnival at Bray*; *Life Is Funny*; *Looking for Alaska*; *Homegoing*; *To All the Boys I've Loved Before*; *Speak*; *Catch 22*; *The Kite Runner (Graphic Novel)*; *home body*; *milk and honey*; *the sun and her flowers*; *Girl in Translation*; *Wicked: The Life and Times of the Wicked Witch of the West, by Gregory Maguire*; *Heroine*; *The Female of the Species*; *Beloved*; *Out of Darkness*; *Beautiful*; *Eleanor and Park*; *Concrete Rose*.

The fact that a small subset of the books that were removed as part of a large-scale library review process might have involved LGBTQ+ themes is insufficient to allege that the Board removed these challenged books "because of their distaste for the viewpoints" expressed. (Complaint, DE 1, PageID# 34). *See Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006) (holding that the Court "need not accept as true legal conclusions or unwarranted factual inferences."); *Ashcroft*, 556 U.S. at 663 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."). Plaintiffs' Complaint therefore fails to state a claim under the First Amendment and must be dismissed.

## II.     PEN American Center, Inc. Lacks Standing

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Standing is a core component of this "case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, a plaintiff must show that: (1) he suffered an injury, which means "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical[;]"  (2) the injury was caused by the person sued; and (3) a court can likely redress the injury. *Id.* at 560 (internal citation and quotation marks omitted).  An organization may have either "organizational standing" in its own right, *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 333 (6th Cir. 2002), or "associational standing"—meaning standing on behalf of its members—"when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.*, 528 U.S. 167, 182 (2000).

Plaintiff PEN American Center, Inc. does not appear to assert that it has organizational standing or that the organization itself suffered a "palpable injury as a result of the defendants' actions." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 333 (6th Cir. 2002). Instead, Plaintiff PEN America appears to assert associational standing by alleging that "[r]emoving and restricting access to author members' books in public school libraries therefore injures authors' right to share their books" and that "[s]everal of PEN's author members have authored books that have been removed or restricted by the actions of Defendants and have standing to sue in their own right." (Complaint, DE 1, PageID# 2, 3). PEN America will only have associational standing if its members had a cause of action. *See Friends of the Earth, Inc.*, 528 U.S. at 182. As there exists no legally protected First Amendment right for authors to compel the government to speak for them and the speech at issue is government speech, the authors of the books have not demonstrated that they have suffered an "injury in fact" and therefore do not have standing to sue in their own right. *See Lujan*, 504 U.S. at 560. Because the author members of PEN America do not have standing to sue in their own right, Plaintiff PEN America lacks associational standing. *See Friends of the Earth, Inc.*, 528 U.S. at 182.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that this Court grant their Motion for Judgment on the Pleadings and dismiss Plaintiffs' Complaint in full, with prejudice, with costs taxed to Plaintiffs, deem Defendants as the prevailing parties and award them attorney's fees pursuant to 42 U.S.C. § 1988, and for such other and further relief to which they are entitled.

Respectfully submitted,

**HUDSON, REED & CHRISTIANSEN, PLLC**

By: /s/ Nick C. Christiansen
       **JEFF REED, #15000**
       **NICK C. CHRISTIANSEN, #30103**
       **JASON N. KING, #027749**
       16 Public Square North
       P.O. Box 884
       Murfreesboro, TN 37133
       (615) 893-5522
       jreed@mborolaw.com
       nchristiansen@mborolaw.com
       jking@mborolaw.com

       *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was sent to the following via the District Court's electronic filing system and/or U.S. Mail, postage prepaid, to:

Kerry Knox
117 S. Academy Street
Murfreesboro, TN 37130
kek@castelliknox.com

Stella Yarbrough
Lucas Cameron Vaughn
Zee Scout
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
syarbrough@aclu-tn.org

this the 8th day of August, 2025.

       /s/ Nick C. Christiansen
       **NICK C. CHRISTIANSEN**

25