# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

RACHEL ROE, *a minor, by and through her parent and next friend*, ROBERT ROE; DAVID DOE, *a minor, by and through his parent and next friend*, DANA DOE; CLAIRE COE, *a minor, by and through her parent and next friend*, CHARLES COE; and PEN AMERICAN CENTER, INC.,

                Plaintiffs,

    v.

RUTHERFORD COUNTY BOARD OF EDUCATION; JAMES SULLIVAN, *in his official capacity as Director of Rutherford County Schools*,

           Defendants.

Case No. 3:25-cv-00429
Judge Eli Richardson
Magistrate Judge Alistair Newbern

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

---

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 5

STANDARD OF REVIEW ................................................................................... 6

ARGUMENT ....................................................................................................... 6

    I.    **Individual Plaintiffs Have a First Amendment Right to Receive Information in Public School Libraries and Have Adequately Stated a Claim for Relief.** ........................ 6

        A.    Under *Pico*, the First Amendment forbids removal of books based on disagreement with ideas in those books. ...................................................................................... 6

        B.    *Minarcini* is controlling precedent and similarly forbids removal of books based on disagreement with the ideas in those books under the First Amendment. ........................... 11

    II.    **Public School Libraries Are Not Government Speech** ........................................... 15

        A.    The history of school libraries generally and Defendants' use of school library as forum of expression indicate that school library is not government speech. ....................... 16

        B.    The public is not likely to perceive Defendants' school library as a forum for government speech. ................................................................................................. 19

        C.    Defendants fail to demonstrate longstanding practice in controlling and shaping library collection. ............................................................................................................... 22

    III.    **Plaintiffs Have Adequately Stated a Claim for Viewpoint Discrimination** .......... 24

    IV.    **Plaintiff PEN America Has Standing** ................................................................. 27

CONCLUSION ................................................................................................... 29

# **TABLE OF AUTHORITIES**

**Cases**

*ACLU of Florida, Inc. v. Miami-Dade County School Board,* 557 F.3d 1177 (11th Cir. 2009) ... 9, 10, 26

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ............................................................... 12

*Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) ............................ 20, 27

*Bays v. Warden, Ohio State Penitentiary*, No. 3:08-cv-076, WL 6035231 (S.D. Ohio Dec. 6, 2017) ......................................................................................................................... 11

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982) ....... passim

*Brown v. Louisville-Jefferson Cnty. Metro Government*, 135 F.4th 1022 (6th Cir. 2025) ............. 5

*Cajune Indep. Sch. Dist. 194*, 105 F.4th 1070 (8th Cir. 2024) .................................. 15, 18

*Case v. Unified Sch. Dist. No. 233,* 895 F. Supp 1463 (D. Kan. 1995) .............................. 8, 11, 13

*Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) ...................... 8

*Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, No. 1:24-CV-03512-CNS-STV, 2025 WL 863544 (D. Colo. Mar. 19, 2025) ........................................................ 9, 11, 28

*Crookshanks v. Elizabeth Sch. Dist.*, No. 1:12-cv-02826, App. Case 25-1105 (10th Cir. June 20, 2025) ........................................................................................................................ 17

*Epperson v. Ark.*, 393 U.S. 97 (1968), ............................................................................. 5

*GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024) .......... 13, 19, 22

*JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577 (6th Cir. 2007) ............................ 5

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.,* 385 U.S. 589 (1967) ................................ 7

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ................................................................... 6

*Little v. Llano Cnty.,* 138 F.4th 834 (5th Cir. 2025) ............................................... passim

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180 (2021) ................................ 6

*Matal v. Tam*, 582 U.S. 218 (2017) ............................................................................... 13

*Meizbov v. Allen*, 411 F.3d 712 (6th Cir. 2005) ............................................................. 5

*Minarcini v. Strongsville City School District*, 541 F. 2d 577 (1976) .................................. passim

*Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n,* 117 F.4th 389 (6th Cir. 2024), *cert. granted,* No. 24-621, 2025 WL 1787717 (U.S. June 30, 2025) ...................................... 10

*Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585 (6th Cir. 2003).......................... 11

*Packer on behalf of 1-800-Flowers.Com v. Raging Capital Management, LLC,* 105 F.4th 46 (2d. Cir. 2024) ................................................................................................................................ 13

*Parnell v. Sch. Bd. of Lake Cnty., Fla*., No. 4:23-CV-414-AW-MAF, 2024 WL 2703762 (N.D. Fla. Apr. 25, 2024)............................................................................................................... 9, 11

*PEN American Center, Inc. v. Escambia Cnty. Sch. Bd.*, No. 3:23-CV-10385-TKW-ZCB, 2024 WL 133213 (N.D. Fla. Jan. 12, 2024) ............................................................................. passim

*Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573, 2025 WL 902041 (M.D. Fla. Feb. 28, 2025) ........................................................................................................... 11, 23, 28

*People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005)....... 20

*Pleasant Grove Cty., Utah v. Summum*, 555 U.S. 460 (U.S. 2009)...................................... passim

*Pratt v. Ind. Sch. Dist. No*. 831, 670 F.2d 771 (8th Cir. 1982) ................................................... 12

*Roberts v. Madigan*, 702 F. Supp. 1505 (D. Colo. 1989) .......................................................... 17

*Shurtleff v. Cty. of Boston, Mass.*, 596 U.S. 243 (2022) ........................................................ passim

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)................................. 4, 5, 6, 7

*Tucker v. Middleburg-Legacy Place*, 539 F.3d 545 (6th Cir. 2008)....................................... 5, 26

*U.S. v. Elbe*, 774 F.3d 885 (6th Cir. 2014) ......................................................................... 11, 12

*U.S. v. Wehunt*, 230 F.Supp.3d 838 (E.D. Tenn. 2017) ............................................................. 13

*W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)...................................................... 4, 6, 7, 14

*Walls v. Sanders*, 2025 WL 1948450 (8th Cir. July 16, 2025) .................................................... 12

4

## INTRODUCTION

> The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

Defendants Rutherford County School Board and Director of Schools again invite this Court to forgo decades of First Amendment jurisprudence, including binding Sixth Circuit precedent, in favor of a minority, out-of-circuit theory. Defendants would turn school libraries into nothing more than platforms for school board members' personal political and religious beliefs and turn students into nothing more than "closed-circuit recipients of only that which the State chooses to communicate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). This is wrong. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642 (recognizing students' First Amendment right to refuse to pledge allegiance to American flag). Plaintiffs are therefore strongly opposed.

