| | | |
|---|---|---|
| RACHEL ROE, a minor, by and through her parent and next friend, ROBERT ROE; DAVID DOE, a minor, by and through his parent and next friend, DANA DOE; CLAIRE COE, a minor, by and through her parent and next friend, CHARLES COE; and PEN AMERICAN CENTER, INC., | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 3:25-cv-00429 |
| RUTHERFORD COUNTY BOARD OF EDUCATION; JAMES SULLIVAN, in his official capacity as Director of Rutherford County Schools, | ) ) ) ) ) | JUDGE RICHARDSON MAGISTRATE NEWBERN |
| Defendants. | ) ) | |

## DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

COME NOW Defendants Rutherford County Board of Education and James Sullivan, in his official capacity as Director of Rutherford County Schools (collectively, "Defendants"), by and through counsel, and file this Reply to Plaintiffs' Response in Opposition to Defendants' Motion for Judgment on the Pleadings, and would state unto the Court as follows:

## **INTRODUCTION**

Plaintiffs fail to identify any binding precedent recognizing a constitutional right to force a school library to carry particular books. Instead, Plaintiffs rely on a fractured Supreme Court opinion and outdated Sixth Circuit precedent that predates the government speech doctrine, while

1

ignoring modern persuasive authority that school library decisions are government speech not subject to First Amendment challenge.

A local school board is the best attuned to its community's values and is subject to reprimand at election time. *See, e.g.*, *Little v. Llano County*, 103 F.4th 1140, 1185 (5th Cir. 2024) (Duncan, J., dissenting) (asserting that the "most effective constraint" on public library officials and local governments remains accountability in local elections), reh'g en banc granted, vacated, 106 F.4th 426 (5th Cir. 2024); *see also Board of Education v. Pico*, 457 U.S. 853, 894 (1982) (Powell, J., dissenting) ("School boards are uniquely local and democratic institutions . . . responsible . . . to the parents and citizens of school districts."). However, they have no constitutional right to force schools to have access to Plaintiffs' preferred ideas through school libraries.[1] "There is a simple answer to the question posed by this case: A public library's choice of some books for its collection, and its rejection of others, is government speech." *Little*, 103 F.4th at 1185 (Duncan, J., dissenting).

## ARGUMENT

### I.     *Pico* Provides No Binding Precedent

Plaintiffs rely almost entirely on *Pico*. But under *Marks v. United States*, 430 U.S. 188 (1977), *Pico* yields no constitutional holding because no rationale garnered a majority. *Marks*, 430 U.S. at 193 ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken

---

1.        At bottom, Plaintiffs have no constitutional right to force schools to have access to Plaintiffs' preferred ideas through school libraries. As stated by Chief Justice Burger (with whom three other Justices joined) in *Pico*: "Were this to become the law, this Court would come perilously close to becoming a "super censor" of school board library decisions. Stripped to its essentials, the issue comes down to two important propositions: *first*, whether local schools are to be administered by elected school boards, or by federal judges and teenage pupils; and *second*, whether the values of morality, good taste, and relevance to education are valid reasons for school board decisions concerning the contents of a school library." *Pico*, 457 U.S. at 885 (Burger, C.J., dissenting); *see also Little*, 103 F.4th at 1185 (5th Cir. 2024) (Duncan, J., dissenting) ("The commission hanging in my office says "Judge," not "Librarian.").

by those Members who concurred in the judgments on the narrowest grounds.'" (quotation omitted)); *see also DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 409 n. 4 (6th Cir. 1997) ("[W]e do not have the freedom to pick and choose which premises and conclusions we will follow, but instead, with respect to a particular issue, must follow the reasoning of the concurring opinion with the narrowest line of reasoning on that issue."). Importantly, Justice White's narrow concurrence expressly declined to decide any constitutional question, making *Pico* a non-precedent. Numerous courts have recognized as much. *See ACLU of Florida v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1199–1200 (11th Cir. 2009) (describing *Pico* as having "no precedential value"); *Little v. Llano Cnty.*, 138 F.4th 834, 844 n.14 (5th Cir. 2025) (same); *Walls v. Sanders*, 144 F.4th 995, 1003-04 (8th Cir. 2025) (same). There is thus nothing for this Court to "overrule"—*Pico* is not binding precedent to begin with.[2]

