IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| RACHEL ROE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | NO. 3:25-cv-00429 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| RUTHERFORD COUNTY BOARD OF | ) | |
| EDUCATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Pending before the Court is Plaintiffs' "Motion for Preliminary Injunction" (Doc. No. 11, "Motion"), supported by a memorandum (Doc. No. 12, "Opening Brief"). Via, the Motion, Plaintiffs, Rachel Roe, David Doe, Claire Coe, and PEN American Center, Inc., seek to enjoin Defendants, Rutherford County Board of Education (hereinafter, sometimes "Board") and James Sullivan ("Defendant Sullivan"),[1] from continuing to enforce certain provisions in Board Policy 4.403 and related practices removing certain books from Rutherford County Schools' libraries. Defendants have filed a response in opposition to the Motion (Doc. No. 24, "Response"), to which Plaintiffs replied (Doc. No. 30, "Reply"). For the reasons stated herein, the Motion will be **DENIED**.

---

[1] Defendant Sullivan is sued in his official capacity only.

<u>BACKGROUND</u>[2]

This case arises from the Rutherford County Board of Education's ongoing removal of books from public school libraries pursuant to Board Policy 4.403, T.C.A. § 49-6-3803 ("Age-Appropriate Materials Act"), and T.C.A. §§ 39-17-901 *et seq*. ("Obscenity Law"). (*See generally* Doc. No. 1, "Complaint").[3]

Defendant Rutherford County Board of Education "is an entity" operating "all Rutherford County public schools, including the schools attended by the individual [P]laintiffs." (*Id.* at ¶ 10). Defendant James Sullivan "is the Director of Rutherford County Schools" and was "appointed by the Rutherford County [] Board of Education." (*Id.* at ¶ 11). Defendant Sullivan "serves as the chief executive officer for Rutherford County [] Board of Education and is responsible for carrying out the policies of Rutherford County [] Board of Education." (*Id.*) The actions of the Defendants

---

[2] The following facts, unless somehow qualified herein (as for example by "Plaintiffs allege that" or "Defendants assert that"), are taken as true for purposes of the Motion (though not necessarily for any future purposes in this litigation), because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.

As a corollary to the above, no facts alleged in the Complaint are accepted herein as true merely because they are alleged in the Complaint (even though they would be accepted as true on, for example, a motion to dismiss under Rule 12(b)(6). As for alleged facts that are *not* accepted as true (and thus are identified herein as merely alleged by Plaintiffs), they are not accepted as true precisely because they do not fall into one of these four categories. And as for *legal conclusions* asserted in the Complaint, none of them are accepted merely because they are asserted in the Complaint; on a motion for preliminary injunction, a court naturally accepts only legal assertions that the court independently finds to be meritorious.

[3] Board Policy 4.403, described in further detail below, refers to certain procedures adopted by the Rutherford County Board of Education to govern content contained in Rutherford County Schools' library collections. (Doc. No. 1-1). The Age-Appropriate Materials Act "specifically instructs local education agencies, such as a school board, to pass policies as to how their schools will ensure their library collections contain materials that are 'age appropriate.'" (Doc. No. 1 at ¶ 12). *See also* T.C.A. § 49-6-3803. The Obscenity Law, among other things, prescribes a definition for "obscene" (including by defining terms that are included in the definition of obscene, T.C.A. § 39-17-901(10-14)), and imposes criminal penalties for distribution of obscene material to minors. T.C.A. § 39-17-911.

in directing the removal of certain books from public school libraries and implementing and applying Board Policy 4.403 form the basis of this action. (*See generally*, Doc. No. 1).

Three of the Plaintiffs, namely Rachel Roe, David Doe, and Claire Coe (collectively "Student Plaintiffs"), (*id.* at ¶¶ 4, 47-49), are public high school students. The fourth is a national literary organization, PEN American Center, Inc. ("Pen America"). Pen America "is a nonprofit membership organization" with a "membership . . . made up of nearly 5,000 novelists, journalists, nonfiction writers, editors, poets, essayists, playwrights, publishers, translators, agents, other writing professionals, and readers." (*Id.* at ¶ 7). Here, Pen America represents its author members who have had works "removed or restricted by Defendants." (*Id.* at ¶ 8). Plaintiffs challenge the Board's removal or restriction of numerous titles—many of which involve themes relating to race, gender identity, and sexual orientation—as being (according to Plaintiffs) violative of their rights under the First Amendment to the U.S. Constitution. (*Id.* at ¶¶ 51, 65, 69). Defendants first began removing books from Rutherford County Schools' libraries "in the spring of 2024 without any public meeting or vote of the Rutherford County [] Board of Education." (*Id.* at ¶ 14). "At that time, books were summarily removed from the shelves of Defendants' libraries through informal requests by Board members and Director of Schools, [Defendant] Sullivan." (*Id.*). These "books were removed because Defendants believed their content met the definition of Tenn. Code Ann. §§ 39-17-901, 911 and the books were therefore *criminally* obscene." (*Id.*). On August 8, 2024, the Board revised Board Policy 4.403 to include immediate removal provisions, which read in relevant part as follows:

> As defined in TCA § 39-17-901, any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body, in whole or in part, which depicts nudity, sexual conduct, sexual excitement, excess violence, or sado-masochistic abuse, is patently offensive, or appeals to the prurient interest shall be immediately removed from all libraries within the school district and then reviewed for final decision by the Board.

As defined in TCA § 39-17-901, any book, pamphlet, magazine, printed matter, however reproduced, or sound recording, which, in whole or in part, contains nudity, sexual excitement, sexual conduct, excess violence, or sado-masochistic abuse, is patently offensive, or appeals to the prurient interest, or which contains explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, excess violence, or sado-masochistic abuse, is patently offensive, or appeals to the prurient interest, shall be immediately removed from all libraries within the school district and then reviewed for final decision by the Board.

(Doc. No. 1-1 at 1; Doc. No. 1 at ¶ 15).

As quoted above, the provisions in Board Policy 4.403 require the "immediate removal" of library contents if those contents meet certain definitions under T.C.A. § 39-17-901. (Doc. No. 1 at ¶ 16; Doc. No. 1-1 at 1).

On September 17, 2024, and September 19, 2024, the Board met "to address the removal of seven books." (*Id.* at ¶ 17).[4] At the September 17, 2024 meeting, a Board member, Caleb Tidwell, endorsed "[b]ookreviewwrc.com," a website that contained reviews "of the books being considered for removal" and was ultimately revealed to be "created by someone who asked Mr. Tidwell 'how he could help.'" (*Id.* at ¶ 18). The reviews on bookreviewwrc.com "were taken directly from BookLooks.org, an ultra-conservative website founded by a former member of Moms for Liberty." (*Id.* at ¶ 20). "The BookLooks reviews offer a one sentence synopsis of the plot of the book and then list several pages of out-of-context quotes from the books—quotes that may contain references to sex, body parts, or LGBTQ+ characters." (*Id.* at ¶ 21). "All BookLooks reviews assign the book a rating from 0-5, with '5' being the most explicit." (*Id.* at ¶ 23; Doc. No. 1-4). Various factors can increase a book's number rating, including:

- "Content that includes 'sexuality/gender ideology', 'non-sexual' nudity, and 'references to sexual activity.'" (Doc. No. 1 at ¶ 23).

---

[4] The books considered by the Board at these meetings included "*Beloved* by Toni Morrison; *Wicked: The Life and Times of the Wicked Witch of the West* by Gregory Macguire; *Homegoing* by Yaa Gyasi; and *The Perks of Being a Wallflower* by Stephen Chbosky." (Doc. No. 1 at ¶ 17).

- "'Profanity.'" (*Id.* at ¶ 24).

- "[R]eferences to sexual assault or battery" (*Id.* at ¶ 25).

- "[C]ontroversial racial, social or religious commentary." (*Id.* at ¶ 26).

On September 19, 2024, the Board rejected a motion that "any book contained in the high school library that had a rating of '3 or 4' on BookLooks.org [] be contained in a section behind the library desk" requiring "parent approval for access" and that "any book with a rating of '5' [] be immediately and permanently removed." (*Id.* at ¶ 27). Ultimately, the Board voted to remove six of the seven books under consideration during the September 17, 2024 and September 19, 2024 meetings. (*Id.* at ¶ 30).

