**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| RACHEL ROE, a minor, by and through her parent and next friend, ROBERT ROE; DAVID DOE, a minor, by and through his parent and next friend, DANA DOE; CLAIRE COE, a minor, by and through her parent and next friend, CHARLES COE; and PEN AMERICAN CENTER, INC., | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 3:25-cv-00429 |
| RUTHERFORD COUNTY BOARD OF EDUCATION; JAMES SULLIVAN, in his official capacity as Director of Rutherford County Schools, | ) ) ) ) ) | JUDGE RICHARDSON MAGISTRATE EVANS |
| Defendants. | ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' EXPEDITED MOTION FOR PROTECTIVE ORDER**

---

COME NOW Defendants, Rutherford County Board of Education and James Sullivan, in his official capacity as Director of Rutherford County Schools, by and through counsel, and file this Memorandum of Law in support of their Expedited Motion for Protective Order filed contemporaneously herewith.

## **INTRODUCTION**

"Legislative privilege protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *Parnell v. Sch. Bd. of Lake Cnty.*, No. 4:23-cv-414, 2024 WL 5508347, at *1 (N.D. Fla. Sept. 24, 2024) (quoting *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015) (emphasis omitted) (internal quotation marks and citation omitted). "It 'applies with full force against requests for information about the motives for

1

legislative votes and legislative enactments . . . .'" *Id.* (quoting *In re Hubbard*, 803 F.3d at 1310). This protection applies equally to written discovery, document production, and deposition testimony, as the privilege shields legislators from compelled examination concerning legislative acts and motivations.

The Supreme Court has interpreted the legislative privilege as shielding legislators "against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *United States v. Brewster*, 408 U.S. 501, 525 (1972). Local school boards can enjoy legislative privilege. *Parnell v. Sch. Bd. of Lake Cnty.*, No. 4:23-cv-414, 2024 WL 5508347, at *1 (N.D. Fla. Sept. 24, 2024); *Doe v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:20-CV-01023, 2021 WL 5882653 (M.D. Tenn. Dec. 13, 2021). Even assuming *arguendo* that the Board members were motivated by an improper purpose as alleged by Plaintiffs, this does not change this analysis, as "[t]he claim of an unworthy purpose does not destroy the privilege." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951).

Here, Plaintiffs attempt to reframe the Board's district-wide decisions about library materials as ordinary administrative actions to justify improper discovery into what individual members considered and reviewed in determining their votes. But the Board's actions were legislative in nature, and Plaintiffs' requests for information concerning internal deliberations, information-gathering, and subjective motivations go to the core of legislative privilege. Thus, legislative privilege squarely protects against discovery into Board members' motivations and deliberative processes. Moreover, in this civil First Amendment context, Supreme Court precedent treats legislative privilege as absolute rather than qualified. However, even under a qualified-privilege framework, the balancing factors weigh against disclosure. Finally, Plaintiffs' discovery

requests are independently improper because they seek information belonging, if at all, to individual nonparty Board members rather than to the Board as a collective entity.

<u>**LAW AND ARGUMENT**</u>

**A. Legislative Privilege Applies Because the Challenged Decisions Were Legislative in Nature**

Plaintiffs' argument incorrectly classifies the Board's decisions regarding the availability of library materials as merely administrative applications of existing policy. "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998). An act which "reflect[s] a discretionary, policymaking decision" that implicates the priorities of a public entity bears "all the hallmarks of traditional legislation." *Id.* at 55. When officials engage in forward-looking, policy-driven decisions affecting the public at large, those actions are legislative. *Parnell*, 2024 WL 5508347, at *2.

Plaintiffs' reliance on cases involving individualized permitting or personnel decisions is misplaced. Plaintiffs cite *Jaggers v. City of Alexandria* for the general proposition that legislative acts establish policy while administrative acts apply existing rules, but *Jaggers* involved a city council's rejection of a specific development plan affecting particular applicants. No. 08-5213, 2009 WL 233244, at *4 (6th Cir. Feb. 2, 2009). That kind of individualized land-use determination bears no resemblance to the district-wide, forward-looking policy decisions at issue here. Unlike the action challenged in *Jaggers*, where the legislative body was applying objective criteria to a single situation under a pre-existing policy, the Board's actions went far beyond routine administration. After receiving public input, the Board voted on whether to retain or remove certain materials through a district-wide decision-making process that included debating evaluation standards and creating a librarian advisory committee not covered by existing policy. As stated by

the Eleventh Circuit, "voting, debate and reacting to public opinion are manifestly in furtherance of legislative duties." *DeSisto Coll., Inc. v. Line*, 888 F.2d 755, 765 (11th Cir. 1989). Courts have recognized that similar decisions by school boards are legislative in both form and substance. *See Parnell v. Sch. Bd. of Lake Cnty.*, No. 4:23-cv-414, 2024 WL 5508347, at *2 (N.D. Fla. Sept. 24, 2024) (holding book-removal decision was "a quintessential policy decision" entitled to legislative privilege); *Doe v. Metro. Gov't of Nashville & Davidson Cnty.*, 2021 WL 5882653, at *5–6 (M.D. Tenn. Dec. 13, 2021) (school-board decisions involving broad policy judgments are legislative).

