| | | |
|---|---|---|
| RACHEL ROE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  3:25-cv-00429 |
| | ) | |
| RUTHERFORD COUNTY BOARD OF EDUCATION, et al. | ) | JUDGE RICHARDSON |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

COME NOW Defendants Rutherford County Board of Education and James Sullivan, in his official capacity as Director of Rutherford County Schools (collectively, "Defendants"), by and through counsel, and in response to Plaintiffs' Motion and Memorandum of law in Support of Plaintiffs' Motion to Compel Documents, Interrogatory Responses and Deposition Testimony (DE 71) would state as follows:

## INTRODUCTION

Legislative privilege shields legislators "against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *United States v. Brewster*, 408 U.S. 501, 525 (1972). This includes requests for information about the motives for legislative votes and legislative enactments.  *Parnell v. Sch. Bd. of Lake Cnty.*, No. 4:23-cv-414, 2024 WL 5508347, at *1 (N.D. Fla. Sept. 24, 2024).  Local school boards can enjoy legislative privilege. *Id.*; *Doe v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:20-CV-01023, 2021 WL 5882653 (M.D. Tenn. Dec. 13, 2021). Even assuming *arguendo* that the Board members were motivated by an improper purpose as alleged by Plaintiffs, this does not change this analysis, as "[t]he claim of

an unworthy purpose does not destroy the privilege." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951).

The Board Members and Dr. Sullivan assert legislative privilege over the discovery at issue, as set forth in the declarations filed contemporaneously herewith. Although Plaintiffs attempt to reframe the Board's district-wide decisions about library materials as ordinary administrative actions to justify improper discovery into what individual members considered and reviewed in determining their votes, the Board's actions were legislative in nature, and Plaintiffs' requests for information concerning internal deliberations, information-gathering, and subjective motivations go to the core of legislative privilege. Thus, legislative privilege squarely protects against the discovery sought. Moreover, in this civil First Amendment context, Supreme Court precedent treats legislative privilege as absolute rather than qualified. However, even under a qualified-privilege framework, the balancing factors weigh against disclosure.

## LAW AND ARGUMENT

## I. PLAINTIFFS ARE NOT ENTITLED TO THE DISCOVERY SOUGHT

The Court should deny Plaintiffs' Motion to Compel (DE 71) because the discovery sought is protected by the legislative privilege. The acts at issue are legislative in nature and the discovery improperly seeks to inquire into the motivation of the Board members for their legislative actions. Moreover, the privilege extends to factual material that inevitably reveals the motivation of the Board members and to third-party materials that were part of the legislative process.

### A. The Documents and Information Sought are protected by the Legislative Privilege

#### 1. Legislative Privilege Protects Inquiry into Motivations and Deliberations, including Factual Information that Reveals Those Motivations

Legislative privilege "shields legislators from inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *United States v. Brewster*,

408 U.S. 501, 525 (1972). The privilege extends well beyond the act of voting itself and encompasses information gathering, deliberation, weighing of sources, and internal discussions undertaken in connection with legislative decision-making. *See League of United Latin Am. Citizens v. Abbott*, 708 F. Supp. 3d 870, 877-882 (W.D. Tex. 2023) ("LULAC"). The protection is not limited to documents; it equally prohibits compelled deposition testimony that would require legislators to disclose their mental impressions, deliberative processes, or subjective motivations.

Plaintiffs mischaracterize the discovery sought as "discovery of factual information, publicly available materials, or third-party communications" not subject to the privilege. (DE 71 at PageID# 789). However, the interrogatories and document requests at issue, as well as the depositions Plaintiffs seek to take, are aimed precisely at the core of what the privilege protects: Board members' motivations, mental impressions, deliberative processes, and evaluative judgments about which materials to consider, which sources to consult, and how to weigh competing viewpoints. Courts consistently reject efforts to compel legislators to explain why they acted as they did or what influenced their decisions.

In *League of United Latin American Citizens v. Abbott*, the court clarified that legislative privilege extends to the possession, preparation, and review of factual information when disclosure would inevitably reveal a legislator's deliberative process. *LULAC*, 708 F. Supp. at 877. While the court recognized that underlying facts, standing alone, are not always privileged, it explained that disclosure becomes impermissible where it would reveal which facts a legislator considered, emphasized, or disregarded in reaching a legislative decision. *Id.* at 877-78.[1] Testimony or

---

[1] The LULAC court explained that the privilege includes more than simply voting for or against an action. It covers "material prepared for a legislator's understanding of legislation, lobbying conversations encouraging a vote on pending legislation, and even materials the legislator possesses related to potential legislation" including "any discussions and agreements ... prior to the vote, regardless of whether those discussions and agreements took place in secret" and "material provided by or to third parties involved in the legislative process" because all of these actions occur "within the regular course of the legislative process." *LULAC*, 708 F. Supp. at 877 (internal citations omitted).

3

documents indicating a legislator's focus, such as what materials were reviewed or not reviewed, or whether a legislator "did not recall" certain information, would necessarily expose deliberative priorities and are therefore protected. *Id.* at 878. "The legislative privilege extends further than either other privilege when it comes to bare facts." *Id.* Because requests for such information function probe legislative motivation and mental impressions, the court held they fall within the core protections of legislative privilege. *Id.*

Here, as in *LULAC*, Plaintiffs' discovery requests impermissibly seek to uncover legislative deliberations by demanding disclosure of what information Board members reviewed, relied upon, or disregarded in reaching their decisions. Although Plaintiffs characterize their requests as seeking only "underlying facts," compelling Board members to identify the materials, sources, or reviews they considered would necessarily expose which information they deemed important, how they framed the issue, and what they chose not to credit. Such inquiries do not merely seek neutral facts. Requiring disclosure of what was reviewed or not reviewed would inevitably reveal the mental impressions underlying the Board's legislative judgments, including how individual members came to their decision to vote on the challenged books. *See also Pittsfield Dev., LLC v. City of Chicago*, No. 17 C 1951, 2019 WL 13170617, at *3 (N.D. Ill. Nov. 12, 2019).[2]