The questions before the Court are (1) whether, under the First Amendment, Plaintiffs may challenge a school board that has removed hundreds of books because of the disliked ideas in those books and (2) whether Plaintiffs have adequately alleged such claims in their pleadings. The clear answer to both is *yes*, and Defendants' Motion should be denied. Questions about how boards of education purchase books, organize their libraries, set curriculum standards, and the future of how the First Amendment applies to "the multitude of controversies that beset our campuses today,"

5

*Epperson v. Ark.*, 393 U.S. 97, 106 (1968), are merely distractions and are, most importantly, not before the Court to decide.

## STANDARD OF REVIEW

Courts analyze a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) using the same standard for a motion to dismiss under Rule 12(b)(6). *Brown v. Louisville-Jefferson Cnty. Metro Government*, 135 F.4th 1022, 1030 (6th Cir. 2025). Under that standard, "all well-pleaded material allegations of the [non-moving party] must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)); *Meizbov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005) ("To state a valid claim, a complaint must contain direct or inferential allegations respecting the material elements under some viable legal theory."). A court, then, may only grant a 12(c) motion when "no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Tucker*, 539 F.3d at 549.

## ARGUMENT

I.    **Individual Plaintiffs Have a First Amendment Right to Receive Information in Public School Libraries and Have Adequately Stated a Claim for Relief.**

A.    Under *Pico*, the First Amendment forbids removal of books based on disagreement with ideas in those books.

For at least a century, the Supreme Court has recognized that the First Amendment applies within the special context of the American public school system. *See Tinker*, 393 U.S. at 506 (gathering cases dating back to 1923). In the well-worn words of *Tinker*: "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights

6

to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. Over the years, students have been found to have a First Amendment right to refuse to say the pledge of allegiance, *Barnette*, 319 U.S. at 642, to wear an armband in protest of war, *Tinker*, 383 U.S. at 514, and to not be punished for non-disruptive, off-campus speech, *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 190 (2021).

The corollary of students' right to express themselves—be it through an armband or Snapchat—is the right to receive information and ideas. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866 (1982) (Brennan, J., joined by Marshall and Stevens, JJ.) ("This right [to receive information and ideas] is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution"). Like a two-way street, this right to receive exists, in part, because of the sender's right to send information and the recipient's willingness to receive it. *Pico*, 457 U.S. at 867; *see also Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) (collecting cases recognizing right to receive information).

The right to receive within the school context also exists because student speech is likely to be senseless if a wide range of information does not inform that speech. *See Pico*, 457 U.S. at 867. Put differently: an open mouth is of little use if the brain behind it is empty—especially in a democracy. As put by James Madison, and quoted by Justice Brennan: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." *Pico*, 457 U.S. at 867 (citing 9 Writings of James Madison 103 (G. Hunt ed. 1910)).

Equipping students with the requisite knowledge to meaningfully participate in a democracy by exposing them to a "marketplace of ideas" is the unique provenance of American

schools. *Keyishian v. Bd. of Regents of Univ. of State of N. Y.,* 385 U.S. 589, 603 (1967) ("The classroom is peculiarly the 'marketplace of ideas.'"). So is inculcating the value of free speech and other "important principles of our government." *Barnette*, 319 U.S. at 637. For these reasons even *Tinker* recognizes that, "[i]n our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved." *Tinker*, 393 U.S. at 511.

Recognizing the traditional role these reciprocal rights (to speak *and* to receive) have played in schools, the *Pico* plurality stated in clear terms: "[L]ocal school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Pico*, 457 U.S. at 872 (plurality opinion) (quoting *Barnette*, 319 U.S. at 642); *see also id*. at 879–80, (Blackmun, J., concurring in part and concurring in the judgment) ("[S]chool officials may not remove books for the purpose of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved."). The decisive factor in the Court's analysis was whether the school board members "*intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed." *Id*. at 872 (emphasis added).

Justice White's concurring opinion in *Pico* confirms the plurality's judgment that resolving the case depended on answering the factual question of what motivated the board to remove books. *Pico*, 457 U.S. at 883 (White, J., concurring in the judgment). Remanding the case for further factual inquiry into the motivation behind the book removal would be a fool's errand if there were not some impermissible motivations by a school board that could offend the constitution. *Cf. Little*

*v. Llano Cnty.,* 138 F.4th 834, 877-78 (5th Cir. 2025) (Higginson, J., dissenting)[1] ("Justice White's opinion confirms the same conclusion about the threshold First Amendment inquiry as the *Pico* plurality, whose judgment Justice White joined: that determining a state's motivation is necessarily anterior to assessing whether a book removal violates the First Amendment."). Even the three dissenting Justices in *Pico* "cheerfully concede[d]" that the book removal scenarios posited in the plurality opinion—an all-Democrat board removing books by Republicans, an all-white board removing books by Black authors—could violate the First and Fourteenth Amendments. *Pico*, 457 U.S. at 907-908 (Rehnquist, J., joined by Burger, C.J., and Powell, J., dissenting).

In sum, "[w]hat clearly emerges from the *Pico* decision is that the trial court must determine the motivation of the school officials in removing the book. Five of the justices in *Pico* agreed that some motivations would be unconstitutional." *Case v. Unified Sch. Dist. No. 233,* 895 F. Supp 1463, 1468 (D. Kan. 1995) (finding genuine issue of material fact existed as to school's motivation in removing LGBTQ+ book from school district's libraries).