## II.  The Proper Framework is Government Speech; Not Public Forum Doctrine

### A.  *Pico's Ad Hoc* "Right to Receive Ideas" is Doctrinally Unstable and Non-Binding

The *Pico* Court did not ground its analysis in traditional public forum doctrine but instead fashioned a one-off combination of a newly created constitutional right of "right to receive information" and what the Court deemed to be the "special characteristics of the school environment." *See Pico,* 457 U.S. at 866-69.[3] Under the public forum doctrine, courts generally

---

2.  Plaintiffs cite to a Kansas District Court case of *Case v. Unified Sch. Dist. No. 233*, 895 F. Supp 1463, 1468 (D. Kan. 1995) for the proposition that *Pico* a fact-based examination into the motivation of school officials behind book removals. The problem with Plaintiff's reliance on *Case* (and *Pico* for that matter) is that the same were decided well before the advent of the government speech doctrine. The modern government speech doctrine, as developed by *PETA v. Gittens*, 414 F.3d 23, 30 (D.C. Cir. 2005), *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009), *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015), and *Shurtleff v. City of Boston*, 596 U.S. 243 (2022) gives the government broad discretion over curated expressive choices. A school library is curated by the school board for educational purposes, much like a city curates monuments (*Summum*) or an art exhibit (*Gittens*). Under today's doctrine, book selection and removal are government speech decisions, not student speech suppression. Notably, Justice Rehnquist foreshadowed that *Pico* would have required a different result in that case based on the government speech doctrine. *See Pico*, 457 U.S. at 920 (Rehnquist, J., dissenting) ("[T]he Court will far better serve the cause of First Amendment jurisprudence by candidly recognizing that the role of government as sovereign is subject to more stringent limitations than [its] role" as "educator.").

3.  In fact, the *Pico* Court did not use the word "forum" once.

agree that a school library is not a public forum at all, but a government-controlled educational resource. If there is no forum, then there is no implication of the first amendment and no constitutional obligation to maintain viewpoint neutrality. The dissent in *Pico* made this point forcefully, rejecting the notion that the First Amendment limits book removals and emphasizing that library collections, like curricula, fall squarely within the school board's discretionary authority. *Id.* at 893–97 (Burger, C.J., dissenting). At least four Justices thus concluded that the First Amendment does not constrain removal decisions, underscoring that the plurality's *sui generis* approach carries no binding force.[4] In other words, *Pico* is doctrinally unstable because it bypassed forum analysis altogether and instead adopted an *ad hoc* "right to receive ideas" framework that lacks clear boundaries and majority support.

The U.S. Supreme Court and other circuits have repeatedly recognized the government's authority to regulate the content of its own message, which includes the discretion to curate materials and content for presentation to citizens. *See, e.g., Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586 (1998) (state-sponsored art gallery); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (broadcast debate and state-university commencement); *Pleasant Grove City v. Summum*, 555 U.S. 460, 470-93 (2009) (selection of monuments); *Gittens*, 414 F.3d at 28 (government sponsored art program); *Leake v. Drinkard*, 14 F.4th 1242, 1253 (11th Cir. 2021) (government parade). "[F]orum analysis and heightened judicial scrutiny . . . are also incompatible with the discretion that [government-run] libraries must have to fulfill their traditional missions." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 209 n. 4 (2003) (plurality op.). A library's purpose is to "provide its patrons with materials or requisite and appropriate quality, not to create

---

4.      The dissent also explained that there "no restraints of any kind are placed on students. They are free to read the books in question, which are available at public libraries and bookstores; they are free to discuss them in the classroom or elsewhere." *Pico*, 457 U.S. at 886 (Burger, C.J., dissenting).

a public forum for [private parties] to express themselves." *Id.*; *see also Gittens*, 414 F.3d at 28 ("[T]he government speaks through its selection of which books to put on the shelves and which books to exclude. In the case before us, the [government] spoke when it determined which [materials] to include in the exhibition and which not to include. In using its 'editorial discretion in the selection and presentation of' the [materials,] the Commission thus 'engage[d] in speech activity'; 'compilation of the speech of third parties' is a communicative act.") (quoting *Forbes*, 523 U.S. at 674). In other words, the selection reflects the government's view about what materials have the "requisite and ***appropriate*** quality." Indeed "[j]ust as ordinary citizens cannot require the government to express a certain viewpoint or maintain a prior message, students cannot oblige the government to maintain a particular curriculum or offer certain materials in that curriculum based on the Free Speech Clause." *Walls*, 144 F.4th at 1003. In the end, the government speech doctrine is the proper framework for this Court to analyze curated expression like school libraries.