Later in the school year, on November 12, 2024, another Board member, Frances Rosales, "emailed [Defendant] Sullivan a list of 150 books flagged for 'sexually explicit content.'" (*Id.* at ¶ 32). Board Policy 4.403 "requires immediate removal of materials" containing such content. (*Id.* at ¶ 34). Faced with considering 150 books requiring removal, "on November 14, 2024, the Board voted to have Rutherford County Schools library materials specialists . . . review the challenged books and to create reports on whether the books should be kept for all students, restricted to students of certain ages, or removed." (*Id.* at ¶ 35). Also at the November 14, 2024 Board meeting, Board members expressed confusion "as to the standards by which the 150 books were being evaluated." (*Id.* at ¶¶ 36-39). Eventually, Board "attorney Jeff Reed clarified that the Board was operating under the immediate removal provisions of Board Policy 4.403[,] and Board member Tidwell again stated that 'sexually explicit' meant, collectively, all the phrases in Board Policy 4.403's immediate removal provisions." (*Id.* at ¶ 40). Ultimately, even after voting "to have Rutherford County Schools library materials specialists . . . review the challenged books and to create reports on whether the books should be kept for all students, restricted to students of certain

ages, or removed," (*id.* at ¶ 35), the "Board failed to follow the specialists' recommendations for more than 70% of their votes, repeatedly voting to remove materials that librarians found not [to] meet any of the definitions in Tenn. Code Ann. § 39-17-901." (*Id.* at ¶ 43). And, all told, "over 140 titles have been permanently removed or restricted from [Rutherford County Schools'] libraries." (*Id.* at ¶ 44).[5]

Plaintiffs bring two claims for relief.

First, the Student Plaintiffs bring a 42 U.S.C. § 1983 claim for violation of their "First Amendment Right to Receive Information" ("Right-to-Receive-Information Claim"), (*id.* at 32), asserting that "[s]chool boards are not permitted to remove books from school libraries in a narrowly partisan or political manner, or because of board members' disagreement with the ideas contained in the books." (*Id.* at ¶ 56). Plaintiffs allege that the removal of the books at issue was done by the Board in a "narrowly partisan or political manner, or because Defendants disagree with the ideas or views contained in those books." (*Id.* at ¶ 57). Plaintiffs further allege that (1) "Defendants have no substantial or legitimate pedagogical interest in banning the removed books from Rutherford County Schools' libraries" (*Id.* at ¶ 60); (2) "None of the removed books . . . are obscene" (*Id.* at ¶ 61); (3) "The removed books . . . were not interfering with order and discipline in Rutherford County Schools" (*Id.* at ¶ 62); (4) "The removed books . . . contain educational value and are educationally suitable for students in Rutherford County Schools" (*Id.* at ¶ 63); and (5) "Defendants' removal of books from Rutherford County Schools['] libraries interferes with the ability of the individual Plaintiffs to learn about diversity of information and viewpoints." (*Id.* at ¶ 64).

---

[5] Plaintiffs challenge the removal or restriction of only some, and not *all*, 140 titles. A complete list of the particular book removals and restrictions challenged by Plaintiffs may be found in paragraph 51 of the Complaint. (Doc. No. 1 at ¶ 51).

Second, Pen America brings a claim under 42 U.S.C. § 1983 for a violation of the "First Amendment [Right to] Freedom of Expression" ("Freedom-of-Expression Claim" or "Pen America's Claim), (*id.* at 34), alleging that Defendants' "removal and restriction of [Pen] America author members' books from Rutherford County Schools['] libraries violates the First Amendment because it interferes with author members' ability to share their constitutionally protected books free from viewpoint-based discrimination." (*Id.* at ¶ 69).

As relevant to the present motion, Plaintiffs seek a preliminary injunction: (1) "requiring the Defendants to restore the removed books . . . to Rutherford County Schools' libraries;" (2) "requiring the Defendants to restore the restricted books . . . to their previous status in Rutherford County Schools' libraries;" and (3) "enjoining Defendants from removing or restricting books from Rutherford County Schools['] libraries pursuant to the immediate removal provisions of Board Policy 4.403." (Doc. No. 11 at 1).

## LEGAL STANDARD

Those seeking a preliminary injunction must meet four requirements.[6] They must show a likelihood of success on the merits; irreparable harm in the absence of the injunction; the balance

---

[6] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a preliminary injunction alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with other (including more recent) Sixth Circuit case law and with Supreme Court cases (including *Winter*) that describe these as all being requirements (i.e., things that *must* be established. *See, e.g., id.* at 328, 329 (Nabaldian, J., concurring) (noting that "[*Winter*]'s language seems clear—a plaintiff *must* establish the factors" and questioning "whether the balancing analysis itself aligns with *Winter.*").

Notably, other courts have likewise treated the four items as requirements (prerequisites), rather than as factors. *E.g., Southern Poverty Law Ctr. v. United States Dep't Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 WL 3265533, *10 (D.D.C. June 17, 2020); *Transatlantic, LLC v. Humana, Inc.*, 8:13–CV–1925–T–17TBM, 2013 WL 3958361, *1 (M.D. Fla. Aug. 1, 2013).

The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Motion does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion for preliminary injunction. And the Court believes

of equities favors them; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022).

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations but rather must come forward with more than "scant evidence" to substantiate their allegations.

---

that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually irreparable harm *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors) and likelihood of success (at least to some minimal extent) is also required. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (noting that it is reversible error for a district court to issue a preliminary injunction "where there is simply no likelihood of success on the merits (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010))). Second, it is easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing" of (mismatched) factors. This is especially true given that case-specific balancing apparently is based in part on some inscrutable sliding scale of required likelihood of success on the merits that depends on the strength of the other three factors. *See, e.g., In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985) ("[T]he degree of likelihood of success required may depend on the strength of the other factors.").

The Court notes that herein it quotes some case law that refers to these items as "factors" and describes them in language that befits factors more than requirements—as for example by referring to the *issue* of *whether* issuing the injunction would harm others (factor-style language) rather than the *requirement* that the balance of equities favors the movant, or by referring to the issue of where the public interest lies (factor-style language) rather than the requirement that the public interest favors an injunction. In so doing, the Court is confident that the astute reader readily will be able to translate the factor-style language into the corresponding language of requirements for purposes of following the Court's analysis herein.

*See, e.g., Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *McNeilly*, 684 F.3d at 614 (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead relied on mere allegations); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, at *1 n.1 (6th Cir. 1996) (affirming denial of a preliminary injunction where the district court relied on a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice."), *report and recommendation adopted*, 2008 WL 2095387 (W.D. Mich. May 15, 2008). The decision whether to grant a preliminary injunction is a matter within the discretion of the district court. *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009).

<u>DISCUSSION</u>

As noted, a party seeking grant of a preliminary injunction must meet each of four requirements: (1) whether the movant has demonstrated a likelihood of success on the merits; (2) whether the movant will suffer irreparable harm in the absence of relief; (3) whether the balance of equities favors the movant; and (4) whether the injunction would serve the public interest. *Winter*, 555 U.S. at 20; *Overstreet*, 305 F.3d at 573.

1. <u>Likelihood of Success on the Merits</u>

To obtain a preliminary injunction, Plaintiffs must demonstrate that they are likely to succeed on the merits of their First Amendment claims. *See Winter*, 555 U.S. at 20. Plaintiffs argue that Defendants violated Student Plaintiffs' and Pen America's author members' First Amendment

rights by removing or restricting certain books from Rutherford County Schools' libraries. (*See generally* Doc. No. 1). The Court finds that Plaintiffs have not shown a likelihood of success on either the Right-to-Receive Information Claim or the Freedom-of-Expression Claim.

a. *Right-to-Receive Information Claim*

Turning first to the sole claim of Student Plaintiffs, the Student Plaintiffs rely primarily on *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), and *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 (6th Cir. 1976) in support of the Right-to-Receive Information Claim. (Doc. No. 12 at 14-18).[7] To properly assess the strength of the Right-to-Receive-Information Claim, it is important to ascertain what the Court can draw from *Pico* and *Minarcini*.[8]

---

[7] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page ___ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

[8] To the extent that Student Plaintiffs would have this Court assess their claim under "lesser standards of scrutiny" found in *Tinker v. Des Moines*, 393 U.S. 503 (1969) and *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), (Doc. No. 12 at 19-20), those standards and cases are inapposite to the present set of circumstances and inquiry.

In *Tinker*, the Supreme Court held that "[i]n order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained." 393 U.S. at 509. However, *Tinker* concerned prohibitions on student *expression*. *See generally Tinker*, 393 U.S. 503. Here, the Court is not faced with a ban on any student's "expression of opinion." *Id.* Instead, the Court is faced with a school board's removal of books, the constitutionality of which is governed by a different inquiry, as discussed below.

And in *Hazelwood*, the Supreme Court addressed "the extent to which educators may exercise editorial control over the contents of a high school newspaper produced as part of the school's journalism curriculum." 484 U.S. at 262. There, the Court ultimately held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. Again, the case before the Court today is not concerned with student speech per se as in *Hazelwood*, but is instead focused on the removal of books from a public school library. As Plaintiffs acknowledge, "*Hazelwood* may have little application to school libraries because *Hazelwood* concerned school-sponsored student speech rather than student access to information in a library." (Doc. No. 12 at 20).

*Pico* is a case that has long vexed attorneys and courts. *See, e.g., C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 913 (E.D. Mo. 2022) ("it is not clear what, if anything, from *Pico* is binding on the case here."); *Griswold v. Driscoll*, 616 F.3d 53, 57 (1st Cir. 2010) (Souter, J.) (noting that *Pico*'s "rule of decision" is "unclear"). *Pico*, a Supreme Court case concerning a public school district's decision to remove nine books from a school library, produced seven opinions from the justices, none garnering a majority. So there is no one opinion that constitutes binding authority. It is thus important first to examine *Pico* in some depth to determine what, if any, binding law the Court may deduce from the case.