In *Parnell*, the court held that a school board's decision to remove a book from school libraries was legislative because it reflected a broad, forward-looking policy judgment rather than an individualized administrative act. 2024 WL 5508347, at *2. The board voted after receiving public input on a controversial issue concerning what types of books should be available to public school children. *Id*. The decision applied district-wide, rendering the book unavailable in all school libraries and to all students, and remained in effect indefinitely unless changed by a future board action. *Id.* Because the decision did not target specific individuals and instead established policy governing educational materials for the entire school system, the court concluded it was "a quintessential policy decision about how best to educate" students and therefore legislative in nature, triggering legislative privilege. *Id.*

Similarly, in *Doe*, this Court held that a school board's consideration and approval of a school budget constituted a legislative act entitled to legislative protection. The court explained that budget approval involves a general policy decision affecting the school system as a whole, rather than an action directed at any particular individual. 2021 WL 5882653, at *5–6. Although the Court acknowledged that certain personnel decisions, such as terminations or demotions, could be administrative, it emphasized that this distinction did not alter the legislative character of the

4

board's vote on the budget itself. *Id.* Because the challenged action involved a broad policy applicable district-wide, the court concluded that it was inherently legislative in nature. *Id.*

Notably, the *Parnell* Court granted a protective order prohibiting the depositions outright, reasoning that any inquiry—direct or indirect—into the board members' intent or deliberative process struck at the core of legislative privilege. 2024 WL 5508347, at *3–4. In doing so, *Parnell* relied on Supreme Court precedent in *Brewster*, and applied principles consistent with this Court's reasoning in *Doe* distinguishing *Nashville SOC* outside the voting-rights context. Accordingly, *Parnell* does not conflict with Sixth Circuit authority but instead reinforces the proper application of legislative privilege in civil First Amendment litigation involving school boards. The *Parnell* Court held, in pertinent part, as follows:

> Plaintiffs do propose some questions that are arguably independent from the members' motivations. *See, e.g.*, ECF No. 184 at 3 ("Questions about the history of the Libraries"); *id.* ("Questions about the types of books and materials in the Libraries"). But if they do not go to the motivations, they are not relevant at all. And as in *In re Hubbard*, "[t]he factual heart of [Plaintiffs'] claim and the scope of the legislative privilege [are] one and the same: the subjective motivations of those acting in a legislative capacity." 803 F.3d at 1311. Thus, "[a]ny material, documents, or information that did not go to legislative motive [is] irrelevant ..., while any that did go to legislative motive was covered by the legislative privilege." *Id.* Finally, even assuming there were some relevant and nonprivileged matters, I would, as a matter of discretion, direct that Plaintiffs seek it elsewhere before burdening elected public officials with depositions.

2024 WL 5508347, at *3–4.

Here, as in *Parnell*, the Board engaged in a forward-looking, policy-driven decision of general applicability to remove sexually explicit materials from the school system's libraries rather than a ministerial application of existing rules. The Board did not simply enforce objective criteria against a discrete set of books under a pre-existing policy. Instead, it undertook a public, deliberative process: receiving community input, debating evaluation standards, and voting on whether challenged materials should remain available in school libraries across the district. The

5

resulting decisions applied district-wide, affected all students and schools, and remained in effect indefinitely unless altered by future Board action. Like the school board in *Parnell*, the Board here made a judgment about what materials should be available to public-school students as a matter of educational policy, not an individualized administrative determination. The Board's creation of additional procedures for evaluation, an evaluative mechanism not prescribed by the written policy, further underscores that it was exercising legislative discretion to shape policy going forward, rather than merely administering existing rules. Under *Parnell*, such broad, prospective judgments concerning educational materials are "quintessential policy decision[s]" and therefore legislative in nature. *Parnell*, 2024 WL 5508347, at *2.

The Board's actions also parallel the legislative conduct identified in *Doe*, where this Court held that school board decisions involving system-wide policy judgments fall squarely within the scope of legislative activity. As in *Doe*, the challenged conduct here was not directed at particular individuals or isolated circumstances, but instead involved the adoption of standards and outcomes affecting the school system as a whole. The Board's votes determined what materials would be accessible to all students throughout the district and reflected the collective judgment of the Board about educational suitability. That the Board engaged in debate, weighed competing considerations, and adopted procedures not expressly dictated by existing policy reinforces the legislative character of its actions. Just as budget approval in *Doe* constituted a legislative act because it reflected general policy choices applicable district-wide, the Board's decisions here likewise involved the exercise of legislative judgment concerning the governance and direction of the district's educational resources. Accordingly, under *Doe*, the Board's conduct constitutes legislative activity entitled to legislative privilege. *Doe*, 2021 WL 5882653, at *5–6.