For these same reasons, Plaintiffs' objections to Defendants' privilege log also fail. Requiring Defendants to provide detailed descriptions of privileged legislative materials would inevitably reveal the very deliberative processes, internal analyses, and mental impressions the privilege is designed to shield. Such granular logging is not required where the discovery requests

---

[2] In *Pittsfield*, the court sustained a legislative-privilege objection to interrogatories seeking a legislator's motivations for proposing an ordinance, while allowing only limited discovery into objective procedural steps. 2019 WL 13170617, at *3. Plaintiffs' requests here fall squarely within the impermissible category because they seek explanations for why books were reviewed, why particular sources or recommendations were accepted or rejected, what individual Board members read or relied upon, and the reasons underlying the Board's decisions. *See, e.g.*, Interrogatories 3, 5, 8, 9, 11, 12; Requests for Production 1–4. These requests necessarily probe legislative motivations and deliberative judgments rather than neutral procedural facts and therefore fall within the core of the privilege.

target core legislative activity. In *In re Hubbard*, the Eleventh Circuit held that lawmakers adequately invoked legislative privilege without specifically designating each document because the subpoenas sought information about legislative motives—the very subject the privilege protects. 803 F.3d 1298, 1310–11 (11th Cir. 2015). The court explained that Rule 45 requires only enough information to "enable the parties to assess the claim." *Id.* at 1310 (quoting Fed. R. Civ. P. 45(e)(2)(A)(ii)). The same reasoning applies here. Plaintiffs' discovery requests seek information concerning legislators' motivations, deliberations, and evaluative judgments—matters squarely within the legislative sphere. Where "the factual heart" of the claim is legislative motive, any responsive material either would be irrelevant or would be privileged, making detailed document-by-document logging unnecessary. *See In re Hubbard*, 803 F.3d at 1311. Requiring Defendants to catalog such materials with specificity would defeat the privilege's core purpose of shielding lawmakers from intrusive inquiry into the legislative process itself. Accordingly, Defendants' privilege log provides sufficient information under the circumstances and Plaintiffs' challenge to the privilege log therefore provides no basis to compel production.

In sum, because Plaintiffs' requests seek information at the core of the legislative process, the legislative privilege applies and bars the requested discovery.[3]

### 2. The Privilege Applies Because the Challenged Decisions Were Legislative in Nature

Plaintiffs' argument incorrectly classifies the Board's decisions regarding the availability of library materials as merely administrative applications of existing policy. "Whether an act is

---

[3] And, to the extent Plaintiffs seek remain in the personal custody of individual members instead of the Board, the Board cannot speak to what individual members read, reviewed, or relied upon in casting their votes, nor can the Board be compelled to produce materials that are not in its possession, custody, or control. *See Carr-Lambert v. Grant Cnty. Bd. of Educ.*, No. 2:09-CV-61, 2011 WL 13309047, at *2 (N.D.W. Va. Aug. 15, 2011) (holding that a school board adequately responded to discovery seeking the reasoning behind each member's vote by stating it had no responsive information and could not speak for individual members).

5

legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998). An act which "reflect[s] a discretionary, policymaking decision" that implicates the priorities of a public entity bears "all the hallmarks of traditional legislation." *Id*. at 55. When officials engage in forward-looking, policy-driven decisions affecting the public at large, those actions are legislative. *Parnell*, 2024 WL 5508347, at *2; *see also Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1062-63 (11th Cir. 1992) (explaining that legislative acts "involve[ ] line-drawing" on matters of general concern).

The decisions at issue in this case parallel those in *Doe v. Metro. Gov't of Nashville & Davidson Cnty.*, 2021 WL 5882653, at *5–6 (M.D. Tenn. Dec. 13, 2021), in which this Court held that a school board's consideration and approval of a school budget constituted a legislative act entitled to legislative protection. The court explained that budget approval involves a general policy decision affecting the school system as a whole, rather than an action directed at any particular individual. 2021 WL 5882653, at *5–6. Although the Court acknowledged that certain personnel decisions could be administrative, it emphasized that this distinction did not alter the legislative character of the board's vote on the budget itself. *Id.* Because the challenged action involved a policy that was applicable district-wide, the court concluded that it was inherently legislative in nature. *Id.*

As in *Doe*, the challenged conduct here was not directed at a particular individual or isolated circumstance, but instead involved the adoption of standards and outcomes affecting the school system as a whole. The Board's votes determined what content would be accessible to all students throughout the district and reflected the collective judgment of the Board about educational suitability. The Board's treatment of specific titles, as shown on the Board minutes submitted contemporaneously herewith, demonstrates that it exercised discretionary judgment

6

through individualized votes and deliberation rather than applying a predetermined rule.[4,5] That the Board engaged in debate, weighed competing considerations, and adopted procedures not expressly dictated by existing policy reinforces the legislative character of its actions. Just as budget approval in *Doe* constituted a legislative act because it reflected general policy choices applicable district-wide, the Board's decisions here likewise involved the exercise of legislative judgment concerning the governance and direction of the district's educational resources, *i.e.*, what materials will be available in publicly funded institutions. Accordingly, like in *Doe*, the Board's conduct constitutes legislative activity entitled to legislative privilege. *Doe*, 2021 WL 5882653, at *5–6.

The Board's actions here also parallel the legislative conduct at issue in *Parnell v. School Board of Lake County*, where the court held that a school board's decision to remove a book from school libraries was legislative because it reflected a broad, forward-looking policy judgment rather than an individualized administrative act. 2024 WL 5508347, at *2. The board voted after receiving public input on a controversial issue concerning what types of books should be available to public school children. *Id*. The decision applied district-wide, rendering the book unavailable in all school libraries and to all students, and remained in effect indefinitely unless changed by future

---

[4] Federal Rule of Evidence 201 governs judicial notice of adjudicative facts. The Rule, in relevant part, provides that "[t]he Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2). The Board materials submitted herewith are public records maintained on the Board of Education's official government website and therefore fall squarely within Rule 201. Therefore, this Court may take judicial notice of such public records.