Given this coherence, *Pico*'s plurality decision has been applied in manifold cases in the forty-plus years that have passed since it was decided. *See, e.g., Case*, 908 F. Supp. at 877 (relying on *Pico* to enjoin a book removal); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1004-05 (W.D. Ark. 2003) (drawing from *Pico* to grant summary judgment to plaintiffs who challenged a school district's restriction of access to certain books in its library); *Parnell v. Sch. Bd. of Lake Cnty., Fla.*, No. 4:23-CV-414-AW-MAF, 2024 WL 2703762, at *26 (N.D. Fla. Apr. 25, 2024) (Plaintiffs stated plausible claim that removing a book about two male penguins raising a baby

---

[1] Almost as many judges (six) signed on to Judge Higginson's dissent in *Little* as did Judge Duncan's holding (seven) on government speech. *Compare Little,* 138 F.4th at 835 *with Little*, 138 F.4th at 868.

penguin violated First Amendment); *PEN American Center, Inc. v. Escambia Cnty. Sch. Bd.*, No. 3:23-CV-10385-TKW-ZCB, 2024 WL 133213, at *2 (N.D. Fla. Jan. 12, 2024) (Plaintiffs stated plausible claim that board's removal of books from high school library violated First Amendment); *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist*., No. 1:24-CV-03512-CNS-STV, 2025 WL 863544, at *15 (D. Colo. Mar. 19, 2025) (Plaintiffs likely to succeed on claims that board removal of "sensitive" books violated First Amendment rights).

The only post-*Pico* federal appellate decision to squarely address a book removal from a school library is *ACLU of Florida, Inc. v. Miami-Dade County School Board,* 557 F.3d 1177, 1220 (11th Cir. 2009). While the Eleventh Circuit noted the non-binding precedential effect of *Pico*'s plurality opinion, it nonetheless applied *Pico* and conducted a detailed factual inquiry into the school board's motivation for removing a book. *Id.* ("If the matter is to be resolved by looking at how the actions that the Board took in this case have been described by other courts in other opinions, we would think that the best place to look is in the Supreme Court decision [*Pico*] from which we are drawing our legal standard."). In applying *Pico*, the Eleventh Circuit rejected the school board's arguments that the more deferential *Hazelwood* standard[2] or the government speech doctrine should apply. *See id*. at 1201-1202.

---

[2] Some district courts have considered whether the rational-basis review espoused in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) should control First Amendment claims challenging books removals. *See, e.g.*, *Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573-CEM-RMN, 2025 WL 2408178, at *11 (M.D. Fla. Aug. 13, 2025). Under *Hazelwood*, the "public might reasonably perceive" a school library as third-party speech "bear[ing] the imprimatur of the school." 484 U.S. at 270. If so, a school board does not violate the First Amendment by restricting speech "so long as their actions are reasonably related to legitimate pedagogical concerns." *Id*. at 273. Even under this deferential standard, however, Individual Plaintiffs have adequately pled a First Amendment claim. Defendants do not advance a legitimate pedagogical concern by removing critically acclaimed books that are, per their own statements, often related to curriculum and other educational aims. *See* Compl. ¶¶ 60-63; Pls.' Memo. (Doc. No. 12 at PageID 98-99).

Most importantly, the Supreme Court has never disclaimed *Pico* or issued another ruling about book removals from public school libraries that even impliedly undermines the reasoning in *Pico*. Even if it had: "[W]hen the Supreme Court embraces a new line of reasoning in a given area and even when that reasoning allegedly undercuts the foundation of a decision, it remains the Court's job, not ours, to overrule it." *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n,* 117 F.4th 389, 395 (6th Cir. 2024), *cert. granted,* No. 24-621, 2025 WL 1787717 (U.S. June 30, 2025) (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989)); *cf. also Little,* 138 F.4th at 879 (Higginson, J., dissenting) ("The authority to adjust *Pico*—whether to extend it further or to change course—lies with the Supreme Court alone.").

Accordingly, the Court should follow the lead of the majority of Justices in *Pico*, recognize that the First Amendment places restrictions on the motivations a school board may have in removing books from their schools' libraries, and allow Plaintiffs to develop the factual record as to this point. *Cf. Little*, 138 F.4th at 878 (arguing that, as the narrowest point of concurrence, Justice White's opinion calling for further factual development is the controlling precedent of *Pico*).

### B. *Minarcini* is controlling precedent and similarly forbids removal of books based on disagreement with the ideas in those books under the First Amendment.

*Minarcini v. Strongsville City School District* is binding Sixth Circuit precedent. 541 F. 2d 577 (6th Cir. 1976); *see also* Pls' Memo. (Doc. No. 12 at PageID 94-95) and Pls' Reply (Doc. No. 30 at PageID 325-327). Per *Minarcini*, a school is not obligated to provide a library, but once it does, "[t]hat privilege is not subject to being withdrawn by succeeding school boards whose members might desire to 'winnow' the library for books the content of which occasioned their displeasure or disapproval." 541 F. 2d at 581. A school board cannot "place conditions on the use of the library which were related solely to the social or political tastes of school board members." *Id*. at 582. This is because targeted removal of books from the library burdens students' in-class

speech—even more than the action found unconstitutional in *Tinker*—and students have a First Amendment right to receive information. *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753 (1972) (professors have right to hear non-citizen speaker); *Procunier v. Martinez*, 416 U.S. 396, 408-409 (1974) (addressee and sender of mail both have First Amendment interest in communication); *Va. Bd. of Pharm. v. Va. Citizens Consumers Council, Inc.,* 425 U.S. 748 (1976) (recipients of advertisement have interest in receiving advertising)).

Only the U.S. Supreme Court or Sixth Circuit sitting en banc can overrule a prior panel decision. *See U.S. v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014); *Bays v. Warden, Ohio State Penitentiary*, No. 3:08-cv-076, WL 6035231, at *3 (S.D. Ohio Dec. 6, 2017) (citing Sixth Circuit rule that "a later panel of the Sixth Circuit cannot overrule the published decision of a prior panel."). *Minarcini* has not been overruled by the Sixth Circuit or U.S. Supreme Court. Indeed, *Minarcini* is still routinely cited for the proposition that book removal claims implicate the First Amendment and that students have a right to receive information. *See, e.g., Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585, 591 (6th Cir. 2003) (citing *Minarcini* for holding that right to receive includes access to libraries); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 876 (D. Kan. 1995); *Parnell v. Sch. Bd. of Lake Cnty., Fla.*, 731 F. Supp. 3d 1298, 1313 (N.D. Fla. 2024) (citing *Minarcini* as "authority [that] suggests school-library curation implicates the First Amendment"); *Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573, 2025 WL 902041, at *4 (M.D. Fla. Feb. 28, 2025) (similar); *Crookshanks. v. Elizabeth Sch. Dist.,* No. 1:24-CV-03512, 2025 WL 863544, at *16 (D. Colo. Mar. 19, 2025) (similar).