**B. School Library Curation Decisions Are Government Speech under *Shurtleff* [5]**

In determining whether government speech is present, the Supreme Court in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), reaffirmed that courts look to "the history of the expression at issue," "the public's likely perception as to who (the government or a private person) is speaking," and "the extent to which the government has actively shaped or controlled the expression." *Id.* at 252 (citation omitted). Applying those factors, the Court found that although flags are often used by governments to convey messages, Boston's "lack of meaningful involvement in the selection of flags or the crafting of their messages" showed the program created a forum for private speech rather than conveying government speech. *Id.* at 258; *cf. Summum*, 555

---

5. The *Little* case, upon which Defendants rely, extensively examined the *Shurtleff* factors in a nearly identical circumstance as this case (curation / removal decisions in a library) and found that all three of *Shurtleff's* questions support the holding that a library's selection and rejection or books constitutes government speech. *Little*, 139 F.4th at 860-66.

U.S. at 470-73 (holding that messages of monuments in a public park constituted government speech, even when the monuments were privately funded and donated). Applied here, the *Shurtleff* factors confirm that school library collections are curated government speech, not public fora.

**History of the Expression at Issue:** Unlike in *Shurtleff* where Boston's flagpole had historically been opened to private groups, the history of public school libraries is the opposite—they have always been curated by school boards, librarians, and educators to serve pedagogical goals, not to provide an open platform for private speakers. This longstanding history weighs in favor of treating library collections as government speech. Moreover, professional directives call for libraries, including school libraries, to have written policies for selection, deselection/weeding, and reconsideration of library books. *See* American Library Association, *Selection & Reconsideration Policy Toolkit for Public, School, & Academic Libraries*, https://www.ala.org/tools/challengesupport/selectionpolicytoolkit (last visited Sept. 11, 2025).[6] This is the antithesis of an "open microphone." Further, Tennessee law directs local school boards to adopt board-approved selection policies and to systematically shape the collection (again, not to open shelves to private speakers). *See* T.C.A. § 49-6-3801, *et seq.* In addition, Courts have long recognized that library collections are curated by government actors rather than opened as forums for private speech. *See Am. Libr. Ass'n, Inc.*, 539 U.S. 194 (2003) ("public libraries must have broad discretion to decide what material to provide to their patrons", and "public forum principles . . . are out of place" in the context of a public library's decision to exclude access to certain content). *Id.* at 204–05. Under established doctrine, a school library is not a public forum at all, but a government-controlled educational resource.

---

6. "Every library — academic, public, and school (public, private, charter, independent, and international) — should have a comprehensive written policy that guides the selection, deselection or weeding, and reconsideration of library resources[, and t]he policy should be approved by the library's governing board or other policy-making body and disseminated widely for understanding by all stakeholders."

**Public Perception:** The public perception factor strongly favors government speech. In the context of a school library, students and parents reasonably attribute the contents of the collection to the school itself, just as they do with curriculum or school-sponsored student media. The Supreme Court in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) confirmed that school-sponsored expressive activities "bear the imprimatur of the school" and are thus perceived as the school's own message, subject to editorial control. *Id.* at 271. In *Downs v. Los Angels Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000), the court held that school bulletin board postings related to sexual orientation were government speech, emphasizing that the public would reasonably perceive the displays as the school's message. *Id*. at 1016-17. Similarly, in *Summum*, the Court explained that permanent displays in a city park were understood by the public as government speech, even if privately donated. *Summum*, 555 U.S. at 470-93. By the same logic, the public perceives a school library collection as the product of the school's educational judgment that such materials are appropriate and consistent with the school's mission, not as a neutral forum for private voices. In open forums like parks or soapboxes, the public assumes the speaker is private. In a school library, the opposite is true: the curated shelves "speak" for the school.