As noted in Justice Brennan's below-described plurality opinion, *Pico* primarily presented the question of "whether the First Amendment imposes limitations upon the exercise by a local school board of its discretion to remove library books from high school and junior high school libraries." *Pico*, 457 U.S. at 855-56 (footnotes omitted). As the Eleventh Circuit cogently described the procedural background of the case:

> In *Pico,* a New York school board voted to remove nine books from the libraries of the school district's middle and high schools because the books, according to the school board, were **"anti-American, anti-Christian, anti-Semitic, and just plain filthy,"** and as a result posed a "moral danger" to the students. *Id.* at 857, 102 S. Ct. at 2803 (alteration omitted). Some students at those schools sued the school board claiming that the removal of the books for "social, political, and moral" reasons violated their First Amendment rights to have access to the books. *Id.* at 856, 858–59, 102 S. Ct. at 2802, 2804.
>
> After the district court granted summary judgment for the school board, the Second Circuit reversed and remanded for a trial on the students' First Amendment claim. *Id.* at 859–60, 102 S. Ct. at 2804–05. The Supreme Court affirmed in a badly fractured decision.

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1199 (11th Cir. 2009) (emphasis added).

---

Thus, the Court declines to consider the present motion through the lenses of either *Tinker* or *Hazelwood*.

As the United States Reports notes, Justice Brennan "announced the judgment of the Court and delivered an opinion, in which Justice MARSHALL and Justice STEVENS joined, and in which Justice BLACKMUN joined except for Part II–A–(1)." *Pico*, 457 U.S. at 855. In context, it is clear that the "judgment" announced by Justice Brennan was simply that the decision of the Second Circuit below was affirmed. *See id.* This is to say that he announced that there were at least five votes to affirm the Second Circuit. That is not to say, however, that there were at least five votes supporting any particular rationale for affirming the Second Circuit. And to the extent that the various opinions do not reflect at least five justices coalescing around any one rationale for the affirmance, then there is no rationale that is binding upon lower courts.

The question is whether there is any rationale (or principle) embraced by at least five justices in *Pico*, and answering that question requires a review of the various opinions. As noted, Justice Brennan wrote an opinion that was joined by Justice Marshall and Justice Stevens in full and by Justice Blackmun in part. Justice Brennan's opinion stated "this constitutional standard: '[L]ocal school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."'" *Am. C.L. Union of Fla.*, 557 F.3d at 1199 (quoting *Pico*, 457 U.S. at 872 (quoting *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 642 (1943))). This standard, stated in Part II-A-(2) of Justice Brennan's plurality opinion, was joined by Justice Blackmun, and so it was embraced by four (but, crucially, not five) justices.

For his part, Justice Blackmun, concluded in a separate concurring opinion that:

> . . . [T]he principle involved here is both narrower and more basic than the "right to receive information" identified by the plurality. I do not suggest that the State has any affirmative obligation to provide students with information or ideas, something that may well be associated with a "right to receive." See *post*, at 2819

(Burger, C.J., dissenting); *post*, at 2833–2834 (Rehnquist, J., dissenting). And I do not believe, as the plurality suggests, that the right at issue here is somehow associated with the peculiar nature of the school library, see *ante*, at 2809; if schools may be used to inculcate ideas, surely libraries may play a role in that process. Instead, I suggest that certain forms of state discrimination *between* ideas are improper. In particular, our precedents command the conclusion that the State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons.

*Pico*, 457 U.S. at 878-79 (Blackmun, J., concurring) (footnotes omitted). Justice Blackmun further stated in his concurrence that he found "crucial the State's decision to single out an idea for disapproval and then deny access to it." *Id.* at 879 n.2.

Justice White also concurred in the judgment, but did not explain under what standards he would have considered the First Amendment issue, instead preferring to wait until "findings of fact and conclusions of law are made by the District Court," before elucidating any viewpoints on the First Amendment issue. *Id.* at 883 (White, J., concurring). So, although Justice White provided the fifth vote to affirm the judgment of the Second Circuit, he did not provide the fifth vote needed to make precedential the above-quoted constitutional standard stated in the plurality opinion.

Justice Rehnquist, joined by Justice Powell in dissent, "cheerfully concede[d]" that "[i]f a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students. . . . The same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration. Our Constitution does not permit the official suppression of *ideas.*" *Id.* at 907 (Rehnquist, J., dissenting).

It should be noted that none of Justice Brennan's, Justice Blackman's or Justice Rehnquist's opinions suggest that school officials are forbidden from removing vulgar or otherwise non-

educationally suitable content from public school libraries. *Id.* at 871-72, 879-80, 890. Additionally and crucially, in *Pico* fewer than five Supreme Court justices endorsed a "right to receive information" in public school libraries; in fact only three (Justices Brennan, Marshall and Stevens) did so. *See generally Pico*, 457 U.S. 853. *See also Fowler v. Bd. of Educ. of Lincoln Cnty., Ky.*, 819 F.2d 657, 662 n.5 (6th Cir. 1987) ("Only three justices in *Pico* agreed that students possess a constitutionally protected entitlement to access particular books in the school's library.").[9]

Thus, the Court is left with the unenviable task of piecing together a maze of opinions because a plurality opinion "is not binding." *Tennessee Clean Water Network v. TVA*, 905 F.3d 436, 449 (6th Cir. 2018) (Clay, J., dissenting). Typically, under *Marks v. United States*, 430 U.S. 188 (1977), when "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds.'" *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). Here, however, Justice White's opinion, which plainly sets forth the narrowest grounds for the judgment, has given the Court no precedential constitutional standard (or, for that matter, any other precedential principle that might be useful in the present case, except perhaps the below-referenced principle that there are some motivations for book removal that render book removal unconstitutional).[10] Recognizing this, other courts (ones outside the Sixth Circuit) have addressed what utility *Pico*'s plurality opinion may have despite being non-precedential. One court has called it "a starting point" because it is the "only Supreme Court decision dealing specifically with the removal of books from a public

---

[9] The "right to receive information" was recognized in Part II-A-(1) of Justice Brennan's plurality opinion—the part in which Justice Blackmun did not join.

[10] But that below-referenced principle is not helpful here because although five justices agreed on the principle, no five justices agreed on any particular motivation(s) that would render book removal unconstitutional.

library." *Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*, 895 F. Supp. 1463, 1469 (D. Kan. 1995). Other courts have found to similar effect. *See Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995) ("Even though the constitutional analysis in the *Pico* plurality opinion does not constitute binding precedent, it may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives."), *overruled in part by Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025); *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) (relying in part on the *Pico* decision in a school library book removal case); *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1178 (D. Colo. 2025) (collecting cases supporting the same).

Thus, as the first of the above-quoted district courts put it:

> What clearly emerges from the *Pico* decision is that the trial court must determine the motivation of the school officials in removing the book. Five of the justices in *Pico* agreed that some motivations would be unconstitutional. The plurality found the motivations unconstitutional if school officials "intended by their removal decision to deny respondents access to ideas with which [the officials] disagreed, and if this intent was the decisive factor in [the removal] decision." *Pico*, 457 U.S. at 871, 102 S. Ct. 2799. Removal may be permissible if based on vulgarity or "educational suitability." *Id.*

*Case*, 895 F. Supp. at 1468-69.

Still, the *Case* summation of *Pico* does not actually solve the problem of identifying the specific inquiry in which a court should engage in cases like the instant one. Indeed, as *Case* put it, "[t]he major difficulty the court faces in applying *Pico* . . . is that it is a plurality opinion, and no clear legal rule emerges from it." *Id.* at 1468.

At the very least, what appears to emerge from *Pico*, as well cases interpreting *Pico*, is that some sort of inquiry into school officials' motivations is appropriate in cases like the instant one. As another district court put it, "[t]he applicable legal standard for evaluating alleged First Amendment violations in the school library context is not entirely clear [but] the common theme

in all potentially relevant standards (e.g., *Pico* plurality, *Hazelwood*, nonpublic forum) is that school officials cannot remove books solely because they disagree with the views expressed in the books," but may make "content-based removal decisions based on legitimate pedagogical concerns including things like pornographic or sexual content, vulgar or offensive language, gross factual inaccuracies, and educational unsuitability for certain grade levels." *Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d at 1331.[11]

The Court finds the approach laid out by the *Escambia* court persuasive and, following *Escambia*, will thus begin its inquiry of the Right-to-Receive Information Claim by addressing whether the Board's decision to remove the books at issue was made "solely because [the Board] disagree[d] with the views expressed in the books," or whether instead the Board's removal decisions were in fact permissible "content-based removal decisions based on legitimate pedagogical concerns." *Id.*

Before making that inquiry, however, it is important to briefly address *Minarcini* because it is binding Sixth Circuit precedent on which Plaintiffs rely heavily. In *Minarcini*, the Sixth Circuit ruled unconstitutional a school board's removal from a school library of certain books, where the books were removed because the school board "found them objectionable in content and because it felt that it had the power, unfettered by the First Amendment, to censor the school library for subject matter which the Board members found distasteful." 541 F.2d at 582.