6

Plaintiffs' attempt to characterize the challenged conduct as administrative is further undermined by the scope of the Board's actions. The Board did not make an isolated, individual determination about a single book; instead, it considered and acted on a large group of books at once, adopting decisions that applied district-wide and prospectively. Courts have recognized that when a governing body's vote affects multiple subjects or individuals at the same time, the action reflects legislative judgment rather than administrative enforcement. *See, e.g., Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 401-403 (E.D.N.Y. 2018) (holding board action legislative rather than administrative where a single vote eliminated the positions of thirteen employees on a consent docket, explaining that the vote was not directed at any individual employee).

Accordingly, the Board's decisions at issue in this case constitute legislative acts entitled to legislative privilege.

### B. Legislative Privilege Protects Inquiry into Motivations and Deliberations

Legislative privilege "shields legislators from inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *United States v. Brewster*, 408 U.S. 501, 525 (1972). The privilege extends well beyond the act of voting itself and encompasses information gathering, deliberation, weighing of sources, and internal discussions undertaken in connection with legislative decision-making. *See League of United Latin Am. Citizens v. Abbott*, 708 F. Supp. 3d 870, 877-882 (W.D. Tex. 2023) ("LULAC"). The protection is not limited to documents; it equally prohibits compelled deposition testimony that would require legislators to disclose their mental impressions, deliberative processes, or subjective motivations.

The interrogatories and document requests at issue, as well as the depositions Plaintiffs seek to take, are aimed precisely at the core of what the privilege protects: Board members'

7

motivations, mental impressions, deliberative processes, and evaluative judgments about which materials to consider, which sources to consult, and how to weigh competing viewpoints. Courts consistently reject efforts to compel legislators to explain why they acted as they did or what influenced their decisions.

For example, in *Pittsfield Development, LLC v. City of Chicago*, the court illustrated the difference between discovery that impermissibly probed legislative motivation and discovery that permissibly sought objective, procedural facts. The court sustained a legislative-privilege objection to interrogatories asking about an alderman's motivations for introducing an ordinance, explaining that inquiries into a legislator's subjective reasons for proposing legislation fall squarely within the core of the privilege. No. 17 C 1951, 2019 WL 13170617, at *3 (N.D. Ill. Nov. 12, 2019). By contrast, the court overruled the privilege objection to interrogatories that sought to identify the procedures and steps leading to the zoning decision, reasoning that such questions did not probe mental impressions or deliberative priorities but instead sought factual information about the decision-making process itself. *Id.*

Here, Plaintiffs' discovery requests mirror the impermissible inquiries rejected in *Pittsfield* because they seek to probe the Board members' motivations, mental impressions, and deliberative judgments underlying legislative decisions, rather than merely objective procedural facts. Unlike the permissible interrogatories in *Pittsfield* that asked only for the steps and procedures leading to a zoning decision, Plaintiffs' interrogatories repeatedly demand explanations for *why* books were reviewed, *why* particular sources or recommendations were accepted or rejected, *why* individual Board members acted as they did, and *why* certain criteria were applied. For example, Interrogatories 3, 5, and 8 seek not just to identify processes or participants, but to elicit the Board's reasons for choosing particular review sources, criteria, or recommendations, precisely the type of

subjective legislative judgment *Pittsfield* held to be protected. Likewise, Interrogatories 9, 11, and 12 target what individual Board members read, considered, or relied upon in connection with their legislative votes, directly intruding into the "core" of legislative deliberation that *Pittsfield* shielded from discovery. Plaintiffs' document requests suffer from the same defect. Requests for Production 1 through 4 broadly seek internal communications and evaluations concerning the challenged books, necessarily revealing legislative deliberations and motivations rather than neutral, external facts about procedural steps. Because these requests go well beyond identifying objective procedures and instead seek to uncover the subjective reasoning behind legislative acts, they fall squarely within the category of discovery barred by legislative privilege.

In *League of United Latin American Citizens v. Abbott*, the court clarified that legislative privilege extends to the possession, preparation, and review of factual information when disclosure would inevitably reveal a legislator's deliberative process. 708 F. Supp. 3d 870, 877 (W.D. Tex. 2023). While the court recognized that underlying facts, standing alone, are not always privileged, it explained that disclosure becomes impermissible where it would reveal which facts a legislator considered, emphasized, or disregarded in reaching a legislative decision. *Id.* Testimony or documents indicating a legislator's focus, such as what materials were reviewed or not reviewed, or whether a legislator "did not recall" certain information, would necessarily expose deliberative priorities and are therefore protected. *Id.* Because requests for such information function as indirect probes into legislative motivation and mental impressions, the court held they fall within the core protections of legislative privilege. *Id.*

Here, as in *League of United Latin American Citizens v. Abbott*, Plaintiffs' discovery requests impermissibly seek to uncover legislative deliberations by demanding disclosure of what information Board members reviewed, relied upon, or disregarded in reaching their decisions.