[5] The decisions reflected in the Board meeting records exhibited herewith reflect policy choices and "line drawing" characteristic of legislative processes as opposed to selections from a predetermined option set indicative of bureaucratic administration. *Yeldell* at 1056. That the Board engaged in debate, weighed competing considerations, and took actions not expressly dictated by existing policy reinforces the legislative character of its actions. *See, e.g.*, *A Love Story Starring My Dead Best Friend* (Board Minutes, Apr. 9, 2025), *Speak* (Board Minutes, Jan. 23, 2025), *To All the Boys I've Loved Before* (Board Minutes, Jan. 9, 2025). In addition, on February 6, 2025, the Board considered dozens of titles as part of a single review and voted on them in batches rather than individually, reflecting a broad policy determination rather than case-by-case application of a fixed rule.

7

board action. *Id.* Because the decision did not target specific individuals and instead established policy governing educational materials for the entire school system, the court concluded it was "a quintessential policy decision about how best to educate" students and therefore legislative in nature, triggering legislative privilege. *Id.*[6, 7]

Here, like in *Parnell*, Plaintiffs' attempt to characterize the challenged conduct as administrative is undermined by the scope of the Board's actions. The Board did not make an isolated determination about a single title or a single school; instead, it considered numerous books together and adopted decisions that applied district-wide and prospectively. Plaintiffs argue that the school board in *Parnell* made ad hoc determinations, whereas the Board here "plainly took an administrative step when it applied the Policy to the Subject Books" by evaluating whether particular titles were "Age Appropriate," and further contend that the decisions merely enforced the Age Appropriate Materials Act. But the fact that the Board acted in light of a statute does not transform its policymaking judgments into administrative enforcement. Legislative bodies routinely exercise discretion within statutory frameworks when determining how best to implement their legislative objectives. Nor does the existence of Board Policy 4.403 (attached to Plaintiffs' Complaint as DE 1-1) convert the Board's independent legislative actions into administrative ones. The Policy assigns responsibility for day-to-day library collection

---

[6] Other courts have recognized that when a governing body's vote affects multiple subjects or individuals at the same time, the action reflects legislative judgment rather than administrative enforcement. *See, e.g., Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 401-403 (E.D.N.Y. 2018) (holding board action legislative rather than administrative where a single vote eliminated the positions of thirteen employees on a consent docket, explaining that the vote was not directed at any individual employee).

[7] Notably, in *Parnell*, the court recently granted summary judgment to the school board, holding that removal of books from school libraries did not implicate students' or authors' First Amendment rights. *Parnell*, 802 F. Supp. 3d 1361, 1365 (N.D. Fla. 2025) (citing *Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir.) (en banc), cert. pending). The court explained that, whether viewed as government speech or not, selecting which books to include in a library does not create a forum for private expression and therefore does not trigger First Amendment protection. *Id.* at 1367–68. It further observed that removing a book from a school library does not suppress access to the ideas within it, because students remain free to obtain the book elsewhere, and that libraries have always exercised judgment about which materials belong in their collections. *Id.* at 1369–70.

development and review to school officials and administrators—not to the Board—and establishes standards to guide those personnel in curating materials at the school level.

For example, the Policy provides that "[t]he Assistant Superintendent for Curriculum and Instruction or his/her designee shall be responsible for library collection development" and requires librarians to review materials for suitability, including whether they are "suitable for and consistent with the educational mission of the school" and "appropriate for the age and maturity levels of the students who may access them." Board Policy 4.403, DE 1-1. The complaint procedures likewise contemplate a school-level process before the Board becomes involved. Board Policy 4.403, DE 1-1. Nothing in the Policy purports to bind the Board's own authority, restrict the Board from acting on its own initiative, or prescribe procedures governing how the Board must proceed when acting in the absence of the appeal procedure described in the Policy. Even when the Board serves as an additional layer of review, the Policy vests it with discretion to "evaluate the material" and determine whether it is appropriate and consistent with the educational mission, with the Board's decision deemed "final." Board Policy 4.403, DE 1-1. Thus, when the Board acts, it is not mechanically applying pre-existing rules but exercising policy judgment informed by the same general principles embedded in the Policy to determine, on a district-wide basis, what content should be available to students. And here, the Board developed additional procedures for evaluating challenged materials that were not prescribed by the written policy—such as empaneling the Review Committee—in order to aid the Board in developing a library collection compliant with state law moving forward. When making the challenged decisions, the Board received public input, debated appropriate standards, considered system-wide educational concerns, and voted on the degree to which certain content should remain accessible in all school libraries. These functions are inherently legislative rather than administrative.

9

The government-speech nature of the Board's actions further confirms that they are legislative rather than administrative. When a governmental body selects and presents materials for its own programs, it is not regulating private speech but "speaks for itself" through the messages it chooses to convey. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009). Such decisions inherently involve policy judgments about educational goals and public resources and therefore bear "all the hallmarks of traditional legislation." *Bogan*, 523 U.S. at 55. Accordingly, the Board's decisions at issue in this case constitute legislative acts entitled to legislative privilege.

Plaintiffs cite *PEN American Center, Inc. v. Escambia County School Board* for the proposition that a school board book removal decision is "functionally an administrative act." 787 F. Supp. 3d 1292, 1297-98 (N.D. Fla. 2024). In that case, the school board removed or restricted access to several school library books after receiving complaints from a county teacher alleging that the materials contained pornography, explicit language, or inappropriate themes. *PEN Am. Ctr., Inc.*, 787 F. Supp. at 1296–97. The books were removed under a policy adopted pursuant to a Florida law that required school boards to adopt policies for handling community members' objections to specific instructional materials and to provide a process for reviewing and resolving such challenges. *Id.* at 1297 (citing Fla. Stat. § 1006.28(2)(a)). Under the policy, a district review committee evaluated challenged books using a form that was prescribed by the State and then the committee's decision would be appealed to the board for a final determination. *Id.* The court found that on those facts, the board was performing "functionally administrative" tasks by applying existing standards to individual books rather than formulating general standards that apply to all book, and that legislative immunity did not apply. *Id.* at 1297.