Absent explicit reversal, a prior panel decision remains "controlling authority" unless an inconsistent decision of the U.S. Supreme Court "requires" modification of the decision. *Elbe*, 774 F.3d at 891 (internal quotation omitted). Here, Supreme Court decisions concerning government

12

speech do not require modification of *Minarcini*'s holding. Yet, Defendants rely on another out-of-circuit case to argue that this Court should take on this task. (Doc. No. 32 at PageID 354) (citing *Walls v. Sanders*, 2025 WL 1948450 (8th Cir. July 16, 2025)). This would be inappropriate for several reasons.

In *Walls*, the Eighth Circuit reasoned that its prior holding regarding students' First Amendment challenges to school curricula, *Pratt v. Ind. Sch. Dist. No*. 831, 670 F.2d 771 (8th Cir. 1982), should be revisited in light of subsequent Supreme Court decisions on government speech. 144 F.4th at 1004-1005. *Minarcini*, though, is not like *Pratt*. School decisions about curriculum have traditionally been afforded much wider latitude. *See Pico*, 457 U.S. at 862 (recognizing "that the government has a 'claim of absolute discretion in matters of *curriculum*' and 'the compulsory environment of the classroom' to carry out its 'duty to inculcate community values.'") (emphasis added); *Minarcini*, 541 F.2d at 580 ("discretion as to the selection of textbooks must be lodged somewhere and we can find no federal constitutional prohibition which prevents its being lodged in school board officials who are elected representatives of the people"); *cf. Arce v. Douglas*, 793 F.3d 968, 983 (9th Cir. 2015) (adopting deferential *Hazelwood* standard in student challenge to changes to school curriculum).

Libraries are different than curriculum. Libraries are "mighty resource[s] in the marketplace of free ideas," *Minarcini*, 541 F.2d at 583, and places "designed for freewheeling inquiry." *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting). Students decide which materials to check out—not the school. *See, e.g., Case v. Unified Sch. Dist*., 908 F. Supp. 864, 875-76 (D. Kan. 1995) (school officials do not have "absolute discretion beyond the compulsory environment of the classroom into the school library," where "the regime of voluntary inquiry hold[s] sway."). As argued in Section II below, school libraries are not fora for government speech—and have never

13

been treated by the Supreme Court as such. The Eighth Circuit—the same Circuit that issued *Walls*—agrees. *See GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024). When asked to consider a school library as government speech—it said no. Why then would this Court, on the basis of an Eighth Circuit opinion (*Walls*), embrace a ruling that even the Eighth Circuit has rejected? *See id.* (rejecting government speech doctrine applying to school library).

Moreover, a Rule 12(c) motion is a particularly inopportune moment to re-write Circuit precedent. As stated above, a district court should apply controlling circuit precedent, leaving decisions about whether to keep the precedent intact to the Court of Appeals and U.S. Supreme Court. *U.S. v. Wehunt*, 230 F.Supp.3d 838, 846 (E.D. Tenn. 2017) (district court can rarely determine that intervening Supreme Court precedent implicitly or explicitly overturned circuit precedent); *cf. also Packer on behalf of 1-800-Flowers.Com v. Raging Capital Management, LLC*, 105 F.4th 46, 55-56 (2d. Cir. 2024) (finding reversible error and remanding because district court improperly determined that Supreme Court decision overturned circuit precedent). As argued in Section II below, none of the government speech cases involve a school library and most of them involve fora that differ meaningfully from school libraries. Given the Supreme Court's clear warnings against expending government speech doctrine to other fora, *see Matal v. Tam*, 582 U.S. 218, 235 (2017), doing so here, without factual inquiry into the history and purpose of the forum, seems reckless at best—and rewriting Circuit precedent at the same time feels like Defendants inviting the Court to go double or nothing. *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) ("the factors that used to determine whether something is government speech […] are fact-intensive and generally not amenable to resolution at the motion to dismiss stage.").

Defendants repeatedly cabin Plaintiffs' argument into a claim that the First Amendment

gives them a right to "compel the government to provide them continuing access to certain books…" (Doc. No. 32 at PageID 343). But, Plaintiffs are not demanding that the government provide specific materials, only that "once the school endeavors to create a library, the school cannot 'place conditions on the use of the library which were related solely to the social or political tastes of school board members.'" *Minarcini*, 541 F. 2d at 581. Both *Pico* and *Minarcini* support this claim.

Plaintiffs do not ask the Court to act as librarian. (Defendants already employ many capable librarians—and would do well to heed their professional opinions.) Plaintiffs ask this Court to be *a Court* and provide the "judgment that history authenticates as the function of this Court when liberty is infringed." *Barnette*, 319 U.S. at 64; *cf. Little*, 138 F.4th at 876 (Higginson, J., dissenting) ("We cannot shirk our responsibility simply because some members of our court hypothesize that First Amendment lines may be difficult to draw.").

## II. Public School Libraries Are Not Government Speech

Defendants argue that they engaged in expressive activity insulated from First Amendment review under the government speech doctrine when they removed 133 books from (or "curated") their library collection. Defs' Mot. (Doc 32 at PageID 345-51). But public-school libraries are not government speech and finding otherwise (and conducting the necessary fact-intensive analysis required) cannot be done within the limited scope of a Rule 12(c) motion.

The Supreme Court has long warned that government speech doctrine is "susceptible to dangerous misuse." *Matal*, 582. U.S. at 235. "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id.*; *see also Shurtleff v. Cty. of Boston, Mass.*, 596 U.S. 243, 262 (2022) (concurring, J., Alito) (government speech can be used "'as a subterfuge for favoring

certain private speakers over others based on viewpoint'") (quoting *Pleasant Grove Cty., Utah v. Summum*, 555 U.S. 460, 473 (2009)). This is the exact evil the *Pico* court hypothesized: with no First Amendment boundaries a Democratic school board could remove all Republican books, or an all-white school board could remove books advocating for racial equality—all with impunity. *Pico*, 457 U.S. at 871.