**Extent of Government Control and Editorial Discretion:** Unlike Boston's "lack of meaningful involvement in the selection of flags or the crafting of their messages", *Shurtleff*, 596 U.S. at 252, school libraries are paradigmatic examples of government-controlled curation. School boards and librarians exercise editorial discretion by adopting written selection and reconsideration policies, systematically reviewing acquisitions, and regularly removing or replacing materials for reasons of age-appropriateness, educational value, and alignment with curriculum. Applying the *Shurtleff* framework, a school library is not an open public forum but rather a collection of materials attributable to the school itself, selected with direct editorial oversight, and grounded in

the history of educational curation. As such, school boards retain broad authority—even viewpoint-based authority.[7]

Plaintiff's also rest their opposition on the argument that libraries are different than curriculum. Courts recognize that school library collections are not neutral repositories of private speech but curated resources that are closely tied to curriculum and integral to the school's broader educational mission. S*ee Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1003–04 (W.D. Ark. 2003) (school libraries "play a unique role in the school setting, providing resources that support the curriculum"). Just as student newspapers "bear the imprimatur of the school," *Hazelwood*, 484 U.S. at 271, so too do school library collections, which are selected, maintained, and—when appropriate—removed under the school board's authority. Indeed, even four Justices in *Pico* emphasized that "unlike university or public libraries, elementary and secondary school libraries are not designed for freewheeling inquiry; they are tailored, as the public school curriculum is tailored, to the teaching of basic skills and ideas." *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting); *see also id.* at 889 (Burger, C.J., dissenting) ("How are 'fundamental values' to be inculcated except by having school boards make content-based decisions about the appropriateness of retaining materials in the school library and curriculum?"); *id.* at 921 (O'Connor, J., dissenting) ("If the school board can set the curriculum, select teachers, and determine initially what books to

---

7.      Plaintiffs argue that "library book collections are most like trademarks issued by a patent office, which *Matal* deemed private speech. [citation omitted]. Books, like patents, are created by private individuals, and they only interact with the government when they pass through a government registration system." (Pl. Response, DE 37, at PageID# 467). Plaintiffs' analogy to *Matal v. Tam*, 582 U.S. 218 (2017), is misplaced. The trademark registry at issue in *Matal* was a neutral, ministerial system in which the government passively recorded marks created entirely by private actors. *Matal*, 582 U.S. at 235-36. The Court emphasized that trademarks were perceived by the public as the private expression of their owners, not curated or endorsed by the government. *Id.* at 219. By contrast, a school library is not a passive registration system but a curated collection assembled by school officials to further the district's educational mission. Viewpoint-based choices in library curation fall within the school's prerogative to shape its own educational message. This active curation and governmental purpose align the library with the government-speech line of cases such as *Summum* (public art displays), not with *Matal*'s neutral registrar model. *See Summum*, 555 U.S. at 467-69 (government engages in "expressive conduct" when it exercises "effective control" over selection of messages).

purchase for the school library, it surely can decide which books to discontinue or remove"). Together, these authorities confirm that school libraries are not open public forums but functional extensions of the curriculum, curated to advance the school's pedagogical goals and mission.

### III. *Minarcini* Cannot Control in Light of Subsequent Doctrine

Plaintiffs' reliance on *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 (6th Cir. 1976), is misplaced. *Minarcini* predates the Supreme Court's modern government-speech decisions, including *Summum*, 555 U.S. 460 (2009), *Walker*, 576 U.S. 200 (2015), and *Shurtleff*, 596 U.S. 243 (2022). Those cases make clear that when government actors curate or select among third-party speech, they are engaging in government speech, not creating a forum for private expression. To the extent *Minarcini* suggests otherwise, it cannot be reconciled with this intervening Supreme Court precedent. Accordingly, this Court need not—and should not—extend *Minarcini* beyond its facts. At a minimum, the Sixth Circuit—possibly in this case—should revisit the issue in light of controlling authority that has since clarified the law.

### IV. *Walls* Provides Authority That School Library Decisions Are Government Speech

Plaintiffs' reliance on *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 670 (8th Cir. 2024) is misplaced because the decision's flawed reasoning on government speech cannot be reconciled with the Eighth Circuit's subsequent decision in the *Walls* case.