In reaching this decision, the Sixth Circuit recognized a particular First Amendment right of public school students to "receive information which they and their teachers desire them to have." *Id.* at 583. The Sixth Circuit reasoned that "[a] public school library is . . . a valuable adjunct to classroom discussion. If [a teacher] considered Joseph Heller's *Catch 22* to be one of the more

---

[11] The above-referenced *Hazelwood* standard is discussed above.

important modern American novels (as, indeed, at least one did), we assume that no one would dispute that the First Amendment's protection of academic freedom would protect both his right to say so in class and his students' right to hear him and to find and read the book." *Id.* at 582. Accordingly, the Sixth Circuit found that there was a firmly established "First Amendment right to know which [was] involved in [their] case" (that is, *Minarcini*). *Id.* at 583. That is to say, the Sixth Circuit recognized a First Amendment right of public school students to know or receive information where students' *teachers* (a well as their students) desire those students to have access to particular information (or books). *Id.* at 582-83.

Here, the Court cannot deduce clearly that *Minarcini* is applicable. Although it is clear that Student Plaintiffs desire to have access to the books at issue, it is uncertain that Student Plaintiffs' teachers desire Student Plaintiffs to have access to the books at issue, such as to implicate *Minarcini*. Indeed, the record is altogether unclear as to the extent to which the Student Plaintiffs' teachers want Student Plaintiffs to have any or all of the books at issue or whether the books at issue were or are part of Rutherford County public schools' curriculum, such as to indicate Student Plaintiffs' teachers want Student Plaintiffs to have some or all of those books.

The Court understands that Plaintiffs allege that the books at issue "frequently appear on traditional school curricula," (Doc. No. 1 at ¶ 46), that at least one of the books, *The Last Night at the Telegraph Club* by Malinda Low, was stated by a library materials specialist to be "heavily tied to curriculum," (Doc. No. 1 at 28), and that another of the books at issue, *Catch 22* by Joseph Heller "often appears on the AP English Literature exam, as well as high school English curricula around the country." (*Id.* at 25). The Court also understands that, according to the record, Plaintiff David Doe has been denied access to books "that may appear on the AP English Literature Test." (Doc. No. 12 at 11 (citing Doc. No. 12-2 at ¶¶ 7, 14)). However, the above facts, even if true, do

not really address the inquiry before the Court, which is focused on whether Student Plaintiffs' teachers want Student Plaintiffs to have the books at issue. Generalized references to curricula, curriculum, and national tests address neither what books are included in the curricula previously or currently in place at Rutherford County public schools, nor what views as to the books at issue are held specifically by *Rutherford County teachers*, and thus fail to show that *Minarcini* is applicable.[12] And the Court is loath to extend the holding of *Minarcini* beyond its express terms. *See Fowler*, 819 F.2d at 662 n.5 (suggesting that reliance on *Minarcini* is "misplaced" in cases that do not fit the fact pattern contemplated by the express holding of *Minarcini*).

The Court also understands and sympathizes with the declaration of Claire Coe that she "will need access to library books for many of [her school] activities," including "newspaper and yearbook club," and "book [and] poetry club," (Doc. No. 12-3 at ¶ 8), and the declaration of Rachel Roe that she is concerned that books she needs for a competition through Junior Beta Club *may* be removed from the library. (Doc. No. 12-1 at ¶ 5). However, these concerns are both somewhat speculative, in that they do not actually identify books removed by the Board that will impact Coe's and Roe's school activities. And even more importantly, these concerns do not establish the existence here of the specific circumstances circumscribing the right identified in *Minarcini*, which

---

[12] The Court's focus on the views of *local* teachers here, as opposed to generalized notions about national curricula or the national views of teachers, is buttressed by *Minarcini*, which even in overturning a particular decision of a school board noted that "[b]y and a large, public education in our nation is committed to the control of state and local authorities." *Minarcini*, 541 F.2d at 580. Thus, the Court views its inquiry on *Minarcini*'s applicability as appropriately trained on the view of local teachers and the contents of local curricula.

involve Student Plaintiffs' teachers desiring the student plaintiffs to have access to the books at issue. [13]

Thus, at is early juncture, it is unclear to the Court that *Minarcini* applies at all. [14]

And even assuming *arguendo* that the Court finds *Minarcini* applicable here, such that Student Plaintiffs enjoy the "right to receive information" endorsed by *Minarcini*, there is still the question of whether that right has been violated. In determining whether the *Minarcini* students' right to receive information had been violated, the Sixth Circuit focused on the "absence of any explanation of the Board's action [that] is neutral in First Amendment terms," a circumstance that the Sixth Circuit noted was "extraordinary in view of the intense community controversy and the expressed professional views of the faculty favorable to the books concerned." *Id.* Thus, to this extent *Minarcini* supports the approach already adopted above by the Court, which focuses on the motivation of the Board. More specifically, *Minarcini* —with its focus on whether a school board

---

[13] That is not to say that the record, given time, may not develop further to provide insights into whether the Student Plaintiffs' teachers wanted them to have the books at issue, or whether the books at issue were part of Rutherford County public schools' curriculum such as to render *Minarcini* applicable.

[14] Plaintiffs' Reply cites a series of cases to argue that *Minarcini*, which as noted above held that student plaintiffs had a right to receive information that *they and their teachers desire them to have*, "is still routinely cited for the [somewhat different] holding that students have a First Amendment right to receive information from their public school libraries." (Doc. No. 30 at 4). However, the cases cited in Plaintiffs' Reply are either distinguishable or misconstrued by Plaintiffs. First, Plaintiffs cite to *Neinast v. Bd. of Trs. of Columbus Metro Libr.*, 346 F.3d 585 (6th Cir. 2003). Yet, *Neinast* concerned more specifically the right to *access* a public *municipal* library in the context of a patron not wearing shoes. *Id.* at 591. Plaintiffs then cite to *Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573, 2025 WL 902041 (M.D. Fla. Feb. 28, 2025). Yet, this case cites *Minarcini* only in the context of distinguishing censorship of social media posts from censorship of the work of "published authors." *Id.* at *4. Plaintiffs also cite to *Crookshanks v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160 (D. Colo. Mar. 19, 2025), but that case cited *Minarcini* in asserting the propriety of focusing on a school board's motive in removing the books in question—an assertion the Court accepts anyway, as noted above. *Id.* at 1184. Plaintiffs finally cite to *Parnell v. Sch. Bd. of Lake Cnty., Fla.*, 731 F. Supp. 3d 1298 (N.D. Fla. 2024), yet *Parnell* cited *Minarcini* only in the context of observing that public school libraries implicate certain First Amendment concerns, namely implicating the "First Amendment rights of students . . . [through] the removal of books from the shelves of a school library." *Id.* at 1313 (quoting *Pico*, 457 U.S. at 866). This is an observation that, as shown by the discussion herein, the Court does not deny.

removed books due to "subject matter which the Board members found distasteful," *id.*—[15] also aligns with the Court's focus herein on whether the Board's decision to remove the books at issue was made because it simply "disagree[d] with the views expressed in the books." *Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d at 1331.

Thus, the Court's general inquiry into whether there has been a violation of the Student Plaintiffs' First Amendment rights (assuming *arguendo* that they exist) is unaffected by whether *Minarcini* applies in the present case. Either way, the proper inquiry is into the Board's motivation in order to determine whether an impermissible motive drove the Board to remove (or restrict)[16] the books at issue. If the Board acted with an impermissible motive, that is, if the Board acted to "remove books solely because [it] disagree[d] with the views expressed in the books," *Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d at 1331, then Student Plaintiffs could demonstrate a likelihood of success as to their First Amendment claim.[17]

---

[15] Although the decision in *Minarcini* was made with reference to a school board's removal of books it found "objectionable in *content*," *Minarcini*, 541 F.2d at 582 (emphasis added), the context of *Minarcini* indicates that the court in that case was really concerned with the removal of books based on objectionable *viewpoints or ideas* as opposed to "content" as we would understand the term in modern First Amendment jurisprudence—a term that connotes the *subject-matter* of material rather than a particular viewpoint or idea related to that subject-matter.

[16] At least for the purposes of the present Motion, the parties do not identify any legal distinction between those books at issue that were removed entirely from circulation at the school library and those books at issue as to which access at the school library was merely restricted. That is, they do not make a distinction between *removing* books on the one hand and *imposing restrictions on access to* books (without entirely removing them) on the other hand. And the Court declines *sua sponte* to raise the possibility that such a distinction exists.