Although Plaintiffs characterize their requests as seeking only "underlying facts," compelling Board members to identify the materials, sources, or reviews they considered would necessarily expose which information they deemed important, how they framed the issue, and what they chose not to credit. Such inquiries do not merely seek neutral facts. Requiring disclosure of what was reviewed or not reviewed would inevitably reveal the mental impressions underlying the Board's legislative judgments, including how individual members came to their decision to vote on the challenged books.

Because Plaintiffs' requests would expose the very deliberative processes that legislative privilege is designed to protect, they fall squarely within the core of the privilege.

### C. Defendant Sullivan Is Entitled to Legislative Privilege to the Extent He Participated in the Legislative Process

Plaintiffs are incorrect that legislative privilege is categorically unavailable to Defendant Sullivan. This Court has previously found that when evaluating whether there is a claim for legislative immunity, courts are to evaluate the "function" performed by the individual claiming the privilege, that is, whether the function performed was "legislative" or "administrative," not whether the entity in which the individual was operating was necessarily a legislative body. *Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:07-0979, 2009 WL 1952780, at *4 (M.D. Tenn. July 2, 2009). Accordingly, government officials outside of the legislative branch still enjoy legislative immunity for legislative functions. *Id.* To the extent Plaintiffs seek discovery into communications, analyses, or recommendations that Defendant Sullivan prepared for or provided to the Board in connection with its legislative deliberations, that material is likewise protected. Legislative privilege extends to information exchanged between legislators and advisors or staff involved in the legislative process. *See LULAC*, 708 F. Supp. at 878.

10

Moreover, Plaintiffs' contention that they are entitled to the requested information from Defendant Sullivan, even if legislative privilege applies to the Board, is undermined by how their discovery requests were drafted. Plaintiffs served a single, undifferentiated set of interrogatories and requests for production on both Defendants, without tailoring the requests to the distinct roles of the Board and Defendant Sullivan. Several of the requests at issue are directed to matters uniquely within the Board's legislative sphere, not to Defendant Sullivan in his capacity as Director of Schools.

For example, Interrogatories Nos. 9, 11, and 12 seek information concerning what individual Board members reviewed, read, or relied upon in connection with the book-removal decisions, and Requests for Production Nos. 1–4 seek internal communications and evaluations reflecting the Board's deliberative process. To the extent such discovery is relevant at all, it pertains to the Board's legislative decision-making and is subject to legislative privilege. Plaintiffs cannot avoid that privilege by directing identical discovery to Sullivan and arguing that he must respond simply because he is not a legislator. Where discovery seeks to probe the Board's legislative deliberations or motivations, the privilege applies regardless of how the request is captioned. Therefore, Plaintiffs cannot circumvent the Board's legislative privilege by directing the same discovery to Defendant Sullivan.

Further, Sullivan does not have possession, custody, or control over the personal review materials, mental impressions, or deliberative communications of individual Board members. He cannot be compelled to produce records he does not possess or testify about matters outside his personal knowledge. But to the extent Plaintiffs contend that some responsive information may exist concerning decisions or actions undertaken by Defendant Sullivan independent of the Board's legislative deliberations, that argument underscores the defect in Plaintiffs' discovery. Plaintiffs

11

did not tailor their interrogatories or requests for production to distinguish between legislative acts of the Board and any separate administrative actions allegedly taken by Sullivan in his role as Director of Schools. Instead, they served overbroad, undifferentiated discovery directed jointly to both Defendants.

For example, many of Plaintiffs' discovery requests are vague and overbroad because they do not include clear time limits and do not distinguish between the Board's legislative actions and Defendant Sullivan's separate administrative role. Interrogatory No. 3 asks for "all book review sources considered by Defendants" without any defined time frame and without clarifying whether it is directed to the Board's legislative deliberations or to Sullivan's independent actions. Likewise, Requests for Production Nos. 1 through 4 seek "all" policies, memoranda, and communications "discussing or evaluating" removed books from July 1, 2023 to the present, without limiting the requests to the specific books challenged in this case or to non-legislative conduct by Sullivan. Other requests, including Interrogatories Nos. 5 and 8, ask Defendants to explain processes, criteria, and reasons for decisions without specifying whether Plaintiffs seek information about the Board or about Sullivan acting administratively. As written, these undifferentiated requests force Defendants to guess at their scope and risk disclosure of privileged legislative material, hence Defendants' objections to these requests.

To the extent Plaintiffs seek non-privileged information concerning discrete administrative decisions made by Sullivan that were not presented to or considered by the Board, such requests must be clearly framed, narrowly tailored, and directed to those actions specifically. As drafted, however, Plaintiffs' discovery impermissibly requests privileged legislative material. *See Pittsfield Dev.*, 2019 WL 13170617, at *3 (holding that a request for "notes of all meetings" over a multi-year period was overbroad and explaining that although some responsive materials might be non-

12

privileged, the breadth and lack of tailoring required the requesting party to narrow the request to avoid encompassing documents protected by the legislative privilege).