10

The facts of this case do not compel the same result. Unlike the procedure at issue in *PEN Am. Ctr., Inc.,* the Board's actions here did not arise from the Board acting in an appellate capacity on individual complaints or applying existing standards to specific books. Moreover, while the Florida statute at issue in *PEN Am. Ctr., Inc.* prescribed a specific challenge form and required school boards to apply procedures for evaluating those challenges, the Age-Appropriate Materials Act of 2022, T.C.A. § 49-6-3801, *et seq.*, gives local school boards in Tennessee discretion to maintain a library collection that is age-appropriate for school children and suitable for, and consistent with, a school's educational mission. T.C.A. § 49-6-3803. Here, the Board undertook a district-wide review initiative aimed at managing publicly-owned educational resources for all students across the district. And those decisions would influence media specialists' decisions in purchasing library materials going forward. Accordingly, *PEN Am. Ctr., Inc.* does not undermine the application of legislative privilege here.

Accordingly, the Board's actions constitute legislative activity—rather than administrative enforcement—and are therefore entitled to legislative privilege.

### 3. Information from Non-Board Members is not Categorically Excluded from the Privilege

Plaintiffs are incorrect that legislative privilege is categorically unavailable to protect information submitted by third parties. This Court has previously held that the inquiry turns on the "function" performed—not the official's title or whether he is a member of a legislative body. *Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:07-0979, 2009 WL 1952780, at *4 (M.D. Tenn. July 2, 2009). Government officials outside the legislative branch may invoke legislative immunity when performing legislative functions. *Id.*

The legislative privilege is available to Defendant Sullivan to the extent he participated in the legislative process. Legislative privilege extends to communications between legislators and

11

their advisors or staff. *See LULAC*, 708 F. Supp. at 878. Sullivan is directly employed by the Board. *See* Sullivan Declaration filed contemporaneously herewith. Thus, to the extent Sullivan prepared, provided, or communicated analyses, recommendations, or information to the Board in connection with its legislative deliberations, those activities fall within the legislative process and are protected. Accordingly, Sullivan may invoke legislative privilege for communications, analyses, and recommendations made in connection with the Board's legislative functions, and Plaintiffs' vague and overbroad discovery cannot be used to defeat that privilege.[8]

The legislative privilege also protects deliberation into materials submitted by third party constituents, including advocacy groups, experts, or members of the public, where such materials were received, considered, or used by legislators in connection with legislative decision-making. *See LULAC*, 708 F. Supp. 3d at 877–78 (explaining that the privilege covers "information gathering, deliberation, and communication with aides and others" undertaken as part of the legislative process); *Brewster*, 408 U.S. at 525 (protecting acts that occur in the "regular course of the legislative process"). If legislative privilege could be defeated simply because the underlying information originated outside the legislature, the privilege would be meaningless.

Plaintiffs contend that, because Board member Rosales submitted a request to remove certain books using a process available to members of the public, communications related to her submission cannot be privileged. That argument misapprehends the scope of the privilege.

---

[8] Plaintiffs served a single, undifferentiated set of requests on both Defendants, many of which seek information uniquely within the Board's legislative sphere—such as what Board members reviewed or relied upon and internal communications reflecting the Board's deliberations. Plaintiffs cannot circumvent the Board's legislative privilege simply by directing the same discovery to Sullivan and asserting that he must respond because he is not a legislator. Where discovery probes legislative deliberations or motivations, the privilege applies regardless of how the request is captioned. Further, Sullivan does not have possession, custody, or control over individual Board members' personal materials, mental impressions, or deliberative communications, nor can he testify to matters outside his personal knowledge. To the extent Plaintiffs seek non-privileged information concerning discrete administrative actions taken by Sullivan, their requests fail to identify those matters. Instead, they are vague, overbroad, and untethered to any clear time frame or non-legislative conduct, thereby risking disclosure of privileged material.

Legislative privilege does not turn on the identity of the speaker, but on whether the communication is part of the legislative process. *See Johnson*, 2009 WL 1952780, at *4. Thus, regardless of the capacity in which Board member Rosales initially submitted materials for consideration, once those materials were received and considered by the Board as part of its deliberations, they became part of the legislative decision-making process and are protected by the privilege.

Accordingly, the mere fact that persons outside of the Board participated in the legislative process does not render such communications outside the scope of the legislative privilege, and Plaintiffs' motion to compel those materials should be denied.

### B. Plaintiffs Have Not Shown That the Privilege Should Be Overcome

Plaintiffs contend that the legislative privilege should yield in this case, but they have not shown any basis for overcoming the privilege, and even under a qualified-privilege framework the relevant factors weigh against disclosure.

#### 1. The Privilege is Not Qualified in This Context

The legislative privilege "exists in two flavors – qualified and absolute." *Clayland Farm Enters., LLC v. Talbot Cnty., Maryland*, No. CV GLR-14-03412, 2018 WL 4700191, at *2 (D. Md. Oct. 1, 2018). Legislative privilege is qualified "in federal criminal cases brought against individual legislators, or where important federal interests" cause comity to yield. *Id.*; *Bethune-Hill v. Virginia State Bd. of Elections*, 114 F. Supp. 3d 323, 335 (E.D. Va. 2015). On the other hand, absolute legislative privilege is appropriate in civil suits vindicating private rights. *Id.*

United States Supreme Court precedent underscores that legislative privilege is absolute rather than "qualified" in this context. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977), the Supreme Court recognized that "[i]n some

extraordinary instances the members [of the decision-making body—which in that case was a municipal planning commission] might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege," citing *Tenney v. Brandhove*, 429 U.S. 252, 268 (1977).[9] The Court further warned that placing officials "on the stand" to probe their motivations is "usually to be avoided" because such inquiries constitute a "substantial intrusion into the workings of other branches of government." *Id.* at 268, n.18. Subsequently, in *United States v. Gillock*, the Supreme Court declined to extend this reasoning to federal criminal prosecutions. *See United States v. Gillock*, 445 U.S. 360, 362–64 (1980) (explaining that its prior immunity and privilege cases "have drawn the line at civil actions," that applying the privilege in civil cases is supported by the presumption of the existence of federal criminal liability as a restraining factor on the conduct of state officials, and that "***where important federal interests are at stake, as in the enforcement of federal criminal statutes***, comity yields.") (emphasis added).