To guard against this evil, lower courts have been instructed to conduct a "holistic," fact-intensive inquiry into the specific context of a case to suss out whether the government is speaking for itself or regulating the private expression of others. *Shurtleff*, 596 U.S. at 252. Courts typically use three factors to parse the difference: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* Because Defendants lose on every factor, this Court should not apply government speech doctrine here.

    A.   <u>The history of school libraries generally and Defendants' use of school library as forum of expression indicate that school library is not government speech.</u>

Supreme Court precedent contains two requirements for this factor: 1) a lengthy and consistent history of *the forum* being used as government fora, *see Shurtleff*, 596 U.S. at 254-55; *Walker v. Tex. Div., Sons of Confederate Vets., Inc.*, 576 U.S. 200, 211 (2015) ; *Summum*, 555 U.S. at 465, and 2) a lengthy and consistent history of the *government in question* using this forum to convey messages, *see Cajune Indep. Sch. Dist. 194*, 105 F.4th 1070, 1079 (8th Cir. 2024) ("general history" shows school walls have been used to communicate government messages, but "specific history" of the district at issue "tells another story."). Defendants fail on both prongs.

**The Forum:** The government speaks where there is an *extensive history* of the forum being used to communicate its messages. *See Shurtleff*, 596 U.S. at 253 ("Flags are almost as old as human civilization."); *Summum*, 555 U.S. at 470 ("Governments have long used monuments to

16

speak to the public. Since ancient times, kings, emperors, and other rulers have erected statutes of themselves to remind their subjects of their authority and power."); *Walker,* 576 U.S. at 210-11 ("[T]he history of license plates shows that, insofar as license plates have conveyed more than state names and vehicle identification numbers, they long have communicated messages from the states," in this case beginning in 1917).

Defendants plead no facts about the history of public libraries (much less school libraries), relying entirely on *Little* for the idea that "from the moment they arose in the mid-19[th] century, public libraries have been shaping their collections for specific educational, civic, and moral purposes." 138 F.4[th] at 865; (Doc. 32 at PageID 347). But government speech doctrine is a fact-intensive inquiry that requires much more. *See, e.g.*, *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) ("the factors that used to determine whether something is government speech [...] are fact-intensive and generally not amenable to resolution at the motion to dismiss stage.").

Even setting this point aside, the limited history of public libraries that *Little* presents does not even support *its own* determination that public libraries are government speech. Much of *Little*'s analysis highlights the exclusively *private* origin of libraries. 138 F.4[th] at 861-64 (charting the development of libraries from "private religious libraries," to private social libraries to "privately owned and subscription-based" libraries, to, finally, public libraries). The Supreme Court has said a sufficient historical nexus exists between a forum and the government when the forum *was created* to convey messages for the government. Flags, for example, came into being to speak on behalf of governed communities. *See Shurtleff*, 596 U.S. at 253 ("From the 'primordial rag dipped in the blood of a conquered enemy and lifted high on a stick,' to the feudal banner bearing a lord's coat of arms, to the standards of the Aztecs, nearly every society has taken a piece

17

of cloth and 'endow[ed] it' ... to speak for the community.") (quoting W. Smith, Flags Through the Ages and Across the World, 1-2, 34 (1975)). The purpose of license plate designs has always been to communicate messages from the state. *Walker*, 576 U.S. at 200. The existence of monuments is largely synonymous with ancient "kings, emperors and other rulers" using them "to remind their subjects of their authority and power." *Summum*, 555 U.S. at 470. *Little* does not grapple with the private speech origins of library collections, and neither do Defendants.

Most importantly, unlike a flag or a license plate design, the raison d'être of a school library is not—and has never been—to convey messages for the government. School libraries have a unique purpose and a different history than public libraries. *See generally* Am. Br. of Freedom to Read Foundation, et al., in Suppt. of Aff., pp. 5-11, *Crookshanks v. Elizabeth Sch. Dist.*, No. 1:12-cv-02826, App. Case 25-1105 (10th Cir. June 20, 2025) (explaining that school libraries emerged about a century after the first public libraries with the goal of giving students voluntary access to a wide range of views to develop the critical thinking skills needed in a pluralistic society). Since at least the time that school libraries have been the subject of First Amendment litigation, they have been seen as places where students can encounter a range of ideas—even conflicting ideas. *See, e.g.*, *Minarcini*, 541 F.2d at 582-83 (school libraries are a "mighty resource in the marketplace of ideas"); *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting) (they are "designed for freewheeling inquiry"); *Roberts v. Madigan*, 702 F. Supp. 1505, 1512 (D. Colo. 1989) ("The school library is a mirror of the human race, a repository of the works of scientists, leaders, and philosophers. [...] The school library offers the student a range of knowledge, from the world's great novels and plays to books on hobbies and how-to-do-it projects."). Given the (at times discordant) range of views and voices housed in a school library, library book collections are most like trademarks issued by a patent office, which *Matal* deemed private speech. *Matal*, 582 U.S. at 233-239. Books, like

patents, are created by private individuals, and they only interact with the government when they pass through a government registration system. Defendants, however, present nothing about the history of school libraries (beside cites to *Little*) to guide the Court's analysis and thus fail on this prong.

**The Government in Question:** Similarly, Defendants introduce no facts, beyond cites to Tennessee statutes, that the Rutherford County Schools Board, specifically, has a lengthy history of using its school libraries to convey government messages, despite precedent requiring such analysis. *See, e.g.*, *Shurtleff*, 596 U.S. at 254-55 (analyzing whether city of Boston had practice of using flags on its City Hall Plaza to convey messages); *Walker*, 576 U.S. at 211 (analyzing whether Texas government had long "selected various messages to communicate through its license plate designs"); *Summum*, 555 U.S. at 465 (Pleasant Grove government began accepting privately donated monuments in city park as early as 1971); *see also Cajune*, 105 F.4th at 1079 ("specific history" of school district did not support using walls as government fora). Because Defendants also fail here, this factor of government speech doctrine weighs against them.

B. The public is not likely to perceive Defendants' school library as a forum for government speech.

Courts determine if the "public would tend to view the speech at issue as the government's," *Shurtleff*, 595 U.S. at 255, by looking at coherence of speech, clear markers of the governmental nature of the speech, and more. This factor, too, weighs against Defendants.