In *GLBT Youth*, the Eighth Circuit vacated a broad preliminary injunction against Iowa's library barring removal of materials from school libraries, emphasizing that "Iowa is not required to tolerate speech that undermines or is inconsistent with its central mission of educating Iowa children." 114 F.4th at 670. However, the *GLBT Youth* court simultaneously rejected the defendants' government speech argument. *See id*. at 668. Plaintiffs argue that in light of the Eighth Circuit's 2024 decision in *GLBT Youth*, the Eighth Circuit's subsequent decision *Walls* cannot be read to apply the government speech doctrine to the school library setting. (Pl. Response at

PageID# 462-63). But that argument overlooks the fundamental weaknesses in *GLBT Youth*'s analysis and the clear course correction outlined *Walls*.

First, *GLBT Youth*'s government speech analysis is significantly flawed. The court based its rejection of the defendants' government speech argument on an incorrect understanding of the speech at issue as being the *content* of the books rather than the defendants' *selection* of the books. *See GLBT Youth*, 114 F.4th at 668 ("[I]t is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking" because if placing copies of books containing a wide range of conflicting ideas on shelves constituted government speech, "the State '[would be] babbling prodigiously and incoherently.'"); *but c.f. Gittens*, 414 F.3d at 28 (while "[t]hose who check out a Tolstoy or Dickens novel would not suppose that they will be reading a government message, . . . the government speaks through its selection of which books to put on the shelves and which books to exclude.").

Second, *GLBT Youth* cites no precedent whatsoever regarding government speech in the school setting **or** the library setting, including the controlling Eighth Circuit precedent at that time—*Pratt v. Independent School District No. 831*, 670 F.2d 771 (8th Cir. 1982) (holding that "school boards do not have an absolute right to remove materials from the curriculum" if the removal "was intended to suppress the ideas expressed" in the removed materials). Instead, the court based its rejection of government speech on the Supreme Court cases of *Shurtleff* and *Matal*, which involve completely different facts from the curation of books in a school library.

The very next year, the Eighth Circuit again had the opportunity to address government speech in the school setting and held that curricular speech regulated by statute was government speech, making clear that "students do not possess a supercharged right to receive information in public schools" that overrides government discretion. *Walls*, 144 F.4th at 1002-03 (8th Cir. 2024).

The *Walls* court abrogated *Pratt*, noting "clear incompatibility of [the] imposition of a viewpoint discrimination limitation and the Supreme Court's government speech doctrine." *Id*. at 1005. Although *Walls* was decided in the context of school curriculum, its reasoning applies with equal force to the school library setting. Accordingly, *Walls* demonstrates that *GLBT Youth*'s rejection of the government speech doctrine in the school library setting was both unsupported and short-lived, and the controlling precedent now makes clear that school officials' decisions regarding library materials fall squarely within the government's prerogative as speaker.

## **CONCLUSION**

The Constitution does not compel school boards to stock or retain particular library books. Plaintiffs have failed to allege a cognizable First Amendment violation under any plausible standard. The Court should grant Defendants' Motion for Judgment on the Pleadings and dismiss the Complaint with prejudice.

**Respectfully submitted,**

**HUDSON, REED & CHRISTIANSEN, PLLC**

**By: /s/ Nick C. Christiansen**
   **JEFF REED, #15000**
   **NICK C. CHRISTIANSEN, #30103**
   **JASON N. KING, #027749**
   16 Public Square North
   P.O. Box 884
   Murfreesboro, TN 37133
   (615) 893-5522
   jreed@mborolaw.com
   nchristiansen@mborolaw.com
   jking@mborolaw.com

   *Attorneys for Defendants*

11

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was sent to the following via the District Court's electronic filing system and/or U.S. Mail, postage prepaid, to:

Kerry Knox
117 S. Academy Street
Murfreesboro, TN 37130
kek@castelliknox.com

Stella Yarbrough
Lucas Cameron Vaughn
Zee Scout
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
syarbrough@aclu-tn.org

this the 12th day of September, 2025.

/s/ Nick C. Christiansen
**NICK C. CHRISTIANSEN**