[17] The Court notes that its inquiry is really focused on the *Board's* collective motivation, as opposed to the motivation of individual Board members or the motivation of the Board majority in adopting and implementing Board Policy 4.403. That the Court focuses its inquiry here is supported by other courts who have addressed similar school library book removal decisions. *See e.g., Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d at 1331 (focusing on a defendant board's motivation in removing certain books from school libraries); *Am. C.L. Union of Fla., Inc.*, 557 F.3d at 1207 (noting, in a school library book removal case that the "record shows that the *Board* did not simply dislike the ideas in [a particular] book," but also considering the motivations of individual Board members in making this determination (emphasis added)); *Minarcini*,

The current record before the Court does not indicate that the Board "remove[d]" the books at issue "solely because [it] disagree[d] with the views expressed in the books." *Id.* Rather, the record seems to indicate that the Board made a "content-based" decision to remove these books "based on legitimate pedagogical concerns including things like pornographic or sexual content, vulgar or offensive language, gross factual inaccuracies, and educational unsuitability for certain grade levels." *Id.* [18]

Here, the Rutherford County Board of Education acted pursuant to a viewpoint-neutral (i.e., idea-neutral), though not content-neutral, policy—Board Policy 4.403—which was adopted pursuant to the Tennessee Age-Appropriate Materials Act, and includes references to the Obscenity Law. (Doc. No. 1 at ¶ 12; Doc No. 1-1). The Tennessee Age-Appropriate Materials Act mandates that school library materials be "suitable for the age and maturity levels of the students who may access the materials and must be suitable for, and consistent with, the educational mission of the school" and prohibits inclusion of materials in school library collections with content meeting specific statutory definitions of obscenity, sexual excitement, or prurient appeal. *See* T.C.A. §§ 49-6-3803 *et seq*. The immediate removal provisions in Board Policy 4.403 that Student Plaintiffs

---

541 F.2d at 582 (concluding that the "*School Board* removed the books because *it* found them objectionable in content." (emphasis added)). Of course, an inquiry into the Board's motivation necessarily involves an examination of the comments and motivations of individual Board members, which the Court also has taken into account herein.

[18] The idea here seems to be that a decision-maker can be concerned that content is "vulgar" or educationally unsuitable without disagreeing with any particular *ideas* expressed or reflected in the content. Indeed, arguably, some content that is vulgar and educationally unsuitable might properly be viewed as not expressing or reflecting any ideas at all—and if content does not express or reflect ideas, that fact itself may be (at least in part) what makes the content "vulgar" or educationally unsuitable in the first place. Think of, for example, a video showing nothing but sexual acts; to the extent that it is properly considered to express or reflect no *ideas*, that arguably tends to support the notion that the video is "vulgar" or educationally unsuitable.

To the extent that a policy bans content specifically because the content does not express or reflect any ideas, the policy—though obviously not *content*-neutral—seems to be *idea*-neutral (i.e., viewpoint-neutral).

would have the Court enjoin incorporated definitions from the Obscenity Law (T.C.A. § 39-17-901), and require the immediate removal of a book from the library "which, in whole or in part, contains nudity, sexual excitement, sexual conduct, excess violence, or sado-masochistic abuse, is patently offensive, or appeals to the prurient interest, or which contains explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, excess violence, or sado-masochistic abuse, is patently offensive, or appeals to the prurient interest." (Doc. No. 1-1 at 1).[19] These provisions are plainly *viewpoint*-neutral, even if they are not content-neutral. It is exactly these kinds of "content-based" removal provisions, "based on legitimate pedagogical concerns including things like pornographic or sexual content, [and] vulgar or offensive language," that passes constitutional muster. *Escambia Cnty Sch. Bd.*, 711 F. Supp. 3d at 1331. Moreover, and perhaps just as importantly for the Court's inquiry into the Board's motivation, the Board's adoption of Board Policy 4.403 pursuant to Tennessee state law[20] indicates that its motivation was not to "remove" the books at issue "solely because [it] disagree[d] with the views expressed in the books," *id.*, but rather that its motivation was derived at least in part from a desire to comply with state law.

Plaintiffs argue that the Board's *application* of Board Policy 4.403 (as opposed to the *adoption* of Board Policy 4.403) was "narrowly partisan or political," (Doc. No. 1 at ¶ 57), and

---

[19] As noted above, the challenged immediate removal provisions also require the immediate removal of a visual representation from the library "which depicts nudity, sexual conduct, sexual excitement, excess violence, or sado-masochistic abuse, is patently offensive, or appeals to the prurient interest." (Doc. No. 1-1 at 1).

[20] That is to say, Board Policy 4.403 was adopted with the goal of effectuating the Age-Appropriate Materials Act, which mandates that school library materials be "suitable for the age and maturity levels of the students who may access the materials and must be suitable for, and consistent with, the educational mission of the school" and prohibits inclusion of materials in school library collections with content meeting specific statutory definitions of obscenity, sexual excitement, or prurient appeal. *See* T.C.A. §§ 49-6-3803 *et seq*. Both Plaintiffs, (Doc. No. 1 at ¶¶ 12-13), and Defendants, (Doc. No. 24 at 18-19), agree that Board Policy 4.403 was adopted pursuant to the Age-Appropriate Materials Act.

urge the Court to look past the statutory policy and language of Policy 4.403 and focus on alleged political animus on the part of the Board. But a few isolated comments by Board members expressing a desire to remove the books at issue from the shelves, (*id.* at ¶¶ 28, 39), or some admitted reliance by Board members on external reviews (such as BookLooks), (*id.* at ¶¶ 27, 28, 33), do not suffice to show that the Board collectively acted with a constitutionally impermissible motive such that Student Plaintiffs are likely to succeed on the Right-to-Receive-Information Claim. For example, although the Complaint refers to some isolated comments by some Board members indicating some other concern(s), the Complaint makes clear that on the whole Board members were concerned about books not because they did not like them or the ideas therein, but rather because they contained "sexually explicit," (*id.* at ¶¶ 38, 39), and also with whether Rutherford County School librarians would be "criminally charged for having the books on their shelves." (*Id.* at ¶ 39).[21] Likewise, as Plaintiffs' Complaint states, the Board rejected a motion that "any book contained in the high school library that had a rating of '3 or 4' on BookLooks.org [] be contained in a section behind the library desk" requiring "parent approval for access" and that "any book with a rating of '5' [] be immediately and permanently removed." (*Id.* at ¶ 27).[22] Instead, the Board opted "to have Rutherford County Schools library materials specialists . . . review the challenged books and to create reports on whether the books should be kept for all students, restricted to students of certain ages, or removed," (*Id.* at ¶ 35), such that Plaintiffs' assertion that the Board had an "overt reliance on BookLook's partisan, biased reviews when deciding to remove

---

[21] The Court accepts Plaintiffs' allegation here because Defendants do not contest them.

[22] BookLooks' rating system involves assigning a "book a rating from 0-5, with '5' being the most explicit." (Doc. No. 1 at ¶ 23). BooksLooks' rating system considers the amount of violence, hate, profanity, sexual activities, drug or alcohol use and "[g]ender [i]deologies" as factors when assigning a rating. (Doc. No. 1-4). Generally, the greater the occurrence of any of the aforementioned factors, the higher the rating. (*Id.*). An overview of BooksLooks' rating system was attached as an exhibit to the Complaint at Docket No. 1-4.

or restrict books" is contradicted by the Board's own actions and Plaintiffs' own pleading. (*Id.* at ¶ 27). In sum, as Plaintiffs' allegations makes clear (and as the Court accepts as true for the purposes of the present Motion in line with the four bases it explained for accepting facts as true in the footnote above), beyond the isolated comments of individual board members, the Board was operating under the viewpoint-neutral standards provided for in Board Policy 4.403, (*id.* at ¶ 40), which themselves are grounded in the viewpoint-neutral Obscenity Law and Age-Appropriate Materials Act. (Doc. No. 1-1).

Rather than suggesting a constitutionally impermissible motive, the record before the Court indicates that the Board was engaged in a course of conduct that the Supreme Court has time and again held does not run afoul of the First Amendment's constitutional protections: the removal of books from a school library based on vulgarity or "educational suitability." *Pico*, 457 U.S. at 871. *See also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986) ("school board[s] ha[ve] the authority to remove books that are vulgar.").

In the face of this well-established precedent permitting removal of books based on vulgarity or educational suitability, Plaintiffs argue that "the Board cannot justify the removal of books for 'obscenity' when the books, at most, only met [] one or two prongs of the *Ginsberg* test." (Doc. No. 12 at 22) (referring to *Ginsberg v. State of N.Y.*, 390 U.S. 629 (1968)).[23]

The Court questions whether *Ginsberg* or the other cases that Plaintiffs cite in support of this argument are applicable at all to the instant case. *Ginsberg* concerned a New York statute that prohibited sale of obscene materials to minors under 17 years of age. In *Ginsberg*, the Court upheld

---

[23] *Ginsberg* explained that "material is obscene as to minors if it (i) is 'patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable . . . for minors'; (ii) appeals to the prurient interest of minors; and (iii) is 'utterly without redeeming social importance for minors.'" *Reno v. American Civil Liberties Union*, 521 U.S. 844, 895 (1997) (O'Connor, J., concurring in part) (quoting *Ginsberg*, 390 U.S. at 633).

the ban on the sale of obscene material to minors, reasoning that "[t]he well-being of its children is of course a subject within the State's constitutional power to regulate" and "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." *Id.* at 638, 639 (internal quotation marks omitted). But the challenged conduct here—"de-circulation and/or restriction of . . . books . . . from school libraries," (Doc. No. 24 at 2) — appears to the Court a good deal less restrictive than the challenged conduct in *Ginsberg*, which involved a wholesale ban on the sale of obscene materials to minors. It is one thing to prohibit minors from buying particular materials (anywhere, in a private sale), and it is another to prohibit minors merely from accessing particular materials at a public (school) library. Moreover, as noted above, *Ginsberg*'s recognition that "[t]he well-being of its children is of course a subject within the State's constitutional power to regulate, and . . . justif[ies] [certain] limitations . . . upon the availability of sex materials to minors under 17," appears to cut against Student Plaintiffs' Right-to-Receive Information Claim. 390 U.S. at 639.