Accordingly, Defendant Sullivan is entitled to invoke legislative privilege for communications, analyses, and recommendations made in connection with the Board's legislative functions, and to the extent Plaintiffs' vague and overbroad requests seek other information, they must be narrowed to specify the information sought.

### D. Plaintiffs Have Not Shown That the Privilege Should Be Overcome

The legislative privilege "exists in two flavors – qualified and absolute." *Clayland Farm Enters., LLC v. Talbot Cnty., Maryland*, No. CV GLR-14-03412, 2018 WL 4700191, at *2 (D. Md. Oct. 1, 2018). Legislative privilege is qualified "in federal criminal cases brought against individual legislators, or where important federal interests" cause comity to yield. *Id.*; *Bethune-Hill v. Virginia State Bd. of Elections*, 114 F. Supp. 3d 323, 335 (E.D. Va. 2015). On the other hand, absolute legislative privilege is appropriate in civil suits vindicating private rights. *Id.* Plaintiffs nevertheless treat the legislative privilege here as qualified—a characterization that is not supported by Supreme Court or Sixth Circuit precedent.

The United States Supreme Court case of *United States v. Gillock* underscores that legislative privilege is absolute rather than "qualified" in this context. In *Gillock*, the Government prosecuted a Tennessee state senator on federal bribery and corruption charges and sought to introduce evidence of his legislative acts. *United States v. Gillock*, 445 U.S. 360, 362–64 (1980). The defendant senator argued that legislative privilege barred the use of that evidence, relying on *Tenney v. Brandhove*, 341 U.S. 367 (1951), a case where the Court had previously recognized an absolute legislative privilege. *Id.* at 366–68. The *Gillock* Court rejected this argument and distinguished *Tenney* on the ground that *Tenney* involved a civil action brought by a private

plaintiff, not a criminal enforcement action. 445 U.S. at 371–73. The Court explained that its prior immunity and privilege cases "have drawn the line at civil actions." *Id.* The Court further explained that applying the privilege in civil cases is supported by the presumption of the existence of federal criminal liability as a restraining factor on the conduct of state officials. *Id.* By contrast, the Court held that "although principles of comity command careful consideration, our cases disclose that ***where important federal interests are at stake, as in the enforcement of federal criminal statutes***, comity yields." *Id.* at 373 (emphasis added).

This case is a federal civil rights lawsuit, not a criminal prosecution. The Supreme Court has not extended its reasoning in *Gillock* to cases arising under the First Amendment. In fact, both before and after *Gillock*, the Supreme Court recognized an absolute legislative privilege in civil First Amendment cases. *Tenney v. Brandhove*, which was cited by the *Gillock* court, involved allegations that a committee's investigative hearing was a sham legislative proceeding designed to intimidate and punish him for circulating a petition, thereby, *inter alia*, violating his First Amendment rights to free speech and petition. The court affirmed the district court's dismissal of the suit, recognizing that "the individual defendants and the legislative committee were acting in a field where legislators traditionally have power to act." *Tenney*, 341 U.S. at 379. The Court further stated that "the privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Id.* at 377.[1]

---

[1] The *Tenney* opinion uses the terms immunity and privilege interchangeably. To the extent *Tenney* was concerned with legislative immunity, rather than privilege, this is immaterial as "legislative immunity and privilege are 'parallel concept[s],' and the privilege 'exists to safeguard' the immunity." *Florida v. Byrd*, 674 F. Supp. 3d 1097, 1103 n.2 (N.D. Fla. 2023) (alteration in original) (quoting *E.E.O.C. v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180-81 (4th Cir. 2011)); *see also Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018) ("While *Tenney*'s holding rested upon a finding of immunity, its logic supports extending the corollary legislative privilege from compulsory testimony to state and local officials as well.").

14

After *Gillock*, the Supreme Court addressed the absolute nature of legislative immunity in civil First Amendment litigation in *Bogan v. Scott-Harris*, where a municipal employee alleged that local officials eliminated her position in retaliation for her protected speech. *Bogan v. Scott-Harris*, 523 U.S. 44, 47–49 (1998). The Court unanimously reversed a jury verdict in the plaintiff's favor, holding that state and local officials are absolutely immune from suit under § 1983 for acts taken "in the sphere of legitimate legislative activity," regardless of alleged retaliatory motive. *Id.* at 54–55. Importantly, the Court emphasized that "it simply is not consonant with our scheme of government for a court to inquire into the motives of legislators." *Id.* at 54 (citations omitted) (internal quotation marks omitted).

Where no federal criminal enforcement interests are at stake and the claims instead mirror the civil First Amendment challenges in *Tenney* and *Bogan*, Supreme Court precedent establishes that legislative privilege is absolute, not qualified. Consistent with that precedent, there is no binding Sixth Circuit authority holding that legislative privilege is categorically qualified in civil litigation—much less in the First Amendment context.