This case is not a criminal prosecution, nor does it involve the "important federal interests" contemplated by *Gillock*. The Supreme Court has not extended its reasoning in *Gillock* to cases arising under the First Amendment. In fact, after *Gillock*, the Supreme Court addressed the absolute nature of legislative immunity in civil First Amendment litigation in *Bogan v. Scott-Harris*, where a municipal employee alleged that local officials eliminated her position in retaliation for her protected speech. *Bogan v. Scott-Harris*, 523 U.S. 44, 47–49 (1998). The Court unanimously reversed a jury verdict in the plaintiff's favor, holding that state and local officials are absolutely

---

[9] *Tenney* has long been understood to support not only immunity from suit but also protection against compelled disclosure of legislative motives. Plaintiffs' suggestion that *Tenney* is limited to legislative immunity and does not inform the evidentiary privilege ignores the Supreme Court's reliance on *Tenney* in addressing compelled testimony from legislators. *Village of Arlington Heights*, 429 U.S. at 268 (1977) (citing *Tenney v. Brandhove*, 341 U.S. 367 (1951)).

immune from suit under § 1983 for acts taken "in the sphere of legitimate legislative activity," regardless of alleged retaliatory motive. *Id.* at 54–55. Importantly, the Court emphasized that "it simply is not consonant with our scheme of government for a court to inquire into the motives of legislators." *Id.* at 54 (citations omitted) (internal quotation marks omitted). *See also Tenney*, 341 U.S. at 377 ("the privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives"); *Virginia Uranium, Inc. v. Warren,* 587 U.S. 761, 775–76 (2019) (warning that routine federal inquiries into legislative motives would "stifle deliberation in state legislatures and encourage resort to secrecy and subterfuge," undermining the "open and vigorous legislative debate" essential to lawmaking).[10]

Consistent with that precedent, there is no binding Sixth Circuit authority holding that legislative privilege is categorically qualified in civil litigation—much less in the First Amendment context. Plaintiffs' extensive reliance on voting rights cases is misplaced here. *Nashville Student Organizing Committee v. Hargett* arose in the distinct context of a voting-rights challenge, and the court's discussion of a qualified legislative privilege was expressly tethered to that setting. 123 F. Supp. 3d 967, 970–71 (M.D. Tenn. 2015). As the court explained, "[i]n cases involving constitutional challenges related to voting rights, the vast majority of federal courts have found that the federal common law also affords state legislators only a qualified … legislative privilege." *Id.* at 970 (emphasis added). The court then surveyed redistricting and voter-ID cases and applied a balancing framework which was developed specifically in the voting rights context. *Id.* at 970–72. Nothing in *Nashville SOC* purports to hold that legislative privilege is always qualified in civil

---

[10] The Court further emphasized that courts should avoid such "misadventures into hidden state legislative intentions without a clear statutory mandate." *Id.* at 776. Attempting to ascribe a collective intent to a multi-member legislative body is especially problematic because individual legislators often act for "multiple and unexpressed purposes," making motive inquiries speculative and unreliable. *Id.* at 776–77.

cases, nor does it extend that approach beyond the voting-rights context. *See Olivier v. City of Brandon, Mississippi*, No. 24-993, 2026 WL 783725, at *7 (U.S. Mar. 20, 2026) ("This Court has often cautioned that "general language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering").[11]

Moreover, this Court has already recognized that *Nashville SOC* does not announce a generally applicable rule governing legislative privilege in civil litigation. In *Doe v. Metropolitan Government of Nashville & Davidson County*, this Court distinguished *Nashville SOC* on the ground that it arose in the unique context of a voting-rights challenge to a state statute, where evidence of legislative intent was unusually difficult to obtain outside the legislative process. 2021 WL 5882653, at *4. The Court emphasized that *Nashville SOC*'s holding was tethered to those specific circumstances. *Id.* The Court thus declined to apply the *Nashville SOC* factors and held that the privilege applied. *Id.* Consistent with *Doe*, Plaintiffs here are not challenging a state statute, and they possess multiple avenues of discovery that do not require intrusion into legislative deliberations through the public record that has already been produced in discovery and from other sources. Accordingly, *Nashville SOC* does not support Plaintiffs' attempt to recast legislative privilege as merely qualified in this case.

---

[11] The Michigan district court cases relied on by Plaintiffs—*Michigan State A. Philip Randolph Inst. v. Johnson*, No. 16-CV-11844, 2018 WL 1465767 (E.D. Mich. Jan. 4, 2018) and  *Loesel v. City of Frankenmuth*, 2010 WL 456931, at *5-6 (E.D. Mich. Feb. 4, 2010) likewise do not support Plaintiffs' position that the privilege should be qualified in the First Amendment context. *Michigan State A. Philip Randolph Inst.* arose in the voting-rights and Equal Protection context and expressly relied on precedent addressing constitutional challenges involving alleged racial discrimination in election laws, where legislative intent may be central. Id. at *4. *Michigan State A. Philip Randolph Inst.* does not purport to extend that reasoning to the First Amendment context. *Loesel* is also inapposite because it bases its entire reasoning on the incorrect statement that *Gillock* stands or the proposition that "a legislative privilege did not apply to state legislators." *Loesel*, 2010 WL 456931, at *5 (E.D. Mich. Feb. 4, 2010). Rather than holding that the privilege is qualified, *Loesel* takes it so far to say the privilege does not exist at all. *Id*. This of course is entirely incorrect and contrary to Supreme Court precedent. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977) (recognizing that testimony "concerning the purpose of the official action . . . frequently will be barred by privilege.")