**Coherence**: Though a crystal-clear message is not required for the public to perceive something as government speech, the government cannot be "babbling prodigiously and incoherently." *See, e.g.*, *Matal*, 582 U.S. at 236 ("[I]f trademarks represent government speech, what does the Government have in mind when it advises Americans to 'make.believe' (Sony), 'Think different' (Apple), 'Just do it,' (Nike), or 'Have it your way' (Burger King)?"). The public

19

must be able to glean some non-contradictory message from government speech, and it cannot do this in a school library teeming with hundreds of conflicting ideas and messages.

Consider the Eighth Circuit, which already reached this conclusion in *GLBT*, 114 F.4th at 668. The government, it reasoned, would be "'babbling prodigiously and incoherently,'" if placing copies of "Plato's *The Republic*, Machiavelli's *The Prince*, Thomas Hobbes' *Leviathan*, Karl Marx and Friedrich Engels' *Das Kapital*, Adolph Hitler's *Mein Kampf*, and Alex de Tocqueville's *Democracy in America*" on the library shelves constituted government speech. *Id.* (quoting *Matal*, 582 U.S. at 236).

Foregoing facts of their own, Defendants attack this point through *Little*, which claimed the Eighth Circuit misunderstood that the speech "is not the words of the library books themselves" but the act of curating which books to place in or remove from the library. 138 F.4th at 864. But this logic falls apart at the slightest tug. For one, *Little* used a hypothetical about a single book to explain how the curation of hundreds of books would be perceived as government speech. *Id.* at 864 (arguing that patron who cannot find a copy of Stephen King's *Salem's Lot* at a public library would complain to government-controlled Library Board, not private entity). But a book does not shed its private speech just because it passes through a government registration system. *See Matal*, 582 U.S. at 239 ("Holding that the registration of a trademark [with the government] converts the mark into government speech would constitute a huge and dangerous extension of the government speech doctrine. For if the registration of trademarks constituted government speech, other systems of government registration could easily be characterized in the same way.").

Even though *Little* tries to dispatch *Matal*'s concern by saying, yet again, that the speech is not the singular book but the curated collection of books, *Little*, 138 F.4th at 858, this fact-starved hypothetical does not explain how it would be *reasonable* for the public to associate this book

20

curation with the government.[3] Even *Summum*, 555 U.S. at 470-71, a case on which *Little* depends, says otherwise. There, the Supreme Court found it would be reasonable for the public to associate the selection and display of permanent monuments in a city park, as opposed to the monuments themselves, with the government. *Id.* This was because "property owners typically do not permit the construction of [permanent] monuments [that convey a message with which they do not want to be associated] on their land." *Id.* That reasoning does not translate: Books are not like monuments. They are not giant, permanent, or even visible, and school libraries, including those run by Defendants, routinely open their shelves to books they dislike. Compl. ¶ 52 (highlighting many since-removed books that circulated for years in Rutherford County).

Furthermore, the curation caselaw cited by Defendants and *Little* does not map onto these facts. Curation is not an infinite license to discriminate among viewpoints; precedent only supports the government doing that at the *outset* of shaping their speech, not after the fact. *See, e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) (state agency did not violate First Amendment rights of an independent political candidate when it rejected his application to be part of a televised debate); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 30 (D.C. Cir. 2005) (hereinafter "*PETA")* (ruling in favor of arts commission accused of viewpoint discrimination during selection process because, "in deciding which designs to accept or reject," it could "communicate some viewpoints while disfavoring others.").

Imagine if the state agency in *Forbes* allowed the independent candidate to join the televised debate but kicked him off stage mid-program because he talked about universal

---

[3] Even Defendants recognized that their censorship was incoherent, calling it a "round robin game of insanity." Compl. ¶ 16 ("We have now placed a task of 150 books, [sic] that they are now asking the librarians to review, when the person that submitted them, from all accounts, didn't even look at all 150 reviews. That's disrespectful to the time of our librarians. I'm not so sure what the point of all of that was [...] Throwing, just randomly doing things without a specific purpose...It's like a round robin game of insanity.")

healthcare—an idea detested by the executive of the agency. What if the city arts commission in *PETA* accepted multiple animal-cruelty designs, placed them around town as part of its exhibit, but took them down because a sponsor who worked for the livestock industry complained about the public being influenced by these ideas? If the government removed speech under these circumstances in a school library – as Plaintiffs adequately allege that Defendants did – case law would characterize it as censorship, not curation. *See, e.g.*, *Pico*, 457 U.S. at 872 (plurality opinion). Accordingly, Defendants fail to show that library collections are coherent messages reasonably associated with the government.

**Visible Government Markings:** Precedent also suggests the public would be likely to perceive something as government speech if "the governmental nature [of the speech] is clear." *Walker*, 576 U.S. at 212. In *Walker*, where the Supreme Court found that license plate designs constituted government speech, several aspects made the government speech clear: The state issued and owned every plate, emblazoned its name in large letters at the top of every plate, and required all Texas vehicle owners to display these plates. *Id.* None of those indicators are present here: Defendants do not own the rights to school library books. They do not publish them. They do not require students to check them out or read them.

Few people, then, would reasonably consider school library collections as coherent messages expressed by school boards; rather, most are familiar with the paens describing school libraries as "mighty resource[s] in the marketplace of free ideas," *Minarcini*, 541 F.2d at 583, and places "designed for freewheeling inquiry." *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting). Because the public perception factor also weighs against Defendants, they are not clearly entitled to judgment as a matter of law under government speech doctrine.

    C.  <u>Defendants fail to demonstrate longstanding practice in controlling and shaping library collection.</u>

22

Like the historical expression factor, this factor requires facts of a longtime pattern or practice of the government in question shaping the speech. *Shurtleff*, for instance, found that the city government of Boston did not use the flags on its City Plaza to convey government messages because it exercised little to no control over which flags it allowed to fly. 596 U.S. at 256-57. City practice "was to approve flag raisings without question," and Boston had "no record of denying a request," until the plaintiff in the case, and kept "no written policies or clear internal guidance ... about what flags group could fly and what those flags would communicate." *Id*. This hands-off approach contrasted, *Shurtleff* noted, *id.*, "with the degree of government involvement" in cases like *Summum*, where Pleasant Grove City "always selected" its park monuments going back to at least 1971, 555 U.S. at 472-73, and *Walker*, where a state board had "'maintain[ed] direct control'" over every aspect of the license plate design process for several years, 576 U.S. at 213.