Similarly, Plaintiffs cite *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975), but that case considered a municipal ordinance that prohibited films with nudity from being shown at drive-in theaters when the "screen is visible from a public street or place." *Id.* at 206. Here, the Board (or for that matter the State writ large) has not prohibited students from reading the books or acquiring them elsewhere; instead it has merely opted not to carry them on school library bookshelves. *Reno v. American Civil Liberties Union*, on which Plaintiffs also rely, concerned provisions of a statute prohibiting "the knowing transmission of obscene or indecent messages to any recipient under 18 years of age," and "the knowing sending or displaying of patently offensive messages in a manner that is available to a person under 18 years of age." 521 U.S. 844, 859-60 (1997) (citing 47 U.S.C. §§ 223(a), 223(d)). Again, however, this case concerned a prohibition on

types of content being obtained by (in this case, sent to) minors—a fact pattern not before the Court. Finally, Plaintiffs cite to *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011), but that is yet another case that concerns a *ban* on violent video games sold to minors. *Id.* at 794. The cases relied on by Plaintiffs here address circumstances that are not before the Court: a general *ban* on minors accessing particular content or communications. Here, instead, the challenged policy merely determines what books are circulated or provided by Rutherford County Schools' libraries. Board Policy 4.403 contains no ban on students reading the removed books, acquiring them elsewhere, or bringing them to school. Thus, Plaintiffs' argument here, and their cited cases, are unavailing for the Student Plaintiffs.

Just as importantly, the Court also notes that school boards are granted broad discretion in setting curriculum and managing library collections. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (describing the "oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges."). Indeed, the Sixth Circuit has held in no uncertain terms that "[l]ocal school officials, better attuned than we to the concerns of the parents/taxpayers who employ them, must obviously be accorded wide latitude in choosing which pedagogical values to emphasize, and in choosing the means through which those values are to be promoted." *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989). Thus, although "[w]e may disagree with the choices [made by local school officials] . . . unless they are beyond the constitutional pale we have no warrant to interfere with them." *Id.* As the Sixth Circuit put it, "[l]ocal control over the public school . . . is one of this nation's most deeply rooted and cherished traditions." *Id.* at 762-763 (citing *Milliken v. Bradley*, 418 U.S 717, 741-42 (1974)). Here, as detailed above, the Court cannot now deduce a constitutionally impermissible motivation underlying the Board's decision to remove these books

such as to warrant interference with local control (through the Board) over Rutherford County public schools.[24]

At base, the record indicates that the challenged removals were conducted under the framework of a democratically adopted policy with statutory grounding. The record does not indicate that the Board "remove[d]" the books at issue "solely because [it] disagree[d] with the views expressed in the books." *Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d at 1331. For the reasons detailed above, the Court is unpersuaded by Student Plaintiffs that the book removals in question are impermissible, either due to the Board's motive, or because the "Board cannot justify the removal of books for 'obscenity' when the books, at most, only met [] one or two prongs of the *Ginsberg* test." (Doc. No. 12 at 22). Thus, Student Plaintiffs have not shown that they have a likelihood of success on the merits on the Right-to-Receive Information Claim.

---

[24] The Court also notes that other courts have upheld similar school-board actions when linked to parental and legislative concerns regarding age-appropriate content. *See, e.g.*, *C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906 (E.D. Mo. 2022) (denying preliminary injunction and emphasizing deference to local school authorities in book removal decisions).

b. *Freedom-of-Expression Claim*[25]

Turning to Pen America's Freedom-of-Expression Claim, Plaintiffs assert in support of this claim that Pen America's "author members' books were excluded [by the Board] based on the authors' viewpoints." (Doc. No. 12 at 23-24). Plaintiffs argue that the "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable," (*id.* at 23) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)), and that therefore, in "most contexts, viewpoint-based discrimination is 'presumed to be unconstitutional.'" (*Id.* at 23) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995)). As an initial matter, the Court reiterates that the Board made its decision to remove the books at issue

---

[25] Defendants also argue that Pen America "lacks standing to sue on behalf of its members." (Doc. No. 24 at 26). Defendants argue essentially that Pen America lacks associational standing because "there exists no legally protected First Amendment right for authors to compel the government to speak for them and the speech at issue is government speech." (*Id.* at 28). Defendants' standing argument here, however, effectively "conflates the concept of failure to state a claim"—meaning, here, the concept that Plaintiffs are not likely to succeed on the merits of their claims even if they did have standing—"with [the concept of] lack of standing." *Cadence Bank, N.A. v. DLO Title, LLC*, No. 3:17-CV-01170, 2018 WL 1399584, at *3 n.3 (M.D. Tenn. Mar. 20, 2018) ("The fact that the court finds, as set forth below, that the plaintiff cannot establish the necessary elements of a negligence claim does not lead to the conclusion that the plaintiff lacks standing or that the court lacks jurisdiction even to make that determination."). Thus, to the extent that Defendants here purportedly argue a lack of standing, the Court rejects this argument because it does not actually appear in substance to be a standing argument. In rejecting Defendants' purported standing argument on this basis, the Court does not reject settled Sixth Circuit precedent that a "standing analysis, though not an inquiry into a claim's merits, is still 'relevant to [the] likelihood of success [on the merits]' inquiry." *Moms for Liberty – Wilson Cnty., Tenn. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 509 (6th Cir. 2025) (quoting *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022)). Nor indeed does the Court intend to imply that a lack of standing is inappropriately raised in response to a motion for a preliminary injunction. Rather, the Court merely notes that Defendants' standing argument in this case is entirely based on the existence (or not as Defendants argue) of a "legally protected First Amendment right for authors to compel the government to speak for them," and whether the "speech at issue is government speech." (Doc. No. 24 at 28). This is an argument challenging not Pen America's standing to seek an injunction or bring a claim (even if Pen America's standing generally could be relevant to likelihood of success on the merits), but instead Pen America's likelihood of success on the merits of the Freedom-Of-Expression Claim assuming *arguendo* that Pen America did have standing.

Nevertheless, although the Court rejects Defendants' purported standing argument, the Court does address whether or not the removal of the books at issue is "government speech" further in a footnote below.

based on viewpoint-neutral (though not content-neutral) considerations, such that any arguments focused on viewpoint discrimination are unavailing here.[26]

Further, with respect to this claim, Plaintiffs appear to request that this Court apply a forum analysis to Rutherford County Schools' libraries. (Doc. No. 12 at 23). Before addressing this request, the Court will first provide a brief overview of the forum doctrine.

"'Congress shall make no law,' the First Amendment says, 'abridging the freedom of speech.'" *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022) (quoting *Manhattan Cmty. Access Corp. v. Halleck*, U.S., 139 S. Ct. 1921, 1928 (2019)). "The Fourteenth Amendment limits state and local governments in the same manner." *Id.* "The Free Speech Clause limits the government's power to regulate speech on public property." *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 485 (6th Cir. 2020). Those limits "var[y] depending on the forum where the speech occurs." *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021). As the Sixth Circuit explained "[t]he Supreme Court has recognized three types of public fora: the traditional public forum, the designated public forum, and the limited public forum." *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010) (citing *Pleasant Grove v. Summum*, 555 U.S. 460 (2009)). Supreme Court precedent has also recognized a "nonpublic forum" which "is a government-owned property that is not by tradition or

---

[26] Plaintiffs also cite two cases that the Court finds inapposite here. Plaintiffs rely on *Martin v. City of Struthers, Ohio*, 319 U.S. 141 (1943) and *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) for the proposition that the First Amendment protects authors' "right to share their books." (Doc. No. 12 at 23). *See Martin*, 319 U.S. at 143 (the First Amendment "embraces the right to distribute literature."); *Bantam*, 372 U.S. at 70 (finding system that subjected "the distribution of publications to a system of prior administrative restraints" unconstitutional). This is true enough, but *Martin* concerned a restriction on "door to door distributors of literature," *Martin*, 319 U.S. at 145, and *Bantam* concerned a state commission, ultimately characterized by the Supreme Court as a "prior administrative restraint[]" that "designated books or magazines" as "objectionable for sale, distribution or display to youths under 18 years of age." *Bantam*, 372 U.S. at 61, 70. No such restriction on literature distribution or a prior administrative restraint on the distribution of publications is at issue in the instant case, which (as noted above) is concerned merely with the "de-circulation and/or restriction of . . . books . . . from school libraries." (Doc. No. 24 at 2).

governmental designation 'a forum for public communication.'" *Id.* (quoting *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007)).