Plaintiffs' reliance on *Nashville Student Organizing Committee v. Hargett* to argue that legislative privilege is merely qualified in this Circuit is misplaced. *Nashville SOC* arose in the distinct context of a voting-rights challenge, and the court's discussion of a qualified legislative privilege was expressly tethered to that setting. 123 F. Supp. 3d 967, 970–71 (M.D. Tenn. 2015). As the court explained, "[i]n cases involving constitutional challenges related to voting rights, the vast majority of federal courts have found that the federal common law also affords state legislators only a qualified … legislative privilege." *Id.* at 970 (emphasis added). The court then surveyed redistricting and voter-ID cases and applied a balancing framework which was developed specifically in the voting rights context. *Id.* at 970–72. Nothing in *Nashville SOC* purports to hold

15

that legislative privilege is always qualified in civil cases, nor does it extend that approach beyond the voting-rights context.

Moreover, this Court has already recognized that *Nashville SOC* does not announce a generally applicable rule governing legislative privilege in civil litigation. In *Doe v. Metropolitan Government of Nashville & Davidson County*, this Court distinguished *Nashville SOC* on the ground that it arose in the unique context of a voting-rights challenge to a state statute, where evidence of legislative intent was unusually difficult to obtain outside the legislative process. 2021 WL 5882653, at *4. The Court emphasized that *Nashville SOC*'s holding was tethered to those specific circumstances. *Id.* The Court thus declined to apply the *Nashville SOC* factors and held that the privilege applied. *Id.* Consistent with *Doe*, Plaintiffs here are not challenging a state statute, and they possess multiple avenues of discovery that do not require intrusion into legislative deliberations. Accordingly, *Nashville SOC* does not support Plaintiffs' attempt to recast legislative privilege as merely qualified in this case.

However, even assuming, *arguendo*, that legislative privilege is qualified in this context, Plaintiffs have not carried their burden to overcome it. The five-factor balancing test applied by some courts does not support compelled disclosure here. The balancing test urged by Plaintiffs examines: "(1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the 'seriousness' of the litigation and the issues involved; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Nashville SOC*, 123 F. Supp. 3d at 969. Taken together, these factors do not favor disclosure.

First, while Plaintiffs assert relevance, the legal import of individual Board members' subjective motivations is limited because the Board acts as a whole through its official

proceedings. *See Pittsfield Dev.*, 2019 WL 13170617, at *3 (holding that the relevance factor neither favors nor disfavors disclosure because an individual council member's motivations, corrupt or otherwise, cannot be attributed to the City Council as a whole and, therefore, the "legal import of [the council member]s motivations is questionable"). ***Notably, this Court previously recognized that its inquiry in this case "is really focused on the Board's collective motivation, as opposed to the motivation of individual Board members or the motivation of the Board majority in adopting and implementing Board Policy 4.403."*** (Memorandum Opinion, DE 45 at PageID# 20; 21 n.17) (emphasis added). Therefore, this factor neither favors nor disfavors disclosure.

Second, Plaintiffs have access to substantial alternative evidence, including Board minutes, full recordings of the Board's deliberations, public statements, and policy text to use as evidence of the Board's motivations. The second factor weighs in favor of application of legislative privilege when plaintiffs can rely on public hearing minutes and statements made by lawmakers during debate to prove alleged discriminatory intent. *See Virginia State Conf. NAACP v. Cnty. Sch. Bd. of Shenandoah Cnty.*, No. 5:24-CV-040, 2025 WL 2585686, at *4 (W.D. Va. Sept. 5, 2025).

Third, while Plaintiffs raise constitutional claims, courts have held that the mere presence of constitutional issues does not automatically override legislative privilege. *See Plain Local Sch. Dist. Bd. of Educ. v. DeWine*, 464 F. Supp. 3d 915, 923–24 (S.D. Ohio 2020).[2] Moreover, the Supreme Court has specifically recognized in First Amendment cases like this that allegations of

---

[2] While the Southern District of Ohio acknowledged a qualified legislative privilege, it declined to apply the five-factor balancing test commonly used in voting-rights cases. 464 F. Supp. 3d 915, 934–36 (S.D. Ohio 2020). Instead, the court emphasized that legislative privilege protects inquiry into legislative deliberation and motivation and expressly "decline[d] to find that this case warrants overcoming the qualified privilege as to such covered information." *Id.* at 936. Thus, even where courts have described the privilege as qualified outside the voting rights context, they have continued to shield legislative deliberations and motives from discovery absent extraordinary circumstances.

unconstitutional motive do not permit judicial inquiry into legislative deliberations or intent. *Tenney*, 341 U.S. at 377–78; *Bogan*, 523 U.S. at 54–55.