Thus, Plaintiffs have not demonstrated that the legislative privilege is qualified in this context, and it therefore applies in full to bar the discovery sought.

## 2. The Balancing Test Suggested by Plaintiffs Weighs Against Disclosure

Even assuming, *arguendo*, that legislative privilege is qualified in this context, Plaintiffs have not carried their burden to overcome it. The five-factor balancing test—considering relevance, availability of other evidence, seriousness of the issues, the government's role, and the risk of chilling future deliberations—does not support compelled disclosure here. *See Nashville SOC*, 123 F. Supp. 3d at 969.

### a. The Evidence Sought Is Not Sufficiently Relevant to Plaintiffs' Claims

What motivates one legislator "is not necessarily what motivates . . . others." *United States v. O'Brien*, 391 U.S. 367, 383–84 (1968). *See also American Trucking Associations, Inc. v. Alviti*, 14 F. 4th 76, 88 (1st Cir. 2021) (recognizing the limited probative value of evidence concerning individual lawmakers' motives).

Here, the legal import of individual Board members' subjective motivations is limited because the Board acts as a whole through its official proceedings. *See Pittsfield Dev.*, 2019 WL 13170617, at *3 (holding that the relevance factor neither favors nor disfavors disclosure because an individual council member's motivations, corrupt or otherwise, cannot be attributed to the City Council as a whole and, therefore, the "legal import of [the council member]s motivations is questionable"). ***Notably, this Court previously recognized that its inquiry in this case "is really focused on the Board's collective motivation, as opposed to the motivation of individual Board members or the motivation of the Board majority in adopting and implementing Board Policy 4.403."*** (Memorandum Opinion, DE 45 at PageID# 20; 21 n.17) (emphasis added).

Plaintiffs argue that this Court has already recognized that the evidence Plaintiffs seek is highly relevant to their claims, focusing on a section of single footnote in this Court's Memorandum Opinion stating that "an inquiry into the Board's motivation necessarily involves an examination of the comments and motivations of individual Board members." (Memorandum Opinion, DE 45 at PageID# 20; 21 n.17). However, the Court's observation does not suggest that disclosure of legislators' privileged internal deliberations, mental impressions, or confidential communications is required for Plaintiffs to prove their claim. To the contrary, the Court expressly explained that "its inquiry is really focused on the *Board's* collective motivation, as opposed to the motivation of individual Board members or the motivation of the Board majority in adopting and implementing Board Policy 4.403." (Memorandum Opinion, DE 45 at PageID# 20; 21 n.17). Thus, the Court recognized the significance that the Board's actions which are the subject of this case were made by the Board as a collective entity after discussion and deliberation (again, the public record on these matters has already been produced in discovery), not by any single Board Member.[12]  Therefore, this factor neither favors nor disfavors disclosure.

### b. Alternative Means Exist for Plaintiffs to Obtain Direct Evidence of the Board's Motivations

The second factor weighs in favor of application of legislative privilege where plaintiffs can rely on public hearing minutes and statements made by lawmakers during debate to prove alleged discriminatory intent. *See Virginia State Conf. NAACP v. Cnty. Sch. Bd. of Shenandoah Cnty.*, No. 5:24-CV-040, 2025 WL 2585686, at *4 (W.D. Va. Sept. 5, 2025). Even where legislative

---

[12] Plaintiffs' reliance on this isolated observation also ignores the broader context of the Court's ruling. In the same Memorandum Opinion, the Court denied Plaintiffs' request for preliminary injunctive relief and concluded that Plaintiffs failed to demonstrate a likelihood of success on the merits of their First Amendment claims. *See* Memorandum Opinion, DE 45 at PageID# 519–21 (holding that Plaintiffs had not shown that the Board removed books "solely because [it] disagree[d] with the views expressed in the books" and finding that the record instead reflected content-based decisions grounded in legitimate pedagogical concerns).

motive is central to a plaintiff's claim, that fact alone does not justify piercing the privilege. As the court explained in *Parnell*, "the factual heart of [plaintiffs'] claim and the scope of the legislative privilege [are] one and the same: the subjective motivations of those acting in a legislative capacity," meaning that materials addressing motive are protected, while materials that do not address motive are irrelevant. *Parnell*, 2024 WL 5508347, at *4 (quoting *In re Hubbard*, 803 F.3d at 1311).[13]

Here, Plaintiffs have access to substantial alternative evidence, including Board minutes, full recordings of the Board's deliberations, public statements, and policy text to use as direct evidence of the Board's motivations. Further, Plaintiffs rely on press interviews and public comments by individual Board members to support their waiver argument, citing multiple news articles quoting Board members about the book-removal decisions, which demonstrates that Plaintiffs possess additional evidence beyond the Board's formal meeting records. (DE 71 at PageID# 20–22).[14] And in addition to these publicly available documents and videos, Defendants have produced 399 pages of records. These sources are sufficient evidence of intent without

---

[13] The *Parnell* Court held, in pertinent part, as follows:

> Plaintiffs do propose some questions that are arguably independent from the members' motivations. *See, e.g.*, ECF No. 184 at 3 ("Questions about the history of the Libraries"); *id.* ("Questions about the types of books and materials in the Libraries"). But if they do not go to the motivations, they are not relevant at all. And as in *In re Hubbard*, "[t]he factual heart of [Plaintiffs'] claim and the scope of the legislative privilege [are] one and the same: the subjective motivations of those acting in a legislative capacity." 803 F.3d at 1311. Thus, "[a]ny material, documents, or information that did not go to legislative motive [is] irrelevant ..., while any that did go to legislative motive was covered by the legislative privilege." *Id.* Finally, even assuming there were some relevant and nonprivileged matters, I would, as a matter of discretion, direct that Plaintiffs seek it elsewhere before burdening elected public officials with depositions.