This situation is like *Shurtleff*. Defendants have no longstanding or fastidious practice of controlling their school library collections. They only began taking an active role in removing books in August 2024 after they modified RCS Policy 4.403 to empower local officials to police "age appropriate" library materials in line with Tenn. Code Ann. §49-6-3803, the "Age Appropriate Materials Act." Compl. (Doc. 1) ¶ 15; *GLBT*, 114 F.4th at 668 (noting as part of its government speech analysis that "historically the government of Iowa [had] not asserted extensive control over removing books from public school libraries" until Iowa Code § 279.80 was passed in 2023). *cf. Summum*, 555 U.S. at 472-73; *Walker*, 576 U.S. at 213.

Defendants are not exercising much control over a library collection – and therefore "speaking" – if they are removing books according to a mandatory statutory scheme. *See, e.g.*, *Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573-CEM-RMN, 2025 WL 2408178, at *9 (M.D. Fla. Aug. 13, 2025) (district court declining to apply *Little's* "curation" theory because

government was not engaged in expressive speech when a statute mandated "the removal of books that contain even a single reference to the prohibited subject matter, regardless of the holistic value of the book individually."); *Matal*, 582 U.S. at 235-36 (reasoning that a government exercised little control over the speech of trademarks because their registration was mandatory under a statutory scheme unless a reviewer determined the viewpoint/content was derogatory or offensive); *see also* Defs' Mot. (Doc. 32) at PageID 355 ("[I]n selecting ... the challenged books ... Defendants [made] statutorily required ... choices.").

Accordingly, Defendants cannot show a history of extensive control over their school library collections. With all three factors weighing against them, Defendants mistakenly stand on *Little*, which disregards established precedent and only garnered 7 out of 17 votes for its government speech section, making it non-controlling in its own circuit, let alone this one. *U.S. v. Edwards*, 456 F. Supp. 3d 953, 955 (M.D. Tenn. 2020) ("Of course…Fifth Circuit opinions—even ones that set forth applicable holdings and not mere observations or other dicta—are not binding on this Court."). The Court should find government speech doctrine does not apply here.

### III. Plaintiffs Have Adequately Stated a Claim for Viewpoint Discrimination

Finally, Plaintiffs adequately allege that Defendants removed books because Defendants disliked ideas contained within those books. The disliked ideas identified by Plaintiffs include content relating to sex, sexuality, or nudity, Compl. ¶58; sexuality, LGBTQ+ themes and characters, Compl. ¶ 23, 58; and books by authors of color, particularly books that highlight racism, Compl. ¶ 22, 26, 48, 51. *See also* Pls.' Memo in Support of P.I. (Doc. 12) at PageID 97; Roe Dec. ¶ 13; Doe Dec. ¶ 12; Coe Dec. ¶ 11. Defendants overlook these pleadings and argue that Plaintiffs' claim fails because Plaintiffs allege that some books without LGBTQ+ content were also removed. (Doc. No. 32 at PageID 360). This ignores the full scope of Plaintiffs' factual

24

pleadings and elides the obvious: Plaintiffs pled many targeted ideas because many ideas were targeted. *See id.*

Moreover, naming each specific disliked idea is a pleading bar for which Defendants cite no authority. In *Minarcini*, the (comparatively sparse) record on appeal indicated only that at least one of the removed books was labeled as "GARBAGE" and "completely sick" by school staff. 541 F.2d at 581. This was enough for the court to conclude that, absent a neutral explanation, "the School Board removed the books because it found them objectionable in content and because it felt that it had the power, unfettered by the First Amendment, to censor the school library for subject matter which the Board members found distasteful." *Id.*; *see also PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.,* 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) (finding plaintiffs plausibly stated claim for relief when complaint alleged books were removed because of "ideological objections to [the books'] content or disagreement with their messages or themes, rather than for pedagogical reasons" and did not meet statutory requirements for removal). As pleaded by Plaintiffs, Defendants' statements at school board meetings reveal a broad dislike for the removed books. Compl. ¶ 28 ("I don't like them. I wouldn't read them."); *id.* ¶ 39 ("Look everybody wants them off the shelf…").

As also pleaded by Plaintiffs, Defendants overtly relied on a partisan resource (BookLooks) to target books for removal. Compl. ¶¶ 20, 27, 28, 32, 33. BookLooks reviews are extremely biased, particularly against LGBTQ+ characters, stories about sexual assault, and discussion of racism. *Id.* ¶¶ 20-26; Pls.' Memo in Support of P.I. (Doc. 12) at PageID 97. Plaintiffs pleaded that these reviews disparage books that critically examine the role of these ideas in shaping an egalitarian society. *See* Compl. ¶ 8 (flattening the synopsis of a complex, award-winning book that reckons with the generational violence of chattel slavery to one sentence); *id.* ¶ 23 (equating books

with marginalized LGBTQ+ identities to derisive topics such as drug or alcohol use, hate, and violence); *id.* ¶ 25 (automatically giving the worst ranking to books that reference sexual assault or battery against younger women by older men). One Board member requested the creation of a website to allow other Board members to skip reading the books and just read BookLook reviews when considering whether to remove a book. *Id.* ¶ 18. Other Board members frequently refer to "the reviews" when discussing book removals at school board meetings. *Id.* ¶¶ 28, 33, 38.

Plaintiffs finally allege that Defendants were so motivated to remove access to these ideas that they disregarded their own materials specialists' recommendations about the removed books – *id.* ¶¶ 42-43 (Defendants refused to follow, more than 70% of the time, recommendations from trained district librarians); *id.* ¶ 52 (citing several reviews from librarians that found removed books <u>did not</u> meet any of the definitions of sexually explicit content in Tenn. Code Ann. §39-17-901) – and were willing to substitute a neutral legal standard with their own judgment, *id.* ¶ 40 (pleading that some board members believed they could remove books based on what *they* found "patently offensive" as opposed to what the law considered "patently offensive.").