The Court questions the propriety of extending a forum analysis to public school library bookshelves or a school library collection, which the Court understands would be the fora in question as it relates to Pen America's members' books.[27] *See Little*, 138 F.4th at 859 (declining to extend a forum analysis to "a library's *bookshelves*" and noting that "it makes no sense to apply forum analysis to a library's collection" because library shelves are not "'places' set aside for 'public expression of particular kinds or by particular groups.'" (quoting *Freedom from Religion Foundation v. Abbot*, 955 F.3d 417, 426 (5th Cir. 2020))).

The Court's skepticism regarding the forum analysis's applicability in this context, that is in the context of school library *shelves* or the school library *collection*, as opposed to the library in and of itself, is buttressed by case law from the Supreme Court and some of the Circuit Courts. *Little*, 138 F.4th at 859. *See also United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality opinion) (holding that forum analysis is "incompatible with the discretion that public libraries must have to fulfill their traditional missions. Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them."); *Illinois Dunesland Pres. Soc'y v. Illinois Dep't of Nat. Res.*, 584 F.3d 719, 724 (7th Cir. 2009) (noting that

---

[27] Plaintiffs frame their discussion of the forum analysis in terms of the library itself (i.e., the physical place/building/location), (Doc. No. 12 at 23; Doc. No. 30 at 4). But the Court, as noted above, understands the forum at issue (if indeed there is any "forum" here) actually to be the library bookshelves or collection, which is where any expression of Pen America's members through their books would take place. The Court understands the distinction between the school library shelves or collection and the library itself to be a crucial one. Although a forum analysis is regularly extended to public libraries, *see e.g., Neinast v. Bd. of Trustees of Columbus Metro. Lib.*, 346 F.3d 585, 591 (6th Cir. 2003) (noting that a public (though non-school) library is a limited public forum), and has sometimes been extended to public school libraries, *see e.g., Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573-CEM-RMN, 2025 WL 2408178, at *13 (M.D. Fla. Aug. 13, 2025) (noting that a "public school library is a non-public forum"), whether a forum analysis should be extended to the school library shelves or collections (or collection decisions), is much less clear. And as discussed below, the Court finds that a forum analysis is likely not applicable to library bookshelves and collections.

"there are cases that say that 'forum analysis' does not apply to public libraries" and collecting cases). *But see Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585, 591 (6th Cir. 2003) (noting that in the context of patron *access* to a public *municipal* library, that a public library was a "limited public forum."). That said, even if the Court elects to extend a forum analysis to Rutherford County Schools' library collections, and treats those school library collections as a "nonpublic forum," which is the only type of forum on which the parties provide briefing, (Doc. No. 12 at 23),[28] this still would not aid Plaintiffs in showing a likelihood of success on the merits.

Restrictions on access to a nonpublic forum—in this case, restrictions on authors' opportunity to have their books included in a public school library collection or on a public school library bookshelf—may be based on "subject matter and speaker identity so long as the distinctions are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). The distinctions here fit the bill. Plaintiffs have alleged that the books were removed in a "narrowly partisan or political manner, or because Defendants disagree with the ideas or views contained in those books." (Doc. No. 1 at ¶ 57). However, as was discussed above, the record does not support Plaintiffs' bald assertion. Instead, the record indicates that the books at issue were removed by the Board for their sexually

---

[28] To the extent that the public school library collection is a type of forum other than a nonpublic forum, the parties do not brief this issue. Nevertheless, the Court will also briefly examine whether treating the school library bookshelves or collections as a limited public forum would avail Pen America here.

"The government may restrict speech in a limited public forum as long as the restrictions do 'not discriminate against speech on the basis of viewpoint' and are 'reasonable in light of the purpose served by the forum.'" *Miller v. City of Cincinnati*, 622 F.3d 524, 535 (6th Cir. 2010) (quoting *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 106-07 (2001)). Here, as already explained above, the Board took its decision to remove the books at issue in a viewpoint-neutral manner. Moreover, if one of the purposes of a public school library is to serve as a "valuable adjunct to classroom discussion," *Minarcini*, 541 F.2d at 582, then the Court must find that the Board's removal of the books at issue for "legitimate pedagogical concerns including things like pornographic or sexual content, [and] vulgar or offensive language," *Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d at 1331, reasonable in light of the purpose of the forum. Accordingly, even if the Court found that school library bookshelves or a school library's collection was a limited public forum, that would not help Pen America succeed on the merits of their Freedom-of-Expression Claim.

explicit *subject matter*, rather than any viewpoint expressed by a particular author or work. The record does not give a strong indication at this stage that books were removed due to the viewpoints expressed in the books (or, for that matter, viewpoints held by the books' respective authors) and thus Plaintiffs have not shown a likelihood of success on the merits as to the Freedom-of-Expression Claim, either.[29]

---

[29] The Court here will address Defendants' argument that the decision to remove the books at issue is protected by the government-speech doctrine. (Doc. No. 24 at 14-19).

"The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). So, where the speech underlying a plaintiff's claim is actually government speech, the plaintiff cannot succeed on a claim under the Free Speech Clause. Thus, according to Defendants, because "Defendants' curation of the libraries within Rutherford County Schools constitutes government speech, Plaintiffs are therefore unlikely to succeed on the merits of their First Amendment claims." (Doc. No. 24 at 19).

Defendants rely predominantly on a plurality opinion in *Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025) in support of their argument that curation of public school libraries constitutes government speech. *See Little*, 138 F.4th at 851-65. In *Little*, a plurality held that "a public library's collection decisions are government speech." *Id.* at 851. The view of the Fifth Circuit plurality is not without some support. *See, e.g.*, *PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."); *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries, broadcasters, newspapers, museums, schools, and the like.'").

However, Defendants' view is not unanimous. The Eighth Circuit has rejected the view that the curation of library books is government speech, in no uncertain terms. *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024) ("[I]t is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking. . . . As Plaintiffs noted, if placing these books on the shelf of public school libraries constitutes government speech, the State 'is babbling prodigiously and incoherently.'"). Indeed, other district courts have rejected this view too. *See e.g., PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) ("the Court simply fails to see how any reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves."); *Crookshanks*, 775 F. Supp. 3d at 1175 ("Courts generally hold that the placement and removal of books in public school libraries is not government speech.").

Faced with this wide range of opinion, "[t]he bottom line is that it is unclear whether the government speech doctrine applies" in cases involving the curation of library books. *Parnell*, 731 F. Supp. 3d at 1314. And because the Court has already determined on other grounds that Plaintiffs have not demonstrated a likelihood of success on the merits of their First Amendment claims, the Court declines to weigh in on whether the government-speech doctrine applies in this context.

Because neither the Student Plaintiffs nor Pen America have shown a likelihood of success on the merits of their respective claims, they are not entitled to a preliminary injunction. Plaintiffs' failure to satisfy the first requirement for a preliminary injunction analysis means that the Court may (or indeed must) deny Plaintiffs' Motion based on that failure alone. Nevertheless, the Court will also conduct an analysis of the remaining requirements.

2. Irreparable Harm

To warrant preliminary injunctive relief, Plaintiffs must also show that they will suffer irreparable harm absent an injunction. *Winter*, 555 U.S. at 20. Irreparable harm must be "both certain and immediate," not "speculative or theoretical." *Nacco Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 Fed. App'x 929, 943 (6th Cir. 2007); *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). Plaintiffs argue that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (Doc. No. 12 at 24) (quoting *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020)).

To assess this argument, the Court starts by noting why the requirement of irreparable injury exists: "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d at 327. Therefore, even when the plaintiff alleges violations of the First Amendment, the plaintiff must show that the alleged resulting irreparable injury *actually* is irreparable (and imminent and non-speculative as well). *See Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016) ("[I]nvocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury."); *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989) ("[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury.").

Moreover, where a plaintiff's constitutional theory is tenuous, courts are hesitant to find irreparable harm. *Overstreet*, 305 F.3d at 578. To put it another way, where plaintiffs "have not shown a sufficiently strong likelihood of success on the merits," they are unlikely to have "shown irreparable harm." *Johnson v. Wickersham*, No. 13-13672, 2014 WL 4897387, at *3 (E.D. Mich. Sept. 11, 2014), *report and recommendation adopted,* No. 13-CV-13672, 2014 WL 4897433 (E.D. Mich. Sept. 30, 2014). Thus, where a plaintiff is unlikely "to demonstrate that he has a cognizable constitutional claim . . . [the] argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit." *Overstreet*, 305 F.3d at 578. Here, as described above, Plaintiffs have not shown a likelihood of success on the merits of their constitutional claims and therefore are not entitled to a presumption of irreparable harm such as to entitle them to injunctive relief.