Fourth, compelling legislators to testify about their individual motivations would directly intrude on the legislative function at the core of the challenged conduct. Plaintiffs argue that this Court has already recognized that the evidence Plaintiffs seek is highly relevant to their claims, focusing on a section of single footnote in this Court's Memorandum Opinion stating that "an inquiry into the Board's motivation necessarily involves an examination of the comments and motivations of individual Board members." (Memorandum Opinion, DE 45 at PageID# 20; 21 n.17). Plaintiffs' reliance on this isolated observation ignores the broader context of the Court's ruling. In the same Memorandum Opinion, the Court denied Plaintiffs' request for preliminary injunctive relief and concluded that Plaintiffs failed to demonstrate a likelihood of success on the merits of their First Amendment claims. *See* Memorandum Opinion, DE 45 at PageID# 519–21 (holding that Plaintiffs had not shown that the Board removed books "solely because [it] disagree[d] with the views expressed in the books" and finding that the record instead reflected content-based decisions grounded in legitimate pedagogical concerns).

Moreover, the Court's observation does not suggest that disclosure of legislators' privileged internal deliberations, mental impressions, or confidential communications is required for Plaintiffs to prove their claim. To the contrary, the Court expressly explained that "its inquiry is really focused on the *Board's* collective motivation, as opposed to the motivation of individual Board members or the motivation of the Board majority in adopting and implementing Board Policy 4.403." (Memorandum Opinion, DE 45 at PageID# 20; 21 n.17). Thus, the court recognized the significance that the Board's actions which are the subject of this case were made by the Board as a collective entity after discussion and deliberation, not by any single Board Member. An

18

inquiry into legislative purpose may be assessed through publicly available and non-privileged evidence, such as policy text, minutes, statements made in open meetings, and statements from social media and news outlets without forcing legislators to explain their subjective reasoning or deliberative thought processes.

Finally, compelling disclosure of internal legislative deliberations would chill future legislative decision-making by discouraging candid discussion, debate, and compromise, precisely the harm legislative privilege is designed to prevent. Contrary to Plaintiffs' argument, that chilling effect does not disappear merely because Plaintiffs have sued the Board as an entity rather than naming individual Board members as defendants. Legislative bodies act only through their members, and discovery that forces disclosure of individual legislators' internal personal thoughts necessarily affects how legislators conduct themselves in future proceedings. Legislative privilege exists to prevent that result, and it applies with equal force regardless of whether individual Board Members are sued.

Thus, even if the Court were to apply a qualified-privilege framework, the balancing of factors confirms that legislative privilege has not been overcome and that compelled disclosure of legislators' internal deliberations is unwarranted.

### E. Plaintiffs Have Not Established Waiver

Plaintiffs' waiver argument also fails. Legislative privilege is waived only when privileged deliberative material is shared with someone outside the deliberative process. *See LULAC*, 708 F. Supp. 3d 870, 886. General public statements, political advocacy, or explanations of votes are not sufficient to waive the privilege as to information that was not made public, such as internal deliberations, mental impressions, or non-public communications.

19

In *LULAC*, the court explained that waiver of legislative privilege turns on whether the disclosure at issue made the information publicly accessible. 708 F. Supp. at 886. The court held that legislators do not waive the privilege merely by communicating with individuals or entities outside the legislature or by involving third parties in the legislative process. *Id.* Rather, legislative privilege is waived only when legislators transmit privileged documents or information to third parties who are outside the legislative process in a manner that renders the information public. *Id.* Where materials are shared with third parties who are functioning within the legislative process and are not made publicly accessible, the privilege is not waived. *Id.* By contrast, when privileged information is disseminated publicly, the legislator has revealed it beyond the legislative process, resulting in waiver. *Id.*

Here, Plaintiffs point to various instances in which certain specific single Board Members made public statements online or spoke to the media, but they do not identify any disclosure of privileged deliberative material. The statements cited reflect general opinions, personal views, or explanations consistent with positions expressed during public meetings, which have already been disclosed in discovery. For example, statements attributed to Board Member Frances Rosales express personal concern and general reasoning, but do not disclose internal deliberations, confidential communications, or mental impressions of other legislators. Likewise, public statements by Board Members Vaughn, Vaught, and Tidwell, whether to the press or on social media, do not reveal nonpublic legislative materials or deliberative processes. To the extent any information contained in these statements was public, Plaintiffs already have access to that information and are free to use that information as they see fit. But the public availability of certain statements does not operate as a waiver of legislative privilege as to other, undisclosed deliberative materials. Plaintiffs cannot use selective public commentary as a gateway to compel production of

20

privileged internal communications or to obtain discovery for which no waiver has occurred. Legislators routinely speak publicly about their decisions, but that does not mean everything discussed or considered privately becomes subject to discovery.

Moreover, Plaintiffs' waiver argument is limited to statements by only four Board Members—Tidwell, Rosales, Vaughn, and Vaught—and Plaintiffs make no showing that any alleged waiver by those individuals could extend to the deliberations, documents, or mental impressions of other Board Members. Nor do Plaintiffs contend that any of the cited statements entitle them to discovery from Board Members who made no public statements at all. Accordingly, Plaintiffs have failed to establish any waiver of legislative privilege, either as to the Board collectively or as to any individual member beyond the narrow scope of information already available from public sources.

### F. Independently of Legislative Privilege, Plaintiffs' Discovery Requests Are Improper Because They Seek Individual Board Members' Motivations and Personal Documents from the Board as an Entity

Defendants' objection to providing information regarding Board Members' motivations and documents reviewed by each Board Member is independently supported by its objections that Plaintiffs' requests to the Board were directed to matters considered privately by individual Board Members, not matters upon which the Board itself deliberated as an entity, and that the Board cannot be compelled to produce documents in the personal custody of individual members.

None of these Board Members were sued individually. The Board as an entity cannot speculate as to the mental impressions of the board members. Interrogatories to the Board are not the appropriate way to get this information, even if it was not privileged. *See Carr-Lambert v. Grant Cnty. Bd. of Educ.*, No. 2:09-CV-61, 2011 WL 13309047, at *2 (N.D.W. Va. Aug. 15, 2011) (holding that the school board adequately responded to discovery requesting the reasoning behind

each member's vote by stating that it had no responsive information and could not speak for the individual board members, and explaining that the board as an entity could not know this information and that plaintiffs should have directed discovery to individual board members rather than the board itself).

Even assuming, *arguendo*, that the legislative privilege did not apply as urged by Plaintiffs, the discovery requests at issue here would still be improper. The Board cannot speak to what individual members read, reviewed, or relied upon in casting their votes. The Board also cannot be compelled to produce individual-level deliberative materials that the Board does not possess in any centralized or institutional form and are instead in the personal custody of individual Board members.

### G. *In Camera* Review Is Not Appropriate

Plaintiffs ask the Court to adopt the *in camera* review procedure used in *Nashville SOC*, permitting discovery to proceed subject to privilege assertions and judicial review of sealed testimony and documents. That approach is inappropriate here for several reasons. First, as explained above, *Nashville SOC* arose in the narrow context of a voting-rights challenge to a state statute where this Court found the legislative privilege to be qualified. This case presents no such circumstances, and the privilege asserted by Defendants in this context is absolute. Requiring legislators to testify or produce documents subject to later *in camera* review would undermine the very protections legislative privilege is designed to afford. Legislative privilege is intended to shield legislators from the burden, disruption, and chilling effect of compelled disclosure into their deliberations—not merely to prevent the ultimate use of privileged material at trial. *See Tenney*, 341 U.S. at 377 ("The privilege would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial . . .").

22

Allowing discovery to proceed first and sorting out privilege later would force legislators to participate in precisely the inquiries the privilege exists to prevent. The same principle applies equally to written discovery and depositions: requiring legislators to sit for examination on matters within the legislative sphere—even subject to later objection or review—undermines the privilege itself by compelling participation in the very process the doctrine forbids. Where, as here, the privilege is absolute and the requests go directly to the heart of the privilege, any review—including *in camera* review—is inappropriate.

## CONCLUSION

For the foregoing reasons, the legislative privilege applies to the discovery at issue and bars inquiry—whether through written discovery or deposition testimony—into the Board Members' and Director's legislative motivations and deliberative processes. Accordingly, Defendants respectfully request that the Court grant their Expedited Motion for Protective Order and provide such further relief as is necessary to safeguard the protections afforded by the legislative privilege and ensure orderly discovery.

**Respectfully submitted,**

**HUDSON, REED & CHRISTIANSEN, PLLC**

**By: /s/ Nick C. Christiansen**
      **JEFF REED, #15000**
      **NICK C. CHRISTIANSEN, #30103**
      **JASON N. KING, #027749**
      16 Public Square North
      P.O. Box 884
      Murfreesboro, TN 37133
      (615) 893-5522
      jreed@mborolaw.com
      nchristiansen@mborolaw.com
      jking@mborolaw.com

      *Attorneys for Defendants*

23

## CERTIFICATE OF SERVICE

I certify that on February 19, 2026 a true and correct copy of the foregoing Memorandum of Law in Support of Defendants' Expedited Motion for Protective Order was served on all parties via the District Court's electronic filing system.

| | |
|---|---|
| **Anand Agneshwar**<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>Amand.Agneshwar@arnoldporter.com | **Lucas Cameron – Vaughn**<br>ACLU<br>PO Box 120160<br>Nashville, TN 37212<br>lucas@aclu-tn.org |
| **Dori Ann Hanswirth**<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>Dori.Hanswirth@arnoldporter.com | **Theresa House**<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>Theresa.House@arnoldporter.com |
| **Kerry E. Knox**<br>Castelli & Knox, LLP<br>117 S Academy Street<br>Murfreesboro, TN 37130<br>kek@castelliknox.com | **Zee Scout**<br>ACLU of Tennessee<br>P.O. Box 120160<br>Nashville, TN 37212<br>zscout@aclu-tn.org |
| **Leah Novak**<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>Leah.Novak@arnoldporter.com | **Zoe Rachael Staum**<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>Zoe.Staum@arnoldporter.com |

**/s/Nick C. Christiansen**
**Nick C. Christiansen**