2024 WL 5508347, at *3–4.

[14] Notably, none of the news articles submitted by Plaintiffs are authenticated as required by Federal Rule of Evidence 901, nor do they fall within any exception to the rule against hearsay under Federal Rules of Evidence 801 and 802. Accordingly, Defendants object on grounds that they are not competent evidence and cannot be relied upon to support Plaintiffs' assertions regarding waiver.

forcing legislators to explain their subjective reasoning or deliberative thought processes. Therefore, this factor weighs against disclosure.

### c. The Federal Interests at Stake are Not Sufficiently Serious

While Plaintiffs raise constitutional claims, courts have held that the mere presence of constitutional issues does not automatically override legislative privilege. *See Plain Local Sch. Dist. Bd. of Educ. v. DeWine*, 464 F. Supp. 3d 915, 923–24 (S.D. Ohio 2020).[15] Moreover, the Supreme Court has specifically recognized in First Amendment cases like this that allegations of unconstitutional motive do not permit judicial inquiry into legislative deliberations or intent. *Tenney*, 341 U.S. at 377–78; *Bogan*, 523 U.S. at 54–55. Unlike the federal criminal prosecution in *Gillock*, 445 U.S. 360 (1980), or the voting-rights cases where courts have found overriding federal interests, *see, e.g., Nashville Student Org. Comm.*, 123 F. Supp. 3d at 970–71, no such extraordinary federal interests are present here.

This case does not involve a prior restraint, the suppression of private speech, or any prohibition on access to ideas. Plaintiffs do not allege that Defendants have prohibited anyone from reading, owning, possessing, or discussing any book. Instead, the challenged conduct concerns only the local school board's decision regarding what materials to include in its own school library collection. As recognized by this Court, "the Board has not banned or proscribed student speech as such. Instead, it has exercised its discretion over library collections in a context that is inherently subject to content curation." (Memorandum Opinion, DE v45, PageID# 546). The First Amendment protects the right to receive information from private speakers, but it does

---

[15] While the Southern District of Ohio acknowledged a qualified legislative privilege, it declined to apply the five-factor balancing test commonly used in voting-rights cases. 464 F. Supp. 3d 915, 934–36 (S.D. Ohio 2020). Instead, the court emphasized that legislative privilege protects inquiry into legislative deliberation and motivation and expressly "decline[d] to find that this case warrants overcoming the qualified privilege as to such covered information." *Id.* at 936. Thus, even where courts have described the privilege as qualified outside the voting rights context, they have continued to shield legislative deliberations and motives from discovery absent extraordinary circumstances.

20

not entitle individuals to demand that the government provide particular content. *See Little v. Llano Cnty.*, 138 F.4th 834, 845 (5th Cir. 2025) ("It is one thing to tell the government it cannot stop you from receiving a book… It is another thing for you to tell the government which books it must keep in the library. The First Amendment does not give you the right to demand that."). Nor does the Free Speech Clause regulate the government's own expression. *See Walls v. Sanders*, 2025 WL 1948450, at *6 (8th Cir. July 16, 2025) ("Since the speech belongs to the government, it gets to control what it says."). Because this case concerns only a local school board's judgment regarding its own libraries, it does not present the type of extraordinary federal interests sufficient to override legislative privilege. Accordingly, this factor does not favor disclosure.

### d. The Role of the Government in this Litigation is Typical and Does Not Favor Disclosure

As to the fourth factor, the role of the government in this litigation is not unusual but is typical of any lawsuit challenging governmental action in which legislative privilege would ordinarily apply. The Board is defending the legality of policy decisions made through its legislative processes, precisely the circumstance in which courts recognize the need to protect legislative deliberations from compelled disclosure. The fact that the government is a party to this suit—a fact typical of cases applying the legislative privilege—it at most neutral, and is outweighed by the remaining factors, which strongly weigh against intrusion into legislative motivations and deliberative processes.

### e. Compelled Disclosure Would Chill Future Legislative Deliberations

The fifth factor strongly weighs against disclosure in this case. Compelling disclosure of internal legislative deliberations would chill future legislative decision-making by the Board by discouraging candid discussion, debate, and compromise, precisely the harm legislative privilege

21

is designed to prevent. Contrary to Plaintiffs' argument, that chilling effect does not disappear merely because Plaintiffs have sued the Board as an entity rather than naming individual Board members as defendants. Legislative bodies act only through their members, and discovery that forces disclosure of individual legislators' internal personal thoughts necessarily affects how legislators conduct themselves in future proceedings.

This concern is especially significant in the public-school context, where the Board is charged with making policy decisions affecting the education and welfare of children. As the Sixth Circuit put it, "[l]ocal control over the public school . . . is one of this nation's most deeply rooted and cherished traditions." *Id.* at 762-763 (citing *Milliken v. Bradley*, 418 U.S 717, 741-42 (1974)).[16] Requiring Board members to disclose their internal deliberations about sensitive educational matters would undermine that discretion, deter candid debate, and impair the Board's ability to fulfill its statutory responsibility to manage and control its public schools. Because these decisions necessarily involve protecting children and balancing competing community concerns, this factor weighs strongly against disclosure.

Thus, even if the Court were to apply a qualified-privilege framework, the balancing of factors confirms that legislative privilege has not been overcome and that compelled disclosure of legislators' internal deliberations is unwarranted.

---

[16] School officials operate *in loco parentis*—"standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them"—and therefore have a duty to protect students while they are in the custody of the school. *See Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 189 (2021); *Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 357 (6th Cir. 2023). Thus, school systems must exercise judgment to ensure that materials are "suitable for the age and maturity levels of the students who may access the materials" and "suitable for, and consistent with, the educational mission of the school." T.C.A. § 49-6-3803(a). "Local school officials, better attuned than [the courts] to the concerns of the parents/taxpayers who employ them, must obviously be accorded wide latitude in choosing which pedagogical values to emphasize, and in choosing the means through which those values are to be promoted." *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989).

### C. Plaintiffs Have Not Established Waiver

Plaintiffs' waiver argument also fails. Legislative privilege is waived only when privileged deliberative material is shared with someone outside the deliberative process. *See LULAC*, 708 F. Supp. 3d at 886. General public statements, political advocacy, or explanations of votes are not sufficient to waive the privilege as to information that was not made public, such as internal deliberations, mental impressions, or non-public communications.

In *LULAC*, the court explained that waiver of legislative privilege turns on whether the disclosure at issue made the information publicly accessible. 708 F. Supp. at 886. The court held that legislators do not waive the privilege merely by communicating with individuals or entities outside the legislature or by involving third parties in the legislative process. *Id.* Rather, legislative privilege is waived only when legislators transmit privileged documents or information to third parties who are outside the legislative process in a manner that renders the information public. *Id.* Where materials are shared with third parties who are functioning within the legislative process and are not made publicly accessible, the privilege is not waived. *Id.* By contrast, when privileged information is disseminated publicly, the legislator has revealed it beyond the legislative process, resulting in waiver. *Id.*

Here, Plaintiffs point to various instances in which certain Board Members made public statements online or spoke to the media, but they do not identify any disclosure of privileged deliberative material. The statements attributed to Board Members Rosales, Vaught, and Tidwell reflect general opinions, personal views, or explanations consistent with positions expressed during public meetings, which have already been disclosed in discovery and do not reveal nonpublic legislative materials or deliberative processes. To the extent any information contained in these statements was public, Plaintiffs already have access to that information and are free to

use that information as they see fit. But the public availability of certain statements does not operate as a waiver of legislative privilege as to other, undisclosed deliberative materials. Plaintiffs cannot use selective public commentary as a gateway to compel production of privileged internal communications or to obtain discovery for which no waiver has occurred. Legislators routinely speak publicly about their decisions, but that does not mean everything discussed or considered privately becomes subject to discovery.

Moreover, Plaintiffs' waiver argument is limited to statements by only three Board Members—Tidwell, Rosales, and Vaught—and Plaintiffs make no showing that any alleged waiver by those individuals could extend to the deliberations, documents, or mental impressions of other Board Members. Nor do Plaintiffs contend that any of the cited statements entitle them to discovery from Board Members who made no public statements at all. Accordingly, Plaintiffs have failed to establish any waiver of legislative privilege, either as to the Board collectively or as to any individual member beyond the narrow scope of information already available from public sources.

### D. *In Camera* Review Is Not Appropriate

Plaintiffs ask the Court to adopt the *in camera* review procedure used in *Nashville SOC*, permitting discovery to proceed subject to privilege assertions and judicial review of sealed testimony and documents. That approach is inappropriate here for several reasons. First, as explained above, *Nashville SOC* arose in the narrow context of a voting-rights challenge to a state statute where this Court found the legislative privilege to be qualified. This case presents no such circumstances, and the privilege asserted by Defendants in this context is absolute. Second, requiring Defendants to fully respond to these improper discovery requests on matters within the legislative sphere—even subject to later objection or review—undermines the privilege by compelling participation in the very process the doctrine forbids. Legislative privilege is intended

24

to shield legislators from the burden, disruption, and chilling effect of compelled disclosure into their deliberations—not merely to prevent the ultimate use of privileged material at trial. *See Tenney*, 341 U.S. at 377. The burden would be especially acute here given the sweeping scope of Plaintiffs' requests, which seek explanations for "all" review sources considered, the reasons underlying each removal decision, what individual Board members read or relied upon, and broad categories of communications over an extended period. *In camera* review would be especially inappropriate here, where Plaintiffs' sweeping requests effectively demand that Defendants "produce everything" related to the challenged decisions and undertake the substantial burden of locating, compiling, and submitting vast categories of legislative materials for judicial review.

Where, as here, the privilege is absolute and the requests go directly to the heart of the privilege, any review—including *in camera* review—is inappropriate.

## **CONCLUSION**

For the foregoing reasons, the legislative privilege applies to the discovery at issue and bars inquiry—whether through written discovery or deposition testimony—into the Board Members' and Director's legislative motivations and deliberative processes. Accordingly, Defendants respectfully request that the Court deny Plaintiffs' Motion to Compel (DE 71) issue a Protective Order pursuant to F.R.C.P. 37(a)(5)(B) protecting Defendant from having to respond to the discovery that is the subject of Plaintiffs' Motion to Compel, including protection from having to produce a detailed privilege log, award Defendant its reasonable expenses incurred in opposing Plaintiffs' Motion to Compel (DE 71), and provide such further relief as is necessary to safeguard the protections afforded by the legislative privilege and ensure orderly discovery.

Respectfully submitted,

HUDSON, REED & CHRISTIANSEN, PLLC

By: **/s/ Nick C. Christiansen**
     **JEFF REED, #15000**
     **NICK C. CHRISTIANSEN, #30103**
     **JASON N. KING, #027749**
     16 Public Square North
     P.O. Box 884
     Murfreesboro, TN  37133
     (615) 893-5522
     jreed@mborolaw.com
     nchristiansen@mborolaw.com
     jking@mborolaw.com

     *Attorneys for Defendants*

26

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on <u>**March 27, 2026**</u> a true and correct copy of the foregoing document was served on all parties via the District Court's electronic filing system.

| | |
|---|---|
| **Anand Agneshwar**<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>Amand.Agneshwar@arnoldporter.com | **Lucas Cameron – Vaughn**<br>ACLU<br>PO Box 120160<br>Nashville, TN 37212<br>lucas@aclu-tn.org |
| **Dori Ann Hanswirth**<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>Dori.Hanswirth@arnoldporter.com | **Theresa House**<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>Theresa.House@arnoldporter.com |
| **Kerry E. Knox**<br>Castelli & Knox, LLP<br>117 S Academy Street<br>Murfreesboro, TN 37130<br>kek@castelliknox.com | **Zee Scout**<br>ACLU of Tennessee<br>P.O. Box 120160<br>Nashville, TN 37212<br>zscout@aclu-tn.org |
| **Leah Novak**<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>Leah.Novak@arnoldporter.com | **Zoe Rachael Staum**<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>Zoe.Staum@arnoldporter.com |

<u>**/s/Nick C. Christiansen**</u>
**Nick C. Christiansen**