Indeed, many of the removed books were noted by library materials specialists as being *not* sexually explicit in any way. *Id.* ¶ 52 (review of removed book *Ask the Passengers*: "There is no nudity, no ultimate sex acts, no sexual excitement – just kissing"; review of The Female of the Species: "no sexual content"; review of *Girl in Translation*: same; review of *The Testaments*: same); *see also id.* ¶ 43. Of particular note: the library materials specialist review of *Almost Perfect* (a book about a cisgender boy falling in love with a transgender girl) openly documents that "there are no descriptions of sex" and that any subsequent removal of the book would be likely based on "disagreement or personal beliefs." *Id.* at ¶ 52. Thus, Defendants' own school board meeting minutes reflect that if Defendants removed *Almost Perfect* it would be, in the material specialist's

26

judgment, specifically because of "disagreement or personal beliefs." *Id*.

This level of proof surely exceeds the "rank suspicion" that Defendants accuse Plaintiffs of pleading. Defs' Mem. Suppt. Mot. for Judg. on the Pleadings (Doc. 32 at PageID 358-59) (citing *C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F.Supp.3d 906, 915 (E.D. Mo. 2022)). At base, Plaintiffs' pleaded facts satisfy the level of proof required at this stage of litigation. *See Tucker*, 539 F.3d at 549 ("all well-pleaded material allegations of the [non-moving party] must be taken as true"). To the extent Defendants dispute their motive in removing books— that is, their reliance on BookLooks and the alleged sexual explicitness of each book—these are factual disputes at the heart of Plaintiffs' First Amendment claim. *A.C.L.U. of Fla. v. Miami-Dade Cnty. Sch. Bd.,* 557 F.3d at 1204 ("the Board's motive is the ultimate fact upon which the resolution of the constitutional question depends"). And, they are rightly resolved through discovery and trial—not a Rule 12(c) motion. *Cf. Pico*, 457 U.S. at 883 (White, J., concurring in the judgment) (concurring in judgment because this would result in "trial and the making of a full record and findings" as to "the reason or reasons underlying the school board's removal of the books.").

## IV.    Plaintiff PEN America Has Standing

To establish associational standing, PEN America must show: (1) its "members would otherwise have standing to sue in their own right"; (2) the "interests" that the suit "seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 342–43 (1977).

PEN American Center, Inc., ("PEN America") is a non-profit membership organization with nearly 5,000 members who are novelists, journalists, nonfiction writers, editors, poets, essayists, playwrights, publishers, translators, agents, other writing professionals, and readers.

27

Compl. ¶ 7. PEN author members whose books have been restricted or removed by Defendants include: Laurie Halse Anderson, Jesse Andrews, Elana K. Arnold, Jay Asher, Judy Blume, Deb Caletti, Mary H.K. Choi, Mike Curato, Jessie Ann Foley, E.R. Frank, Alex Gino, John Green, Ellen Hopkins, Khaled Hosseini, George M. Johnson, Brian Katcher, Rupi Kaur, A.S. King, Jean Kwok, Malinda Lo, Gregory Maguire, Mindy McGinnis, Casy McQuiston, Preston Norton, Ashley Hope Perez, Jodi Picoult, Amy Reed, Rainbow Rowell, Cory Silverberg, Fiona Smyth, and Angie Thomas. Compl. ¶ 9.

These authors have standing to sue in their own right. Authors' right to share their books is protected under the First Amendment. *See Martin v. City of Struthers*, Ohio, 319 U.S. 141, 143 (1943) (The First Amendment "embraces the right to distribute literature."). School libraries are (at least) nonpublic fora where exclusion of a speaker must not be based on the speaker's viewpoint and must be reasonable in light of the purpose of the forum. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682 (1998). PEN America's author members' books were removed over disagreement with the ideas they contained. Compl. ¶¶ 50, 52, 53.

This litigation is germane to PEN America's purpose. PEN America works to promote the rights and professional interests of its author members; in particular, PEN America seeks to protect its author members' right to share their books and viewpoints without undue government censorship and to promote the circulation of its author members' books. Compl. ¶ 7.

Lastly, Plaintiffs' claims do not require individual proof or participation by the authors: the injury is common to all authors members, and the requested relief would flow to each of its members if PEN America prevails. Thus, PEN America has standing. *Cf. Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573-CEM-RMN, 2025 WL 2408178, at *5 (M.D. Fla. Aug. 13, 2025) (finding author association, Authors Guild, had associational standing at summary judgment

stage); *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.,* 711 F. Supp. 3d 1325, 1330 (N.D. Fla. 2024) ("PEN has associational standing as to the specific books its members authored because those members have standing to sue in their own right and the amended complaint alleges […] that the interests implicated by Defendant's actions are germane to the organizations' purpose."); *Crookshanks*, 2025 WL 863544, at *8 (Authors Guild showed likelihood of success on the merits of First Amendment claim).

## CONCLUSION

Construing all facts in Plaintiffs' favor, Individual Plaintiffs and Plaintiff PEN America have adequately stated claims for relief under the First Amendment. Relying only on out-of-circuit law, Defendants have failed to show that they are entitled to judgment as a matter of law. Any factual disputes Defendants raise should be resolved at trial. The Court should therefore deny Defendants' Motion for Judgement on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Dated: August 29, 2025                    Respectfully submitted,

                                          KERRY KNOX, BPR #23302
                                          117 S. Academy Street
                                          Murfreesboro, TN 37130
                                          (615) 896-1000
                                          (615) 896-1027 (facsimile)
                                          kek@castelliknox.com

                                          /s/ Stella Yarbrough
                                          Stella Yarbrough, BPR # 033637
                                          Lucas Cameron Vaughn BPR# 36284
                                          Zee Scout BPR # 042637
                                          American Civil Liberties Union
                                          Foundation of Tennessee
                                          P.O. Box 120160
                                          Nashville, TN 37212
                                          (615) 320-7142
                                          Syarbrough@aclu-tn.org

29

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was sent to all counsel of record via the District Court's electronic filing system on August 29, 2025.

*/s/Stella Yarbrough*