Additionally, Student Plaintiffs' asserted injuries are, at least in part, speculative. Plaintiffs do not point to a specific student who has been denied access to required curricular content or barred from engaging in classroom discourse as a result of the book removals.[30] Plaintiffs also do not demonstrate that the books at issue are unavailable through alternative means, such as public libraries or personal access. The Court notes that there is some disagreement over whether access to the books at issue via alternative means would actually minimize any purported irreparable harm

---

[30] Although Plaintiffs do not allege denial of access to required curricular content, the Court acknowledges that through Board Policy 4.403, Plaintiff David Doe has been denied access to books "that may appear on the AP English Literature Test." (Doc. No. 12 at 11 (citing Doc. No. 12-2 at ¶¶ 7, 14)). However, this injury is somewhat speculative and concerns only removed books that "may" appear on an exam.

As noted above, the Court also sympathizes with Claire Coe, the student who declares that she "will need access to library books for many of [her school] activities," including "newspaper and yearbook club," and "book [and] poetry club," (Doc. No. 12-3 at ¶ 8). The Court likewise sympathizes with Rachel Roe, the student who declares that she is concerned that books she needs for a competition through Junior Beta Club *may* be removed from the library. (Doc. No. 12-1 at ¶ 5). However, these concerns are also somewhat speculative, in that they do not identify books actually removed by the Board that will impact Coe's or Roe's school activities.

to Student Plaintiffs. *See C.K.-W*, 619 F. Supp. 3d at 919 (examining another request for a preliminary injunction related to the removal of books from a public school library, and noting that the "forty years since the Court decided *Pico* have allowed for easier and greater access to ideas more so than perhaps any other forty-year period since the invention of the printing press," and as such even if there was a violation of First Amendment rights "the harm would be slight in comparison to other violations of the First Amendment because [plaintiffs] still have access to ideas."). *But see Minarcini*, 541 F.2d at 582 ("Further, we do not think this burden is minimized by the availability of the disputed book in sources outside the school. Restraint on expression may not generally be justified by the fact that there may be other times, places, or circumstances available for such expression."). Faced with this disagreement between a recent district court case in *C.K.-W*, and a nearly fifty-year-old Sixth Circuit case (*Minarcini*) that was decided even before *Pico*, the Court finds that the approach articulated in the *C.K.-W* case—that alternative means of access to the ideas or viewpoints (or in this case, books) at issue cuts against irreparable harm— the more persuasive approach. The Court makes this determination in light of the advancements in technology that have occurred since *Minarcini* (and *Pico*) were decided; advances in technology that have "allowed for easier and greater access to ideas more so than perhaps any other-forty year period since the invention of the printing press." *C.K.-W*, 619 F. Supp. 3d at 919.

Thus, because Plaintiffs do not point to a specific student who has been denied access to required curricular content or barred from engaging in classroom discourse as a result of the book removals, and because Plaintiffs also do not demonstrate that the books at issue are unavailable through alternative means, the Court is hard-pressed to identify any irreparable injury. To put it another way, injunctive relief is not warranted where, as here, the injury is speculative and the harm is contingent upon future events. *See* Wright & Miller, Federal Practice & Procedure § 2948.1

(noting that "[s]peculative injury is not sufficient" to satisfy this factor and that "there must be more than an unfounded fear on the part of the applicant.").[31]

Next, courts, including the Sixth Circuit, have held that delay in seeking relief undermines claims of irreparable harm. *See Benisek v. Lamone*, 585 U.S. 155, 159-60 (2018); *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 511 F. App'x 398, 405 (6th Cir. 2013) ("an unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm."). This principle is applicable here. The Board's adoption and application of the challenged immediate removal provisions in Board Policy 4.403 occurred months before Plaintiffs filed suit. (Doc. No. 1 at ¶ 15). Plaintiffs' delay in bringing suit, whatever its cause, undercuts their claim of irreparable harm.

Finally, the Court notes that the Board has not banned or proscribed student speech as such. Instead, it has exercised its discretion over library collections in a context that is inherently subject to content curation. The harm asserted by Plaintiffs—although significant in theory—has not been shown to be immediate, personal, and irreparable under established standards. Plaintiffs have therefore failed to satisfy *Winter*'s second requirement for a preliminary injunction.

3. Balance of Equities and Whether an Injunction Would Serve the Public Interest

A plaintiff seeking a preliminary injunction must establish also that the balance of equities tips in his favor and that the injunction is in the public interest. *Winter*, 555 U.S. at 20. Where, as here, the government is the defendant, the "'two remaining preliminary injunction factors — whether issuing the injunction would harm others and where the public interest lies — merge.'" *L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 512 (6th Cir. 2023) (White, J., dissenting) (quoting *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)), *aff'd sub nom. United States v.*

---

[31] In the preliminary-injunction context, courts tend to uses the terms "injury" and "harm" interchangeably, and the Court does likewise herein.

*Skrmetti*, 605 U.S. 495 (2025), *and cert. denied sub nom. Doe 1 v. Kentucky ex rel. Coleman*, 145 S. Ct. 2843 (2025), *and cert. denied*, 145 S. Ct. 2844 (2025).

With respect to these final two requirements, Plaintiffs again hang their hat on the alleged violation of their First Amendment rights. Plaintiffs argue that when a "plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue." (Doc. No. 12 at 24) (quoting 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.2), and that the "preservation of First Amendment rights is always in the public interest." (*Id.* at 25). Plaintiffs additionally argue that "restoring books to school library shelves, where the books were already located for years, will cause no injury to Defendants," (*id.* at 24), and that the "cost . . . of acquiring textbooks, in addition to those other wanted or needed books, is exorbitant." (Doc. No. 30 at 9). Plaintiffs further state that any "public interest in protecting children from sexual content . . . is undercut by the fact that the removed or restricted books have been in circulation for years." (*Id.* at 11). Defendants instead argue that "the public interest in protecting students from graphic sexual content and ensuring that democratically-elected and accountable local school boards retain the power and discretion to accomplish the same weigh in favor [of] denying the requested preliminary injunction." (Doc. No. 24 at 36).

As with the other requirements, Plaintiffs have failed to meet their burden to satisfy these requirements. First, Plaintiffs' focus on their purported constitutional deprivations is unavailing, because, as discussed, Plaintiffs have not made out a likelihood of success on the merits of their First Amendment claims. *See e.g., Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014) ("where the public interest lies [ ] is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest

to prevent the violation of a party's constitutional rights."); *Doe #1 by and through Lee v. Sevier County, Tenn.*, No. 3:17-CV-41, 2017 WL 3038144, at *9 (E.D. Tenn. July 17, 2017) ("Because [plaintiffs] fail to establish that their alleged constitutional violations are likely to succeed on the merits . . . the balance of the remaining factors do not trend in favor of a preliminary injunction.").

Second, as Defendants note, the Supreme Court has recognized "an interest in protecting minors from exposure to vulgar and offensive spoken language, as well as limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." *Fraser*, 478 U.S. at 676 (citations omitted). That public interest is at play here, and cuts against granting a preliminary injunction because the Board has acted to remove content from library shelves deemed by the Board to be "sexually explicit." (Doc. No. 1 at ¶¶ 39, 53).[32]

Moreover, as one district court recently noted when likewise considering a request for a preliminary injunction related to the removal of books from a public school library:

> . . . [T]he injury an injunction would inflict on the District is considerable, and the public interest favors the District in this case. At issue here is a facially neutral policy, by which the District decides whether books in its libraries should be removed, that a duly elected and publicly accountable school board enacted. As previously discussed, no one disputes that the District can remove books from its libraries for numerous reasons. And, therefore, policies providing for when and why books will be removed are necessarily allowable. The specifics of such a policy— especially where, like here, the policy is facially neutral—should not easily be second-guessed by a federal court.

*C.K-W*, 619 F. Supp. at 919-20 (citing *Epperson v. State of Ark.*, 393 U.S. 97, 104 (E.D. Mo. 2022)).

Thus, Defendants would also be harmed by an injunction against "a facially neutral policy . . . that a duly elected and publicly accountable school board enacted." *Id.* at 920.

---

[32] The Court also notes that on the present Motion, it need not decide whether the Board correctly deemed a book "sexually explicit," and therefore it does not consider this issue.

Though the Court acknowledges the potential costs to Student Plaintiffs in acquiring the removed books at issue through private means, these costs do not suffice to shift the balance of equities or the public interest in favor of granting a preliminary injunction.

Thus, Plaintiffs have failed to meet their burden under *Winter* to show these requirements.

<u>CONCLUSION</u>

On the instant Motion, the issue before the Court is not whether the undersigned agrees with the propriety of removing library books from public school libraries, or whether the undersigned supports the Board's actions (generally or with respect to specific books) in particular. The only issue before the Court is whether Plaintiffs have satisfied the legal requirements underlying a request for a preliminary injunction. For the foregoing reasons, the Court finds that Plaintiffs have not satisfied all of them. In particular, in the Court's view, Plaintiffs have failed to satisfy any of the applicable four requirements, let alone all four.

Accordingly, Plaintiffs' Motion (Doc. No. 11) will be **DENIED** in an accompanying order. All other outstanding motions in this matter remain pending.

The Court notes that any views suggested herein regarding the merits of Plaintiffs' claims are subject to change based on subsequent legal argumentation, subsequent development in applicable case law, and future elucidation of relevant facts.


*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE